# EXHIBIT 30

# In The Matter Of:

*CHEVRON CORP v*
*STEVEN DONZIGER, ET AL*

---

*September 25, 2012*

---

*SOUTHERN DISTRICT REPORTERS*

*500 PEARL STREET*

*NEW YORK, NY 10007*

*212 805-0330*

Original File C9PDCHEM.txt

Min-U-Script® with Word Index

CHEVRON CORP v
STEVEN DONZIGER, ET AL                                    September 25, 2012

| C9pdchem | Conference | Page 1 |

```
 1  UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
 2  ------------------------------x
 3  CHEVRON CORPORATION,
 4              Plaintiff,
 5        v.                    11 Civ. 691 (LAK)
 6  STEVEN DONZIGER, et al.,
 7              Defendants.
 8  ------------------------------x
 9                        September 25, 2012
                              11:20 a.m.
10
    Before:
11
               HON. LEWIS A. KAPLAN
12
                              District Judge
13
               APPEARANCES
14
    GIBSON DUNN & CRUTCHER
15       Attorneys for Plaintiff
    BY:  RANDY MASTRO
16       LAUREN ELLIOT
         PETER SELEY
17       ANNE CHAMPION
         BILL W. THOMSON
18       RICHARD MARK
19
    GOMEZ LLC
20       Attorneys for Hugo Geraldo Cammacho and
         Javier Piaguaje
21  BY:  JULIO C. GOMEZ
            - and -
22  SMYSER KAPLAN & VESELKA, LLP
    BY:  GARLAND "Land" D. MURPHY IV
23
    LEADER & BERKON
24       Attorneys for Non-Party
         Patton Boggs LLP
25  BY:  JAMES K. LEADER
```

| C9pdchem | Conference | Page 2 |

```
 1            APPEARANCES CONTINUED
 2          - also present -
 3  PATTON BOGGS LLP
       Non-Party Respondent
 4  BY:  ERIC WESTENBERGER
       EDWARD YENNOCK
 5     JONATHAN PECK
 6              oOo
 7        THE CLERK:  Chevron against Donziger.
 8        Counsel for plaintiff Chevron, are you ready?
 9        MR. MASTRO:  I'm ready, your Honor.
10        THE CLERK:  Counsel for defendants Cammacho and
11  Piaguaje, are you ready?
12        MR. MURPHY:  Yes, your Honor.  We are ready.
13        MR. GOMEZ:  Yes, your Honor.
14        THE CLERK:  And counsel for Patton Boggs, are you
15  ready?
16        MR. LEADER:  Yes, we are.
17        THE COURT:  Mr. Leader, right?
18        MR. LEADER:  Yes.  Good morning, your Honor.
19        THE COURT:  Long time no see.
20        MR. LEADER:  Yes, sir.
21        THE COURT:  Nice to see you again.
22        MR. LEADER:  Thank you, your Honor.  Nice to see you
23  as well.
24        Could I have just one housekeeping matter before we
25  start the formal proceeding?
```

| C9pdchem | Conference | Page 3 |

```
 1        THE COURT: Yes.
 2        MR. LEADER: I would like to introduce to the Court
 3  the managing partner of Patton Boggs Ed Newberry.  Obviously,
 4  his law firm has a substantial interest in today's proceedings
 5  and he wanted to be here.
 6        THE COURT: I gather.  He will be more than welcome.
 7        MR. LEADER: Thank you.
 8        THE COURT: Also on the subject of housekeeping, since
 9  this was scheduled, I drew a 34-defendant indictment in which I
10  have to have an initial appearance at 2:30.  So we are going to
11  go until the lunch break and then we will resume, depending on
12  what I'm told about whether it is really feasible to go for a
13  half hour or so before that starts, either right after the
14  lunch break and then break again or resume after that
15  conference, which will probably be done by about 3, if we are
16  not done by then.
17        MR. LEADER: Your Honor, I have a religious problem
18  after 2 or 3 o'clock.
19        THE COURT: Well, OK.  So we will do the best we can
20  and just continue on another day.
21        MR. LEADER: I would appreciate that, your Honor.
22        THE COURT: All right.  Now, before we get started
23  this morning, I think it is useful to put what we are doing in
24  context.
25        I'm not going to dress the general background of the
```

| C9pdchem | Conference | Page 4 |

```
 1  litigation.  Everybody here knows it and, God knows, it has
 2  been written about enough.  But I do want to make a few points
 3  within the narrative.
 4        First of all, we are concerned today with a subpoena
 5  duces tecum served on Patton Boggs, which has not appeared in
 6  this case in this court, but it is involved in litigation
 7  between Chevron and the Lago Agrio plaintiffs on behalf of the
 8  latter and, in addition, it has been the plaintiff and is the
 9  plaintiff in a number of lawsuits against Chevron on its own
10  behalf.  I think one of those remains pending, though I am not
11  absolutely certain.  In addition, Patton Boggs is named as a
12  co-conspirator in an amended complaint in this case.
13        Secondly, the crux of the dispute over the subpoena is
14  essentially twofold.  The first part of it is whether the
15  documents sought are all or substantially all protected from
16  disclosure by attorney-client privilege or the work product
17  doctrine and whether compliance with the subpoena or, for that
18  matter, even production of a privilege log would be unduly
19  burdensome.  For reasons already discussed in my
20  August 24th decision, the privilege and work product claims in
21  some respects cannot properly be evaluated without a privilege
22  log.
23        Thirdly, there are substantial disputes, at least in
24  number, as to the proper scope of the subpoena considered
25  without regard to questions of privilege and burden.  Patton
```

CHEVRON CORP v
STEVEN DONZIGER, ET AL

September 25, 2012

C9pdchem      Conference      Page 5

1   Boggs has served 186 pages of objections to the 52
2 specifications of the subpoena. It would be most sensible to
3 resolve those issues before definitively addressing the
4 privilege and, in some respects, the burden claims, as the
5 resolution of the specific objections in the 186 pages could
6 well alter the breadth of the material sought, affect the
7 alleged burden, and focus the subpoena on the most important
8 matters.
9   With that in mind, I am going to try to deal with the
10 objections to the subpoena in this framework.
11   First, Patton Boggs has interposed close to 37 pages
12 of general objections and objections to definitions and
13 instructions in the subpoena. With two exceptions, I don't
14 think oral argument will be helpful to me in ruling on those
15 objections. I am going to rule on them shortly. We are not
16 going to deal with them today, except for general objections 8
17 and 9, which address contentions by Patton Boggs that it should
18 not be obliged to collect, produce or log documents from
19 attorneys and professionals working fewer than 50 hours on the
20 Chevron litigation and, in some respects, from legal
21 secretaries.
22   Secondly, there is one respect in which we will
23 address burden questions. To the extent there are claims of
24 undue burden that are enumerated in the 186 pages and that are
25 unique to individual subpoena specifications, as distinguished

C9pdchem      Conference      Page 6

1 from a claim that the overall burden of complying with the
2 subpoena would be undue, I intend to resolve them.
3   Third, it ought to be clear that at least to a very
4 substantial degree, and possibly -- well, strike "and
5 possibly" -- what we are really talking about here is, in the
6 first instance, and today, in major part, is how extensive the
7 privilege log needs to be and on the basis of how extensive a
8 search.
9   Fourthly, it ought to be plainly understood that I'm
10 approaching this, first and foremost, with Rule 26(b)(2)(C) in
11 mind. That gives district courts discretion to limit the
12 extent of discovery, even of relevant matters, for several
13 reasons. One of them is that its burden or expense outweighs
14 its likely benefit, considering the needs of the case, the
15 amount in controversy, the parties' resources, the importance
16 of the issues at stake, and the importance of the discovery in
17 resolving the issues.
18   Unless I otherwise indicate, the rulings that I make
19 should be understood as practical judgments about the
20 appropriate scope of the subpoena in light of these
21 considerations in the present posture of the case, rather than
22 rulings as to relevance as a purely legal matter of the
23 material sought.
24   Fifth, I understand that the specifications, that at
25 the moment might seem to go beyond what seems productive,

C9pdchem      Conference      Page 7

1 might, after any production that ultimately is ordered has been
2 made, appear in a different light. To the extent that I may
3 modify or limit the scope of or sustain objections to
4 individual specifications today, those rulings will be without
5 prejudice to the plaintiff later seeking to require broader
6 compliance in light of production that's actually made. It
7 should be clear, however, that I do not intend to order further
8 production likely, and no such request should be made or likely
9 would be granted unless there is a very convincing reason.
10   If it is at all possible, we should do this enterprise
11 once -- not more than once.
12   Finally, I'm commencing this process of attempting to
13 hear argument on the objections to individual specifications in
14 the hope that it's going to be efficient and helpful. I must
15 say that given the manner in which the parties -- and I mean
16 "the parties" -- and the lawyers for the parties -- and I mean
17 "for the parties" -- have behaved thus far in this and related
18 litigation, I really have substantial doubt that we're going to
19 get anyplace worth getting by this process. If I come to the
20 conclusion that this is not efficient, or not helpful, I'm
21 going to terminate these arguments, and I'll rule on the
22 objections without oral argument. I do not intend the oral
23 argument to add to the confusion and waste of time. I hope to
24 cut through it.
25   With that in mind, let's proceed. And we'll start

C9pdchem      Conference      Page 8

1 with general objection 8, which is on page 7 of the Patton
2 Boggs responses and objections to the subpoena.
3   As I understand it, the fundamental dispute here is
4 that Patton Boggs proposes to collect documents, which, as I
5 understand it in the present posture, means a log for privilege
6 in the main, only from attorneys and professionals who have
7 worked 50 or fewer hours -- or I misstated that slightly -- who
8 have worked less than 50 hours on the Chevron litigation. The
9 plaintiff, as I understand it, doesn't accept that limitation,
10 at least without a list of who would be excluded by it.
11   Is that a fair statement of where you two are?
12   MR. MASTRO: Your Honor, actually, we've agreed to the
13 50-hour limit, and we've received a list that we are reviewing.
14   THE COURT: Bless you. We will move on.
15 I take it, Mr. Leader, that is correct; is that right?
16   MR. LEADER: Yes, your Honor.
17   THE COURT: All right.
18   MR. MASTRO: Progress already, your Honor.
19   THE COURT: Well, this is -- I won't say. We'll move
20 on to general objection number 9, which has to do with
21 documents from legal secretaries.
22   What Patton Boggs' objection is is that it does not
23 wish to collect electronic documents of legal secretaries that
24 primarily used and relied on Patton Boggs' firm-wide document
25 management computer applications.

CHEVRON CORP v
STEVEN DONZIGER, ET AL

September 25, 2012

| C9pdchem | Conference | Page 9 |

1  What's the problem, Mr. Mastro?

2  MR. MASTRO: Your Honor, again, I think we have

3  reached the point of substantial agreement.

4  All we have asked is that they confirm that the

5  secretaries on this matter have not maintained documents

6  separately in some fashion or data separately from the firm's

7  server, and as long as we have that confirmation -- and they

8  have thus been confirming that -- which ultimately they don't

9  have to serve secretaries.

10  THE COURT: Is that agreed, Mr. Leader?

11  MR. LEADER: Yes, your Honor.

12  THE COURT: OK. That takes care of that.

13  You see, we're already up to page 37.

14  Document request number 1. Where are we on this?

15  MS. YOUNG: Your Honor, I can speak to that. Alyssa

16  Young with Patton Boggs.

17  Patton Boggs has agreed to provide a retainer

18  agreement with its clients redacted of any privileged

19  communications or work product. It was unclear in the

20  meet-and-confer what other documents Chevron is looking for,

21  but that is what Patton Boggs has agreed to produce at this

22  point.

23  THE COURT: Mr. Mastro, what else do you want? And

24  why?

25  MR. MASTRO: Sure. Your Honor, we believe that the

| C9pdchem | Conference | Page 10 |

1  retention agreement redacted will not cover the entirety of the

2  scope of the request. We're concerned about the scope of

3  Patton Boggs' authority to represent or act on behalf of the

4  LAPs. We think it is relevant to the fraud and conspiracy

5  claims. We think there are serious questions about whether

6  Patton Boggs has properly, even acting on behalf of the LAPs,

7  are they really acting more on behalf of itself, other law

8  firms and financiers? And, therefore, we think that it's

9  important in that regard to know whether they are properly

10  authorized.

11  It also goes directly to personal jurisdiction issues

12  and whether agents of the LAPs have been acting on their behalf

13  in New York and that Patton Boggs is an appropriate agent.

14  We think this goes to really, you know, the heart of

15  the RICO conspiracy and the fraud claims, whether persons are

16  acting with or without authority and what they're doing. So we

17  think it is not just the retention to deal with, your Honor, it

18  is also the other exchanges that have occurred about what

19  they're authorized to do or not authorized to do and by whom.

20  And your Honor will recall that this became an

21  important issue at an earlier point in time even before the

22  RICO case about whether certain of the lawyers who have been

23  running around the world supposedly acting on behalf of,

24  quote-unquote, indigenous people are really authorized to act

25  on their behalf. We even know those people, where they get

| C9pdchem | Conference | Page 11 |

1  their authority from, and how they have been exercising it.

2  So we think that the scope of potentially relevant

3  documents is broader than just a redacted retention agreement.

4  So we think they probably have had other exchanges on this very

5  subject of Mr. Fajardo, Mr. Donziger. It would be interesting

6  to see if they had any exchanges with their so-called clients.

7  I think we have a right to get those documents to see if they

8  even exist and if they've ever even had any communication with

9  their clients.

10  So we think it is definitely broader, your Honor, than

11  just a redacted retention agreement.

12  THE COURT: Ms. Young.

13  MS. YOUNG: What Mr. Mastro has just described goes

14  exactly to how Patton Boggs conducts this litigation, what

15  interactions it has with various parties related to the

16  litigation, and basically how the work is divided up and done.

17  That goes right to the heart of privileged work product

18  materials, and, frankly, they have very little to do with this

19  case and more to do with trying to invade Patton Boggs' files

20  to understand how its strategy works.

21  MR. MASTRO: Your Honor, may I add one thing?

22  THE COURT: Briefly.

23  MR. MASTRO: Yes. This again -- and I think this is

24  going to come up time and time again -- really goes to a

25  logging issue and whether they should have to collect the

| C9pdchem | Conference | Page 12 |

1  documents. And if they think that they are privileged, put

2  them on a log and we have already, you know, to try to bridge

3  the gap here, agreed to categorical logging in the fashion that

4  they requested.

5  So, really, the objection here doesn't go to the

6  relevance of the information, it goes to whether they are going

7  to have a valid privilege claim, and that should be logged and

8  in a categorical log. And if there are rulings later on

9  whether they have a privilege there and whether there is an in

10  camera review, the documents will be there for production or

11  for your Honor to review.

12  THE COURT: Suppose, Ms. Young, that this request were

13  modified on the basis I indicated before, that is to say,

14  without prejudice, to read all documents discussing,

15  conferring, or evidencing your authority; doesn't that solve

16  the problem you claim exists?

17  MS. YOUNG: Does your Honor mean to exclude work

18  product and other documents in which Patton Boggs analyzed

19  Chevron's allegations that it had acted outside of its

20  authority?

21  THE COURT: No.

22  MS. YOUNG: Without that limitation, I believe the

23  request would still be impermissibly broad and likely to get at

24  documents that are subject to privilege.

25  THE COURT: Yes. But you understand that I'm not

| C9pdchem | Conference | Page 13 |
|---|---|---|

1  passing on privilege questions today. So on that basis I'm
2  going to modify it without prejudice, as I indicated, and then
3  otherwise overrule the objection; that is, I overrule the
4  objection to the request as modified.
5      OK. Number 2, which I gather the parties have already
6  agreed in one respect is modified by striking the words "actual
7  or potential."
8      MR. MASTRO: Correct, your Honor.
9      THE COURT: OK. What is the essence of the dispute?
10     MR. MASTRO: Well, your Honor, we are seeking
11  documents in which Patton Boggs was involved in the preparation
12  of briefs, motions, pleadings in connection with the Lago Agrio
13  litigation or the Lago Agrio appeal. The relevance of it, your
14  Honor, we think goes to the heart of the case. Patton Boggs is
15  a named co-conspirator, and we have argued that, and provided
16  evidence to the Court, that the manner in which the judgment
17  was procured and the ways in which the judgment was written
18  reflect that it was in fact ghostwritten and there was
19  involvement on the plaintiff's side, including the plaintiffs'
20  lawyers, in that process. Patton Boggs actually played an
21  integral role in the briefing -- the final briefing, called the
22  alegato, and differences between that final briefing and the
23  judgment and the changes in the earlier drafts that show up
24  nevertheless in the final judgment, meaning the work product of
25  the plaintiffs that was never submitted to the Court, that

| C9pdchem | Conference | Page 14 |
|---|---|---|

1  Patton Boggs edited and knows wasn't submitted to the Court,
2  nevertheless shows up in the judgment.
3      Your Honor, we think that their role then in trying to
4  style those briefs what it knew or didn't know in the drafting
5  process --
6      THE COURT: I'm sorry. I'm confused. The argument is
7  that if you get at their drafts, the drafts may provide
8  evidence that there is a remarkable similarity between drafts
9  that were not filed and portions of the judgment; is that about
10  it?
11     MR. MASTRO: That's not the entirety of it, but, yes,
12  that is a major part of it.
13     THE COURT: That is part of it.
14     MR. MASTRO: Their involvement in the drafting -- and
15  they were involved in the redrafting of the final brief, the
16  final statement of the case that's submitted to the Court, so
17  it is referred to as the closing argument, those rewrote that
18  brief. The draft contained literally whole sections of
19  material that Patton Boggs took out of the final product that
20  was submitted to the Court that nevertheless somehow show up
21  almost word for word in the judgment.
22     THE COURT: Yeah, I got that. But you tell me you
23  know that now.
24     MR. MASTRO: We know those pieces. These are the
25  documents about their involvement in the preparation of

| C9pdchem | Conference | Page 15 |
|---|---|---|

1  drafting. There are -- and subsequent motions about cleansing
2  the -- I'm sorry. We know that they made certain choices to
3  take things out. We want the documents that reflect their
4  involvement, how that came about, what choices were made to try
5  and show what wasn't part of the court record, what was part of
6  the court record, and their knowledge of what was not actually
7  submitted on the record but nevertheless must have made it to
8  the Court anyway.
9      Number two. They are also the party that drafted what
10  we call the cleansing memo or motion. That's the one where
11  they made application to the Court in mid-2010 to say to the
12  Court, on the eve of the Stratus documents coming out, Patton
13  Boggs does the drafting of the submission that was made by the
14  LAPs in Ecuador to permit them to put in cleansing experts to
15  try and paper over and cleanse the Cabrera fraud. So we want
16  to see their documents on that process, what they knew, what
17  their colleagues knew, the admissions that they were making.
18  We do have some documents in this regard, your Honor, but we
19  don't have their internal documents, and we don't necessarily
20  have all of the communications. It was by tooth and nail and
21  only production of the hard drive that we got what we did from
22  Donziger.
23     So we don't certainly think we have the full universe
24  that tells that story, the story of coming on the case --
25  knowing the case was falling apart because the Cabrera fraud

| C9pdchem | Conference | Page 16 |
|---|---|---|

1  was about to be revealed, Patton Boggs coming on the case and
2  drafting a critically important document to be submitted to the
3  Ecuadorian Court to be able to put in these so-called cleansing
4  experts, who turned out to be just derivative of Cabrera to try
5  to paper it over.
6      So for both of those reasons, both in the judgments,
7  ghostwriting fraud, and in the context of this really, you
8  know, fraud on the process to try and paper over Cabrera as the
9  fraud was unraveling, Patton Boggs was there at the heart of
10  it. And we want to see their documents that reflect their
11  preparation, their involvement, that they knew, what other
12  people knew, and what they were saying about these things as
13  they did them.
14     THE COURT: What about the appeal?
15     MR. MASTRO: Yes. Well, your Honor, that's important,
16  too, because, you know, we don't have transparency into the
17  process since the Donziger documents only go up to a point in
18  early February. We don't have transparency about the
19  judgment's aftermath. Yet there have been many questions
20  raised about the motions that were submitted. Patton Boggs, we
21  believe, participated in the preparation of them to try and fix
22  problems in the judgment, anticipating attacks later. They win
23  the case --
24     THE COURT: My question was what about the appeal?
25  Documents relating to submissions --

CHEVRON CORP v
STEVEN DONZIGER, ET AL                                                September 25, 2012

| C9pdchem | Conference | Page 17 |

1    MR. MASTRO: And on the appeal, your Honor, questions
2  about the composition of the panel and how the appellate panel
3  went about doing its work, because the trial judge who issues
4  the judgment is also the judge who basically oversees who was
5  on the appellate panel.  And there are a lot of issues about
6  the continue manipulation and ghostwriting that occurred even
7  after that, and we need to see -- it will actually be our first
8  chance to see the role of the plaintiffs' team in how there
9  were modifications to the judgment and then how the appellate
10  process worked and the role they played in helping to craft or
11  cause the crafting of the appellate opinion.  We have had no
12  transparency there.
13    THE COURT: Ms. Young or Mr. Leader?
14    MS. YOUNG: I would like to point out that the request
15  is actually directed to all documents related to Patton Boggs'
16  involvement in the preparation of any brief, any motion, any
17  pleading in connection with the Lago Agrio litigation.
18    Mr. Master just spoke to two or three examples of
19  specific documents that were filed, and, in fact, Patton Boggs
20  requested such a list from them during the meet-and-confer.  It
21  is still obvious that we had privilege issues with this
22  document request.  And, of course, Patton Boggs denies the
23  allegations put forth by Mr. Mastro and --
24    THE COURT: OK.  Look, in the interest of not having
25  this repeated every time -- and I don't mean to be unkind -- I

| C9pdchem | Conference | Page 18 |

1  know, as well as you do, that there are privilege issues that
2  I'm not ruling on today, and what we're talking about today is
3  the scope.  So let's just save the time of talking about the
4  privilege issues, except to the extent, if we ever get to an
5  appropriate point, where we did some appropriate narrowing that
6  might in one degree or another reduce or minimize any questions
7  about privilege.  OK?
8    MS. YOUNG: OK.  Understood.
9    Also, to the extent that Mr. Mastro is asking for
10  documents that aren't in the court record, he can certainly --
11  he is certainly aware of the court record in Ecuador and
12  doesn't need Patton Boggs' documents to show that.
13    THE COURT: No.  But he is not asking you to produce
14  documents from the court record in Ecuador.  He is asking you
15  to produce documents related to Patton Boggs' involvement in
16  the preparation of various documents, which is a separate
17  matter.
18    MS. YOUNG: Understood.  And that goes to virtually
19  everything that Patton Boggs did in the course of the
20  Ecuadorian litigation.
21    THE COURT: Now, Patton Boggs' involvement dates to
22  exactly when?
23    MS. YOUNG: Early 2010.
24    THE COURT: Mr. Mastro, when in your submission does
25  the risk of Cabrera being discredited emerge?

| C9pdchem | Conference | Page 19 |

1    MR. MASTRO: Your Honor, it emerges starkly in
2  May 2010 and really continues thereafter.
3    Patton Boggs, under a draft retention agreement that
4  we saw, says they are to be primarily responsible for U.S. and
5  non-Ecuadorian litigation.  Yet, it appears that from May 2010
6  on they were integrally involved in the key briefing in
7  Ecuador, the cleansing expert request relating to the final
8  alegato and the judgment, and then subsequently, post-judgment
9  and on appeal, it appears that they were involved including
10  even moving for clarification on the fraud issue to try and
11  improve their prospects in enforcement later when they had won.
12  Apparently in Ecuador you can make motions when you win to say
13  I would like even better language in my opinions.
14    THE COURT: It has been known to happen in America,
15  too.
16    MR. MASTRO: It can't happen quite so transparently,
17  your Honor.  I don't think that I could move to appeal a
18  complete victory because I wanted some little better language
19  in an opinion.  But in any event, I'm just saying that it's
20  really, you know, the beginning of May 2010 on that it appears
21  Patton Boggs took over in substantial respects briefing and
22  engineering the strategy, too.  The first 1782 was filed in
23  late 2009 in this case.
24    THE COURT: Hold on a second while I look something
25  up.

| C9pdchem | Conference | Page 20 |

1    (Pause)
2    All right.  So we are talking here about the time
3  period from early 2010 until whatever ultimately the cutoff is.
4    Now, you've identified, Mr. Mastro, the alegato.
5  You've identified what else specifically?
6    MR. MASTRO: Your Honor, I identified the cleansing
7  motion, to be able to submit cleansing expert reports, which
8  was filed in mid-2010.  I've identified the alegato, which I
9  believe was filed in December of 2010, and I've identified the
10  post-judgment motion practice, the appellate briefing, and the
11  post-appellate decision motion practice, all which went to
12  trying to manipulate or change the language.
13    And I would just add one thing, your Honor.  This is
14  going to come up again and again, so I am really trying to cut
15  through things.  They're going to repeatedly raise we should
16  have provided them a list of what we know --
17    THE COURT: Let's deal with it if, as, and when we get
18  it.  OK?
19    MR. MASTRO: No problem.  But they raised it here,
20  too, that we should give them a list.  They know which list --
21    THE COURT: OK.  Again, without prejudice, as I've
22  indicated -- and I'm going to stop repeating that -- we're
23  going to modify this, at least temporarily, to documents
24  relating to Patton Boggs' involvement in the preparation of the
25  alegato, the so-called cleansing motion, as defined by

CHEVRON CORP v
STEVEN DONZIGER, ET AL                                          September 25, 2012

C9pdchem          Conference                    Page 21

1  Mr. Mastro, and any post-judgment motion or avocation, and
2  otherwise the objection is going to be sustained for the time
3  being.
4      OK. Number 3. Have you reached agreement on this, I
5  hope?
6      MS. YOUNG: I think the only disagreement remaining on
7  this is whether Patton Boggs can create one travel log, or
8  Chevron has demanded a separate log, signed under penalty of
9  perjury, by each Patton Boggs' attorney who traveled to Ecuador
10 identifying -- and they're asking for a whole host of
11 information -- meetings, start and end times, locations,
12 attendees, photographs, video recordings.
13     I think what we offered to do was to put forth a
14 single log identifying Patton Boggs' lawyers who traveled to
15 Ecuador in connection with the Chevron litigation, dates of
16 travel, and cities or towns visited.
17     THE COURT: Mr. Mastro.
18     MR. MASTRO: I think, your Honor, the only area of
19 disagreement at this point is what that log would look like.
20 We wanted not only arrival and departure dates and the
21 identification of the Patton Boggs' lawyers but who they met
22 with, who were at these meetings. Were they meeting with a
23 judge? Were they meeting with others in Ecuador? And if they
24 are able to provide it, the basic durations of the meetings.
25     So we think it's a positive step that they will

C9pdchem          Conference                    Page 22

1  identify when they went to Ecuador and who from Patton Boggs
2  went there, but we want to know who they met with and for how
3  long. It seems to me that that's the key information that we
4  are entitled to as well in trying to determine what they were
5  doing.
6      THE COURT: What about that, Ms. Young?
7      MS. YOUNG: I think it's-- Chevron wants to know did
8  we meet with a judge, did we -- you know, in keeping with their
9  allegations that we did any improper activity, I think we can
10 certainly respond to that that we did not.
11     THE COURT: I would rather imagine that most parties
12 accused of misconduct are perfectly prepared in discovery to
13 say you don't need discovery, we didn't do it, and you should
14 just accept our word for it. So we're not going down that
15 course of an approach.
16     And, furthermore, as I'm sure you know, the crime
17 fraud exception doesn't even require misconduct by the attorney
18 in order to pierce the privilege, if indeed there is such a
19 privilege, with respect to anything here.
20     And so I'll go along with the one log concept, and the
21 log is to contain the identity of each attorney, the arrival
22 and departure dates of each trip, and with respect to each
23 meeting relating to the case in any way the dates and times and
24 durations and participants.
25     OK. Number 4. Mr. Mastro, how do you justify this?

C9pdchem          Conference                    Page 23

1      MR. MASTRO: Your Honor, here we're seeking documents
2  relating to travel to certain countries where we're already
3  aware, or have reason to believe, might be subjects of
4  enforcement actions. There have already been enforcement
5  actions filed in Brazil and Canada.
6      To us, your Honor, this goes to an essential part of
7  the conspiracy that Patton Boggs came on to the case to
8  execute. This is the Invictus enforcement strategy. This is
9  the extortion shakedown pressure strategy. This is -- these
10 are the documents that relate to the travel that goes to the
11 very heart of that. So we think its relevance to the RICO and
12 fraud case are evident, and we think we are entitled to get
13 them.
14     Patton Boggs objects in its entirety. Some of these
15 things in the travel records wouldn't be subject to any kind of
16 privilege claim anyway, but to the extent they have a privilege
17 claim, they put it on the categorical log. But they've just
18 object categorically to this, and we think it is clearly
19 relevant and we are entitled to see it.
20     THE COURT: I am going to sustain that objection.
21     Number 5. Ms. Young, these people are asserting
22 jurisdictional objections in the case of the two who have
23 appeared. It seems relevant more broadly than that. Why
24 shouldn't you produce this?
25     MS. YOUNG: Your Honor, we have asked Chevron to -- we

C9pdchem          Conference                    Page 24

1  have agreed that we will perform a reasonable search for these
2  documents, and we've suggested ways in which to go about doing
3  that.
4      Searching a set of e-mails, you know, dealing with
5  other people's travel, it's difficult to come up with a search
6  that would potentially target those documents. I think -- the
7  example that Chevron has used is if there is an internal
8  communication at Patton Boggs referring to Pablo Fajardo coming
9  to the United States for a meeting, that's what they are
10 looking for, and we have suggested that we come up with some
11 search terms that might be designed to get at that information.
12     The problem is that Chevron has been unwilling to
13 engage in that discussion on what it will accept as a
14 reasonable search for these types of documents.
15     THE COURT: These are two separate questions. One
16 question is whether the request is appropriate. The second
17 question is, given the respondent's obligation to make a
18 reasonable search, what is a reasonable search?
19     I overrule the objection. Now, the parties are going
20 to have to work it out, or if you can't, the Court will decide
21 what a reasonable search is.
22     I understand there are always problems in designing
23 search terms and the like, and in electronic discovery, as in
24 all other things in life, perfection, desirable as it may be,
25 is not always achievable.

CHEVRON CORP v
STEVEN DONZIGER, ET AL

September 25, 2012

| C9pdchem | Conference | Page 25 |

1    OK.  Number 6.
2        I see that that follows, unless I hear good reason to
3  the contrary, the ruling I made with respect to number 4.  Any
4  reason why not, Mr. Mastro?
5        MR. MASTRO: Your Honor, I think it would be
6  controlled by your ruling on number 4, but when it comes to
7  documents relating to the enforcement actions, I would like to
8  be heard more on that, as opposed to the travel documents, and
9  then we will come to those later requests.
10        THE COURT: Then we will deal with it then.
11        MR. MASTRO: Thank you, your Honor.
12        THE COURT: Number 7 has been withdrawn by Chevron.
13  What remains in dispute as to this?
14        MS. YOUNG: Patton Boggs has agreed to produce power
15  of attorney documents.  I'm not sure what else is at issue.
16        THE COURT: Including drafts?
17        MS. YOUNG: Drafts would -- we would have the same
18  problem with work product, but I believe we could log those.
19        MR. MASTRO: OK.
20        THE COURT: OK.  So the objection is overruled,
21  except, of course, that identical -- well, what about this?
22  Let me raise the question.
23        Shouldn't this exclude or should it exclude identical
24  copies of documents that were produced -- actually produced in
25  the 1782 case against Mr. Donziger?

| C9pdchem | Conference | Page 26 |

1        MS. YOUNG: We don't currently have that production so
2  Chevron would need to identify those for us.
3        MR. MASTRO: Well, your Honor, we don't have a problem
4  with that.  So, you know, but it is not clear to us in terms of
5  burden and everything else, you know, should we give them
6  everything in the Donziger production that relates to this
7  issue?  Is that how they --
8        THE COURT: This is really, I guess, silly.
9        MR. MASTRO: Right.  I don't want to --
10        THE COURT: Because, obviously, I mean, Mr. Donziger
11  represents these people and you are working -- not you, Leader
12  & Berkon, but you Patton Boggs are working hand and glove with
13  the Keker firm, or at least that's the only logical assumption
14  to draw, and so I will just overrule the objection.  You are
15  perfectly able to find out what was in these things.
16        Number 9.
17        (Pause)
18        Anybody wish to address it?
19        MR. MASTRO: Your Honor, again, we think this goes to
20  the heart of the RICO claim because these documents potentially
21  relate to membership in the conspiracy, its scope, its
22  structure, the motives of individuals and their interests,
23  including the Patton Boggs firm which recruited certain of the
24  funders, including Burford.  The Patton Boggs firm, which has a
25  contingency arrangement that should generate over 400 million

| C9pdchem | Conference | Page 27 |

1  as a result if they were able to collect on the entirety of
2  that judgment for that firm.  And it goes to, you know, the
3  individuals or financiers who were recruited to either join the
4  conspiracy as active participants or, in some cases, including
5  Burford and Joe Kohn, who backed out at some point -- Joe Kohn,
6  as we say, with noise.  So we think that this really will be
7  highly relevant to the RICO conspiracy and its scope, structure
8  and membership.
9        THE COURT: Is there any dispute that Patton Boggs has
10  a contingent fee arrangement and has a nine-figure benefit to
11  be gained if and to the extent the judgment is collected?
12        MR. MASTRO: There is not, your Honor.
13        THE COURT: You are not in a position to answer that.
14        MR. MASTRO: Sorry, your Honor.
15        (Pause)
16        MS. YOUNG: Excuse me, your Honor.  I just need to
17  confer with my client.
18        THE COURT: I understand.
19        (Pause)
20        MR. MASTRO: Your Honor, could I add just one more
21  thing while she is conferring?
22        THE COURT: No.  Let's do one thing at a time.
23        MR. MASTRO: No problem, your Honor.
24        (Pause)
25        MS. YOUNG: Your Honor, Patton Boggs is not

| C9pdchem | Conference | Page 28 |

1  comfortable with discussing the financial arrangements relating
2  to its potential payment from this litigation.
3        THE COURT: Well, I mean, you may have your choice
4  between getting comfortable with it or producing all the
5  documents about it.
6        MS. YOUNG: We've agreed to produce the retainer
7  agreement, and I believe it will be redacted of sensitive
8  financial information.
9        THE COURT: Well, that's your version.  I don't see
10  any basis for that redaction.
11        MS. YOUNG: The --
12        THE COURT: So maybe you can persuade me.
13        MS. YOUNG: The funding arrangements as it relates to
14  Patton Boggs, that has no bearing on the RICO litigation.
15        THE COURT: It has to do with motive, doesn't it?
16        MS. YOUNG: Patton Boggs isn't a defendant in the RICO
17  litigation.
18        THE COURT: It is an alleged co-conspirator, isn't it?
19  Right in the complaint.
20        MS. YOUNG: Understood, your Honor.
21        (Pause)
22        At a minimum, your Honor, Patton Boggs requests a
23  protective order, a confidentiality order so that the
24  information relating to its payment or potential payment is not
25  disclosed outside of this litigation.

| C9pdchem | Conference | Page 29 |
|---|---|---|

1 THE COURT: Any problem with that, Mr. Mastro?
2 MR. MASTRO: Your Honor, there has already been
3 disclosures with no protective order that give that amount. I
4 don't have any problem with a protective order, that I won't
5 reveal what they say they'll get out of the litigation.
6 MS. YOUNG: Your Honor, if the plaintiffs already have
7 this information, why does it need to come from Patton Boggs
8 again?
9 THE COURT: Do you know that the United States
10 government takes the position that terrorists who have been
11 held in certain foreign countries, as reported by every media
12 outlet in the world, are in the position where the government
13 will not confirm nor deny which foreign countries even though
14 everybody in the world knows it? Do you understand that? And
15 the reason it doesn't is because they don't want to be bound by
16 the admission, which is why you don't want to be bound by the
17 admission. But the admission is relevant in the lawsuit. And
18 for them to say somebody else said that Patton Boggs' interest
19 is X is different from Patton Boggs saying it or producing the
20 documents.
21 Now, let's use this time productively. Is there any
22 problem with a protective order of the standard garden variety
23 form that would enable them in the first instance to designate
24 that piece of information as for use in this litigation only
25 and would not restrict you, Mr. Mastro, as in all other cases,

| C9pdchem | Conference | Page 30 |
|---|---|---|

1 if you have that information from someplace else, using it?
2 MR. MASTRO: And I said, it will be fine with me, your
3 Honor.
4 THE COURT: OK. So that solves that problem, right,
5 Ms. Young?
6 MS. YOUNG: Understood, your Honor. Yes.
7 THE COURT: OK. Now, what about the limitation to
8 executed funding agreements?
9 MR. MASTRO: Your Honor, the reason why it shouldn't
10 be limited to executed funding agreements is because part of
11 the fraud -- part of the third-party fraud is that
12 misrepresentations by Patton Boggs and others on the
13 plaintiff's team were made to induce people to fund the
14 litigation. In some cases they decided not to, because they
15 concluded not to. In other cases they decided to and later
16 withdrew, apparently because they considered themselves to have
17 been defrauded. So we think we should be able to get documents
18 that go to their efforts to induce funders as well as the
19 funding agreements themselves.
20 THE COURT: And how is that relevant to whether they
21 did what you claim they have done to Chevron?
22 MR. MASTRO: Because, your Honor, take a Burford as an
23 example. We believe that since Burford cut off its funding --
24 and of the limited documents we have seen, we have seen that
25 they are now in some controversy -- we hope the discovery from

| C9pdchem | Conference | Page 31 |
|---|---|---|

1 Patton Boggs will show why Burford stopped funding. But it did
2 provide millions in seed capital at Patton Boggs' behest, based
3 on representations like those in Invictus about the so-called
4 merit of what they were going to try to do, that, you know,
5 funded the enterprise, kept the scheme going, gave them the
6 lifeblood capital they needed. And if those parties -- some of
7 those parties -- I can't say whether that is going to be the
8 case for Burford, but we think we have a good faith basis
9 arising from the discovery, and of others, you know, were
10 induced to fund, to keep this thing going, the scheme going,
11 and later came to realize they had been hoodwinked. That's
12 third-party fraud. That's extremely relevant to the RICO. So
13 we believe we're entitled to those documents.
14 THE COURT: Ms. Young.
15 MS. YOUNG: I think that's pure speculation as to why
16 somebody stopped providing funding or continued. And, again,
17 the fact of someone funding or not funding, we are OK with
18 disclosing that. You know, the discussions back and forth
19 touching on the merits of the case or anything else we think
20 should be off limits.
21 THE COURT: Well, why? It is not exactly privileged,
22 is it, even if there is a privilege?
23 MS. YOUNG: Well, there may be work product revealed
24 in those discussions, yes, about strategy, about planning,
25 about --

| C9pdchem | Conference | Page 32 |
|---|---|---|

1 THE COURT: Which may very well blow even the work
2 product protection.
3 MS. YOUNG: I believe --
4 THE COURT: Because you are dealing with an adverse
5 party at arms' length.
6 MS. YOUNG: Well, I think it is actually the opposite,
7 that they have a common interest in the litigation if they're
8 funding it.
9 THE COURT: Maybe not if they are pulling out. Maybe
10 not if they say no. Maybe not until they decide to fund it.
11 MS. YOUNG: It is a collateral issue. It is
12 speculative. If we're trying to reduce the scope of the
13 subpoena, you know, I don't think there is any meaningful
14 information that's going to come out of that inquiry.
15 THE COURT: I am going to come back to that one. I
16 will think about that a little more.
17 Number 10.
18 MS. YOUNG: 10 is the identical problem. It just
19 lists names.
20 THE COURT: Is that right?
21 MR. MASTRO: These are all parties we believe that are
22 related to funding issues. Your Honor, if I may suggest one
23 other thing that might help you resolve 9 and 10?
24 From the documents we have seen, that we have been
25 able to obtain in discovery, we see the breakdown between the

C9pdchem          Conference          Page 33

1 plaintiffs and Burford, and we have seen from the plaintiff's
2 side some hostile exchanges with Burford when Burford withdrew
3 its funding. There must be Burford letters to the plaintiffs,
4 and we believe they will show exactly what we need to prove,
5 third-party fraud and --
6          THE COURT: Yes. But you haven't persuaded me yet
7 that evidence that third-party investors were snookered, if
8 indeed that's the case, is particularly probative of anything
9 in this case.
10         MR. MASTRO: But, your Honor, it is critically
11 important, because without that money -- without that seed
12 money from Burford, we think the documents will show Patton
13 Boggs never would have gotten involved in this case and not
14 gotten the seed money, because they had a mixed-fee contingency
15 fee arrangement.
16         THE COURT: Without the word processor, they couldn't
17 have gotten involved either and we are not examining IBM.
18         MR. MASTRO: No. But, your Honor, I do believe this
19 is actually critically important, because it was the going out
20 and obtaining of funders, sometimes who became co-conspirators,
21 sometimes who later felt they were duped and were part of a
22 third-party fraud, it was the only reason they could sustain
23 the action they way they did and litigate all around the world
24 and bring in the Patton Boggses of the world and the many
25 national firms --

C9pdchem          Conference          Page 34

1          THE COURT: This is true of every law school that
2 would have accepted anybody of Patton Boggs as a student.
3 Without that, they wouldn't be here.
4          MR. MASTRO: Your Honor, as an essential part of the
5 scheme, part the RICO scheme was to defraud -- to either get
6 co-conspirators or to defraud them into investing and thereby
7 be able to support the ability to try to extort Chevron not
8 only by continuing the Lago Agrio litigation but the
9 litigations around the country. and the common law fraud claim
10 that has been sustained was one of defrauding third parties to
11 the detriment of Chevron. If we are correct that the documents
12 will show Burford, maybe Kohn, others felt that they had been
13 defrauded at certain points into funding, that was integral to
14 the LAPs being able to continue their effort to extort Chevron.
15         THE COURT: Thank you.
16         I'm sustaining, for the time being anyway, the
17 objections to 9 and 10, save that Patton Boggs will produce
18 executed funding agreements.
19         11. Are you guys capable of agreeing as to whether
20 Andres Snaider is a lawyer or not?
21         MR. MASTRO: Your Honor, he apparently at times in his
22 life was a lawyer but we do not believe he is functioning as a
23 lawyer more recently and certainly not in the capacities in
24 which he participated in this case. In his more recent life he
25 hasn't been, to our understanding, practicing law.

C9pdchem          Conference          Page 35

1          THE COURT: And why are you entitled to all documents
2 relating to him?
3          MR. MASTRO: He is a person who both participated in
4 helping them arrange funding and also served as a consultant --
5 as we understand it, a consultant to the LAPs on the foreign
6 enforcement or Invictus strategy.
7          THE COURT: Sustained.
8          MR. MASTRO: Your Honor, may I just ask one more
9 question?
10         THE COURT: Yes.
11         MR. MASTRO: In terms of the limited production on 9
12 and 10, I would strongly implore your Honor that if there are
13 exchanges with Burford that would reflect that Burford backed
14 out of the funding agreement because they felt they were
15 defrauded, that that would be highly relevant.
16         THE COURT: Nobody is stopping you from taking
17 Burford's deposition and let's see where that goes, if you
18 decide to do it.
19         MR. MASTRO: All right. We will, your Honor. We
20 will.
21         THE COURT: Number 12.
22         MS. YOUNG: Number 12. Nextant is, I believe, under
23 Snaider's company.
24         THE COURT: Is that right, Mr. --
25         MS. YOUNG: We have the same objection.

C9pdchem          Conference          Page 36

1          THE COURT: -- Mr. Mastro?
2          MR. MASTRO: Nextant is his company.
3          THE COURT: Sustained.
4          13.
5          (Pause)
6          Anybody have anything to say?
7          MR. MASTRO: Well, your Honor, the relevance of the
8 documents, I think your Honor --
9          THE COURT: I'm fully appreciative of why you want to
10 see them.
11         MR. MASTRO: Right.
12         THE COURT: Which is not the same thing as relevance.
13         MR. MASTRO: I understand, your Honor.
14         But since at the heart of the conspiracy it was the
15 RICO defendants colluding with government officials to procure
16 a thumb on the scale of fraudulent judgment in Ecuador, the
17 communications with the government officials we believe are
18 highly relevant. We don't see how they could be privileged.
19 We don't see how there could be a sovereign immunity question.
20 And, you know, we therefore think that they should have to
21 produce those documents.
22         THE COURT: Ms. Young.
23         MR. MASTRO: To the extent they have a privilege
24 claim, they can put it on a categorical log.
25         THE COURT: I don't understand that point.

| C9pdchem | Conference | Page 37 |
|---|---|---|

1  MS. YOUNG: I just want to clarify that the sovereign
2  immunity objection relates to a completely separate
3  representation of Patton Boggs for the Republic of Ecuador, and
4  although in the meet-and-confer I believe Chevron loosely
5  stated it wasn't really interested in that, they haven't
6  committed to narrowing the scope of the request. So that
7  really relates to things separate from the litigation.
8  THE COURT: Can you enlighten me? Because I take it
9  that since the document request is for documents regarding
10  Chevron for the Chevron litigations, it would be hard to
11  imagine if there were a separate representation in an unrelated
12  litigation, or representation of the Republic of Ecuador, that
13  you would have any responsive documents in connection with that
14  representation; isn't that right?
15  MS. YOUNG: Understood. I mean, if it's related to
16  the Chevron litigation --
17  THE COURT: Or to Chevron.
18  MS. YOUNG: As we -- with that limitation, yes, we
19  understand, and we'll respond as we've indicated.
20  THE COURT: So that limitation is in fact not a
21  limitation, it is the scope of the question in the first place.
22  And so I take it, then, that there is no sovereign
23  immunity objection, right?
24  MS. YOUNG: Correct.
25  THE COURT: OK. Now, with that established, is there

| C9pdchem | Conference | Page 38 |
|---|---|---|

1  any further reason why there is anything to sustain here? That
2  resolves the objection subject --
3  MS. YOUNG: That resolves the objection subject to the
4  privilege log.
5  THE COURT: OK. So the objection is overruled.
6  Number 14. This, I take it, is the specific question
7  that underlay the earlier much more general request that we
8  talked about for quite some time. Right?
9  MR. MASTRO: Yes, your Honor.
10  THE COURT: OK. Any reason why I shouldn't overrule
11  this?
12  MS. YOUNG: Your Honor, this request relates to --
13  it's so overbroad and it relates to any official communication,
14  order, statement, ruling, report, judgment, sentencia, escrito,
15  providencia, edict, or other writing issued by the Lago Agrio
16  Court, and also includes the appeal.
17  THE COURT: Yes. So?
18  MS. YOUNG: So, again, this goes to -- we've asked
19  Chevron to specify and in particular orders or rulings or
20  judgments that they're interested in rather than pretty much
21  everything related to the Lago Agrio litigation.
22  THE COURT: Yes. But it is not everything related to
23  the Lago Agrio litigation. It relates to the writing of court
24  documents issued by those courts. I mean, I, of course, I say
25  "writing," there are more words, but it all amounts to that.

| C9pdchem | Conference | Page 39 |
|---|---|---|

1  MS. YOUNG: Right. And the only allegations that
2  Chevron has made relate to the judgment, the Cabrera motion,
3  and, I think, the appeal. If they're willing to limit it to
4  those items, I believe we would be prepared to respond.
5  THE COURT: Do you have a lot of these documents
6  relating to other --
7  MS. YOUNG: No. But what we do have are a lot of
8  documents relating to Patton Boggs' analysis of Chevron's
9  allegations in that regard. So every time Chevron --
10  THE COURT: Just let me stay with your point and then
11  I'll let you go on.
12  But you're saying if they had flagged two or three or
13  four specific documents, because those are the ones they know
14  about -- there may or may not be others -- and your problem is
15  with your analysis of those. And the way you propose to solve
16  that problem is have them tell you the ones they suspect are
17  problematic, which they've already told you. You know what
18  those are because that's what you are giving right back to them.
19  And the point of their request is to find out if there are
20  others that they don't know about yet, and you want me to cut
21  that out.
22  MS. YOUNG: Well, as drafted, this would also get to
23  all of Patton Boggs' work done in connection with Chevron's
24  allegations. If there is a way to carve that out so that we
25  don't have to log every single time that Patton Boggs weighed

| C9pdchem | Conference | Page 40 |
|---|---|---|

1  in or analyzed an allegation, that would be helpful.
2  THE COURT: OK. Mr. Mastro, what about that?
3  MS. YOUNG: I just want to clarify also, it is not as
4  if we've identified documents that do relate to advance
5  knowledge of the judgment or anything like that. We don't
6  believe that those exist at all.
7  MR. MASTRO: Right --
8  THE COURT: I mean, you know, the fact is if you limit
9  that specifically to the judgment, I don't know one way or
10  another, but I certainly have seen documents in this case in
11  which, if memory serves, it was Mr. Fajardo saying to
12  Mr. Donziger he knew exactly what the judge was going to do
13  about either terminating judicial inspections or whom he was
14  going to appoint as the global expert, etc., etc., there surely
15  are documents. Now, I don't know if Patton Boggs has them and
16  so forth, but there are such documents that have emerged at one
17  point or another. I haven't seen many but there are some.
18  Mr. Mastro.
19  MR. MASTRO: Yes. Correct, your Honor. But I don't
20  think the fact that we've been so diligent in discovery that we
21  have a sense of some of them now, I'm not a soothsayer. I'm
22  shocked at how many we are already aware of.
23  I think that this is a pretty straightforward,
24  targeted request -- the writing, drafting of orders, opinions,
25  decisions by anyone in the Lago-related team. So they are the

| C9pdchem | Conference | Page 41 |
|---|---|---|

1  ones who will know that.  I was able to say "several" because
2  of what we've been fortunate enough to be able to learn, but
3  they're going to know whether there are more.  There could well
4  be more.  And I shouldn't have to tell them what my (1)
5  suspicions are or what else I may have done as a matter of my
6  own work product to know.  OK?  They should know, and produce.
7      THE COURT: That objection is overruled.
8      MS. YOUNG: Your Honor, may I just clarify?
9      THE COURT: Yeah.  Sure.
10     MS. YOUNG: Are you expecting, in response to Request
11 Number 14, that Patton Boggs will need to log all of its
12 internal communications relating to Chevron's allegations, as
13 opposed to documents evidencing the, you know, ghostwriting or
14 advance knowledge?
15     THE COURT: I'm expecting you to comply with this as
16 written.
17     MS. YOUNG: I believe as written it would seek
18 documents that are purely Patton Boggs' analysis and not
19 evidence of some other fraud.  Patton Boggs has spent a
20 considerable amount of time analyzing Chevron's allegations
21 relating to ghostwriting and advance knowledge of things.
22     THE COURT: I'm not elaborating on what I've said.
23 Number 15.  What the heck does this got to do with
24 anything, Mr. Mastro?
25     MR. MASTRO: Well, your Honor, it goes to affirmative

| C9pdchem | Conference | Page 42 |
|---|---|---|

1  defenses that have been raised in this case.
2      THE COURT: What the affirmative defense?
3      MR. MASTRO: Well, they raised affirmative defenses
4  relating to fraud where they accuse Chevron and its
5  predecessors of having engaged in fraudulent activity in
6  connection with the remediation.
7      THE COURT: What pleading are you referring to?  And
8  I'm also -- you know, let's suppose it is there.  We'll then go
9  on to the question of what difference it makes.
10     MR. MASTRO: Well, obviously, your Honor, we don't
11 think there was any fraud or failure to perform, so we wanted
12 to see if they've got any beef there.
13     THE COURT: OK.  On the subject of where is the beef,
14 what pleading and what defense?
15     MR. MASTRO: They are pulling it up now, your Honor.
16 That was one of the affirmative defenses that they alleged
17 alleging fraud.
18     (Pause)
19     Well, we will pull it up for your Honor and give it
20 you.
21     THE COURT: Do you want to come back to that?
22     MR. MASTRO: Yes.  We will, your Honor.
23     THE COURT: All right.  Number 16.  I take it the
24 criminal case is defined as the Veiga and Pallares; is that
25 right, Pallares?

| C9pdchem | Conference | Page 43 |
|---|---|---|

1      MR. MASTRO: Yes.  Just one other thing, your Honor,
2  just on 15, just to close the loop, and we will come back to
3  their affirmative defense.
4      It is also the case that among our allegations is the
5  Lago Agrio litigation was itself a fraudulent act or an attempt
6  to get around the settlement and release agreements that would
7  have precluded it.  So I just wanted to put that on the record,
8  your Honor, as to why it would be relevant to that.
9      THE COURT: We are all indebted to you for that.
10     MR. MASTRO: Thank you, your Honor.
11     THE COURT: Number 16.  This is the two criminal cases
12 that we were all dealing with at the beginning of all the
13 1782s, right?
14     MR. MASTRO: Yes, your Honor.
15     THE COURT: OK.  So where are we on this?
16     MR. MASTRO: Your Honor, it's those criminal cases and
17 any attempts to initiate criminal investigations, that those
18 ones obviously led to prosecution that later had to be dropped,
19 and we think they are clearly relevant to the case.  It was
20 part of their scheme to get these Chevron --
21     THE COURT: This all began before Patton Boggs was on
22 the job, right?
23     MR. MASTRO: It did, your Honor, but Patton Boggs was
24 on the job when the criminal charges got dropped against the
25 lawyers in Ecuador and may well have documents reflecting the

| C9pdchem | Conference | Page 44 |
|---|---|---|

1  back and forth on that.  I think that it was widely recognized
2  that on the LAPs-related team that the pendency of those
3  criminal charges reflected poorly on justice in Ecuador, and we
4  believe that there will be relevant documents there.  The
5  exchanges that Patton Boggs had with others about those cases,
6  or any other investigations that -- the criminal investigation
7  that the LAPs were trying to get initiated against Chevron
8  there.
9      THE COURT: Ms. Young.
10     MS. YOUNG: Patton Boggs was not involved in any
11 effort to encourage prosecution of Chevron's attorneys in
12 Ecuador, and Chevron knows that because it has Mr. Donziger's
13 files.
14     You know, to the extent that Patton Boggs --
15     THE COURT: Well, then you won't have many documents,
16 right?
17     MS. YOUNG: True.  Although, you know, again, Patton
18 Boggs had discussions about the criminal proceedings with its
19 co-counsel and internally, and I don't see any reason why
20 Patton Boggs should be burdened with reviewing and logging
21 those documents where they are not relevant to these
22 proceedings.
23     THE COURT: What would you do differently if this
24 request were in the case in the subpoena than you would do if
25 it were not in terms of searching and things like that -- in

CHEVRON CORP v
STEVEN DONZIGER, ET AL
September 25, 2012

| C9pdchem | Conference | Page 45 |

1 terms of searching?

2     MS. YOUNG: In terms of searching, I think we would

3 probably need to do a search for "criminal," using language

4 around "criminal," the word "criminal."

5     THE COURT: And the incremental cost of sticking that

6 one-word search term in there is what?

7     MS. YOUNG: We don't have a figure on the incremental

8 cost of that figure alone.

9     THE COURT: Right. But it's got to be essentially de

10 minimis, right? And so the difference is that if I leave it

11 in, you're going to get a certain number of hits that you

12 wouldn't otherwise have gotten, and then, presumably, somebody

13 is going to have to look at the hits and may have to schedule

14 it.

15     Mr. Mastro, why should I conclude that the likelihood

16 that doing that will lead to anything of significance is

17 sufficiently likely to go to the trouble?

18     MR. MASTRO: Two reasons, your Honor. I don't think

19 that it's much of a burden at all, since they claim such a

20 limited universe.

21     Two --

22     THE COURT: Well, it depends on how many hits.

23     MR. MASTRO: Two, your Honor, it seems to me it is

24 extremely relevant. I didn't say, as Ms. Young implied, that

25 Patton Boggs was involved in the inception of trying to get

| C9pdchem | Conference | Page 46 |

1 them prosecuted. I said to the Court that Patton Boggs was on

2 the scene in an important role in the overarching litigation

3 when the decisions were made to drop the criminal charges, so

4 they likely had communications with their colleagues.

5     THE COURT: Right. I understand that.

6     Now, to hit a home run in this, what you would need to

7 find -- and I don't suggest it exists, I don't know one way or

8 the other -- what you would need to find is the document in

9 which somebody who was involved earlier says to Patton Boggs

10 this was a put-up job, the fix was in in Ecuador -- and, again,

11 I'm not saying that's the case, but you would have to hit that

12 kind of a long ball, and it wouldn't reflect adversely on

13 Patton Boggs -- just a second -- if in fact, as you seem to

14 assume, they said, My God, stop it.

15     Isn't it much more likely that if we go down this path

16 what happens is, putting aside all the work product issues and

17 so forth, you come up with documents in which, whether on

18 recommendation of Patton Boggs or otherwise, a conclusion is

19 reached that it would be really nice if these things went away

20 because they were getting killed in the 1782 cases because of

21 the criminal prosecutions in Ecuador, certainly on timing, and

22 probably more broadly in some respects, and this is an

23 unnecessary and unhelpful distraction in the United States?

24 Isn't that the more likely place it comes out?

25     MR. MASTRO: Even if that's where it came out, your

| C9pdchem | Conference | Page 47 |

1 Honor, what's the logical import of that? Criminal charges

2 were pending. The government prosecutor was already pursuing

3 criminal charges. It means that Patton Boggs is telling the

4 LAPs, who have such a cozy relationship with the government,

5 can't you see if you can make this go away. And they go to the

6 government and somehow make it go away. That's extremely

7 relevant.

8     And, your Honor, the premise of the question was

9 that's not necessarily something that reflects poorly on Patton

10 Boggs. The discovery is to go after the RICO defendants. Now,

11 they are a co-conspirator.

12     THE COURT: I understand.

13     MR. MASTRO: So we think it goes to the heart of the

14 case and the kind of things that went on in Ecuador, and that

15 the very limited burden -- they don't suggest a huge number of

16 hits. We never heard about any kind of huge number of hits.

17 We heard they don't think they have anything or much on this

18 subject. But if we get hits, even of the type your Honor

19 describes, hugely relevant to us.

20     THE COURT: Ms. Young, what about Mr. Mastro's last

21 point?

22     MS. YOUNG: Well, first of all, the two attorneys were

23 1782 parties, and, therefore, I do believe a large number of

24 hits will result from this type of search. And it just adds to

25 the burden of -- while, in and of itself it may be a small

| C9pdchem | Conference | Page 48 |

1 number, it adds to the overall burden in responding to the

2 subpoena.

3     THE COURT: Everything adds to the overall burden.

4 That is true in a nine-document case.

5     MS. YOUNG: Right. With respect to whether -- I mean,

6 if you will assume that Patton Boggs had some say or control in

7 how the criminal proceedings unfolded in Ecuador, even if

8 Patton Boggs did say, oh, you know, these proceedings should go

9 away, that to me is not relevant to the RICO action. It

10 certainly isn't -- getting them off the hook isn't a predicate

11 act under RICO, and I just think that the burden here outweighs

12 any potential location of any relevant documents.

13     THE COURT: I am certainly not satisfied by the burden

14 argument here, because there is really no basis for me to

15 conclude that the burden would be appreciable at all, the

16 incremental burden, so that's overruled. And the objection

17 altogether is overruled.

18     I think it's, you know, a reasonably close call as to

19 relevance, but I think the likelihoods are that it may be -- it

20 is quite possibly probative of material issues in the case.

21 And so in the absence of a convincing reason not to allow it, I

22 will allow it.

23     OK. 17.

24     MR. MASTRO: Once again, your Honor, we think this

25 goes to a central element of the RICO conspiracy. The RICO

CHEVRON CORP v
STEVEN DONZIGER, ET AL

September 25, 2012

---

C9pdchem          Conference          Page 49

1 defendants engaged in, you know, fraudulent testing,
2 manipulative test results. They ran what they called a Selva
3 Viva lab out of a hotel room. They then used something called
4 a Havoc lab that the crew depicts Donziger running in ex parte
5 to a judge to get him to vacate an inspection order because in
6 his private documents he said it would be a disaster. And
7 there was testimony that, you know, from Stratus and Sand made
8 that they didn't even have equipment to do the tests they said
9 they did.
10        THE COURT: These were the original judicial
11 inspections, or something else?
12        MR. MASTRO: This, your Honor, includes both the
13 original judicial inspections and what the plaintiffs' team did
14 subsequently.
15        Their whole case, their whole PR campaign in this
16 Court, they've, oh, but there really was an environmental
17 disaster there. They called it Chernobyl and everything else.
18 Yet the tests they did were fraudulent; the scientific evidence
19 wasn't there. You will recall Donziger and the crew outtakes
20 talking to his own experts just after they had briefed Cabrera
21 prior to his appointment, Donziger turns to his experts after
22 they tell him the groundwater contamination evidence isn't
23 there, he says: Don't worry about it. This is Ecuador. For
24 the Court, it's all smoke and mirrors and bullshit.
25        So this is a central part of the fraud, to create the

---

C9pdchem          Conference          Page 50

1 fiction that there actually was evidence to support their
2 claims, when in so many respects the scientific evidence -- the
3 genuine testing, even their own testing that wasn't fraudulent,
4 showed that the environmental contamination they alleged, they
5 trumpeted to the world, and they continue to trumpet to the
6 world, was not -- the evidence was not there, and that
7 certainly there was no environmental contamination attributable
8 to Texaco 20 years before, having left the country and
9 remediated before it left. So we think we're entitled to that
10 evidence because it shows a core -- it debunks a core element
11 of their defense and proves a core element of our RICO
12 conspiracy -- the fraud, the big fraud, which was that they
13 lied about the science and there wasn't an environmental
14 disaster attributable to Texaco that occurred there in Ecuador.
15        THE COURT: Ms. Young.
16        MS. YOUNG: This request, like several others, relates
17 to events that happened well before Patton Boggs' involvement
18 in this litigation, and we believe that it is inappropriate for
19 Patton Boggs to have to even respond to these or search for
20 documents that relate to events that predate their involvement.
21        You know, Patton Boggs was not a witness to these
22 events. If anything, it learned about the allegations relating
23 to these events later.
24        THE COURT: That's the objection?
25        MS. YOUNG: Yes.

---

C9pdchem          Conference          Page 51

1        THE COURT: Overruled.
2        MR. MASTRO: Your Honor wanted to know where in the
3 complaint a reference is to --
4        THE COURT: Do you want to go back to that one? This
5 was number 15.
6        MR. MASTRO: Yes. Number 15, your Honor.
7        THE COURT: I thought it was not in the complaint. I
8 thought it was in a responsive pleading.
9        MR. MASTRO: It's mentioned both in the complaint and
10 in responsive pleading -- or I should say Donziger's proposed
11 responsive pleading. He alleges fraud in the remediation at
12 paragraphs 128 and 138. That's docket 561 -- 567-1. Of
13 course, we hope that he will not be permitted to do that
14 proposed amended answer and counterclaims because we have
15 opposed it on grounds of futility.
16        But we also reference it with -- remediation fraud was
17 the basis for the criminal indictments of the two Chevron
18 attorneys. We allege it as a RICO predicate, and it's in the
19 first amended complaint at paragraph 69 and paragraphs 199
20 through 213. So it is directly related to the criminal charges
21 that were brought and ultimately dismissed against the two
22 Chevron attorneys.
23        THE COURT: Let me get it in front of me.
24        (Pause)
25        What is the docket item of the amended criminal

---

C9pdchem          Conference          Page 52

1 complaint?
2        MR. MASTRO: The document number of the first amended
3 complaint is --
4        THE COURT: I got it. OK. Tell me the paragraphs
5 again, please.
6        MR. MASTRO: The paragraphs, your Honor, are
7 paragraphs 69 and paragraphs 199 through 213.
8        (Pause)
9        THE COURT: All right. Ms. Young, what about 15?
10        MS. YOUNG: With respect to 15, and, again, a number
11 of others, your Honor, when you ordered Mr. Donziger to respond
12 to the subpoena, your reasoning was based on the fact that the
13 proposed discovery focused on matters where Donziger was an
14 actor and a witness. Here we have the exact opposite
15 situation. We have a case where Chevron is seeking access to
16 information that Patton Boggs gathered the way attorneys
17 normally gather such information in the course of a litigation.
18        THE COURT: Yes. I'm familiar with your argument and
19 I understand what your argument is, but, with respect, you have
20 taken what I said out of context and you are attempting to
21 misapply it here.
22        What I said was that, among other things supporting a
23 deposition of Mr. Donziger under Section 1782, was that this
24 was a case that saw his knowledge as a percipient witness and a
25 principal actor, right? That was not the basis on which I

---

C9pdchem          Conference          Page 53

1 ordered discovery. It was a factor I considered. And it's a
2 relevant factor, all right, but it doesn't sweep the boards --
3 not even close.
4         MS. YOUNG: As we've --
5         THE COURT: I'm not finished.
6         And was all made in the context of rejecting a
7 Friedman argument that was made on behalf of Mr. Donziger.
8         Now, I do fully appreciate the broader point that you
9 are making, and I think in more than a few degrees the rulings
10 that I have made, a good many of which this morning have
11 favored you, took that into account in the equation that led me
12 to the results I came to. But the simple fact that the
13 allegations -- excuse me, that the alleged fraud with respect
14 to the Texpet remediation and release predated Patton Boggs'
15 arrival on the scene is not a get-out-of-jail-free card on
16 discovery. It may have learned things. Things may have been
17 said to it that they may be protected by privilege; they may
18 not be protected by privilege. They may be work product; they
19 may not be work product. If they are work product, there maybe
20 be good cause shown for overcoming work product even in the
21 absence of any crime fraud exception. Now, it just doesn't get
22 you all the way home.
23         With that said, on this one I'm going to go your way,
24 despite the fact that I'm not doing it on the basis that you
25 suggested. It is a factor but it is only one factor.

---

C9pdchem          Conference          Page 54

1         The objection to 15 is sustained.
2         OK. I think we are up to 18, are we not? Maybe not.
3 Yes. What happened to 17?
4         There is no 17 on the joint submission that you guys
5 gave to me.
6         MR. MASTRO: There is, your Honor. That was the
7 fraudulent testing, your Honor.
8         THE COURT: I thought that was 16. No, that was
9 criminal cases.
10         I see. Page 19 has gone awry on me. I'll find it.
11 So we are up to 18. I found it. OK. What about 18?
12         MS. YOUNG: Patton Boggs has the same objection as to
13 the timing of the events that predated Patton Boggs'
14 involvement.
15         THE COURT: This one is overruled. This is right at
16 the heart of what the plaintiff is halfway home on with respect
17 to the crime fraud exception -- or nearly halfway home, I
18 should say.
19         19. Now, Mr. Mastro, when you say "Court experts"
20 here, I realize I could go back to the Mathison definitions,
21 but just tell me who they are.
22         MR. MASTRO: Sure, your Honor.
23         THE COURT: Is this Cabrera? Is it Cabrera plus the
24 cleansing experts, so-called, or is it a broader universe?
25         MR. MASTRO: It refers to the experts appointed by the

---

C9pdchem          Conference          Page 55

1 Lago Agrio Court, including the settling experts.
2         THE COURT: Who are the settling experts?
3         MR. MASTRO: They would have been persons appointed by
4 the Court. Each side had their own experts and then there were
5 settling experts --
6         THE COURT: This is back in the judicial inspections
7 era?
8         MR. MASTRO: Correct, your Honor.
9         We gave a long list of the people in that category, so
10 this is not one where they don't know who we're talking about.
11 So it included Cabrera and his technical team, but it also
12 included, but not necessarily limited to, if they are aware of
13 others in this category that we haven't listed, but we list the
14 20 or so persons who fell into this category.
15         THE COURT: And this is all before Patton Boggs gets
16 involved, right?
17         MR. MASTRO: Your Honor, it is before they became
18 involved that these people were doing their work, but, your
19 Honor, as you know, Patton Boggs came on the scene to deal with
20 the crisis. So --
21         THE COURT: I understand. The Cabrera crisis?
22         MR. MASTRO: The Cabrera crisis, that related in part
23 to the difference between the joint judicial inspections and
24 then going to a single global damage expert. So there are
25 likely to be documents that Patton Boggs has, exchanges it had

---

C9pdchem          Conference          Page 56

1 with co-counsel or others, about that process, about particular
2 experts, about communications with particular experts as they
3 tried to salvage or resuscitate the fraud.
4         THE COURT: Ms. Young.
5         MS. YOUNG: This is actually a category of documents
6 that I would like to talk about with more specifics about the
7 burden on Patton Boggs.
8         First, as you just heard, there is a long list of
9 experts, and their involvement predated Patton Boggs'
10 involvement in the case.
11         We did a search -- I mean, just isolating Cabrera --
12 obviously, he is the one that has been discussed the most
13 here -- just looking at our top 22 document custodians' e-mail
14 only, there were over 33,000 documents relating to Cabrera.
15 Within Patton Boggs' document management system, there were
16 another 11,000-plus documents related to Cabrera alone. That
17 in and of itself is a huge burden, and those documents are
18 likely to be only privileged documents, only documents where
19 Patton Boggs is analyzing and dealing with Chevron allegations.
20         So when we talk about burden and the burden of logging
21 all of these communications, even where it is a categorical
22 privilege log, it still requires a significant amount of review
23 and analysis to comply with this request.
24         THE COURT: Right. Look, we got two questions here.
25 We got Cabrera and we got everybody else.

CHEVRON CORP v
STEVEN DONZIGER, ET AL

September 25, 2012

| C9pdchem | Conference | Page 57 |

1  Now, let's put Cabrera to one side. Cabrera was after
2  this introductory point -- I mean, Cabrera is what this whole
3  fight has been about for a period of time. It's moved beyond
4  it. It's broadened. But that was the flashpoint where this
5  really all blew up. Right?
6  And counsel is nodding yes.
7  MS. YOUNG: Yes.
8  THE COURT: And that there should be a lot of hits on
9  Cabrera is not in the slightest surprising.
10  Given the evidence so far, it also ought not be
11  surprising that the case for telling you to do the review and
12  to proceed further with Cabrera without making a final judgment
13  on it now is pretty compelling. But we're talking about a
14  whole bunch of other people that I never heard of before this
15  morning except in generic terms, and I don't hear you saying
16  anything about any likelihood of a lot of hits with respect to
17  them. And I don't have any reason to think that there is any
18  particular burden problem with respect to them, because they've
19  just not been a focus of any of the litigation that's been
20  before me since 2010, I think.
21  Why is that not a perfectly reasonable view?
22  MS. YOUNG: Maybe that is an indication of the
23  relevance of these other experts.
24  THE COURT: Well, you may be right, first of all. And
25  it may be, alternatively, that it is because Chevron hasn't

| C9pdchem | Conference | Page 58 |

1  figured out that there was other stuff going on with some of
2  these people.
3  Now, I've got a complaint that alleges that there was
4  corruption with this process in Ecuador, and this is a very
5  logical place to look at it; isn't it?
6  MS. YOUNG: Again, the fact that it predates Patton
7  Boggs' involvement in the litigation, you know, tells us that
8  it is likely to only involve privileged communications and a
9  large number of them, potentially.
10  THE COURT: Yes. But you are overlooking the fact
11  that there has effectively been, as I remember it, summary
12  judgment for the proposition that there was corruption in the
13  appointment of Cabrera, that Cabrera's report was in
14  significant degrees ghostwritten by Patton Boggs' clients, and
15  it is not illogical in those circumstances for a reasonable
16  person to suspect, which I think is essentially the standard,
17  that that may have happened before the global expert framework
18  came on the scene with earlier experts.
19  Now, they don't have to prove summary judgment to get
20  over that hurdle; all they have to prove is probable cause.
21  Now, I'm not there yet. I don't know whether we get there or
22  not. I want to hear you guys fully on that subject. But it's
23  not an unreasonable point of view to think it is possible that
24  we get there.
25  And then the next question is, assuming there is

| C9pdchem | Conference | Page 59 |

1  probable cause, whether particular documents are in furtherance
2  of that fraud.
3  Now, it may well be that there are a lot in Patton
4  Boggs' files, if indeed there are any, that aren't in
5  furtherance; there may be others that are. I can't tell even
6  how to approach that until and unless they are scheduled.
7  So at least for now I'm going to overrule that
8  objection and we'll see where we get.
9  Number 20.
10  MR. MASTRO: Yes, your Honor.
11  THE COURT: Isn't this covered by something already,
12  or perhaps not?
13  MR. MASTRO: Yes, your Honor. I think there is
14  substantial overlap with number 14.
15  THE COURT: All right. So why shouldn't my ruling be
16  the same on this one?
17  MR. MASTRO: It should be the same. It includes
18  Cabrera-related submissions to the court is the only
19  difference.
20  THE COURT: OK.
21  MR. MASTRO: Thank you, your Honor.
22  THE COURT: And 21, also an overlap?
23  MR. MASTRO: It looks like -- your Honor, it has
24  overlap with 19, but it's more comprehensive about Cabrera and
25  Cabrera's team and all documents relating to Cabrera and

| C9pdchem | Conference | Page 60 |

1  Cabrera's team and his reports. It does appear to be, you
2  know, within the scope of your prior rulings as an overall
3  objection.
4  THE COURT: Don't you think it would have been a good
5  idea to have read through this stuff before you served the
6  subpoena?
7  MR. MASTRO: Your Honor, I think that there are some
8  requests that overlap, so my apologies for that.
9  THE COURT: All right. The ruling is the same as on
10  19.
11  I'll probably take a closer look at those three before
12  I sign an order and may modify it slightly, but unless you hear
13  otherwise, that's the ruling.
14  22. Uhl, Baron Rana & Associates?
15  MR. MASTRO: Your Honor, UBR was a consulting firm
16  that was working for the plaintiffs and became an integral part
17  of the Cabrera fraud because the plaintiffs basically
18  assigned --
19  THE COURT: They gave him part of the Cabrera report,
20  right?
21  MR. MASTRO: Exactly. And they wrote it and they
22  passed him off in the Cabrera report as if he was part of
23  Cabrera's technical team when he was really on the plaintiffs'
24  payroll.
25  THE COURT: I see.

C9pdchem          Conference                Page 61

1    MR. MASTRO: So we think it is highly relevant.  They
2  are refusing to produce anything.  They have been fighting
3  tooth and nail on the 1782 in New Jersey and only produced some
4  documents there.  We are not asking them to produce the same
5  documents they produced in New Jersey, but we're trying to get
6  the UBR-related documents and we have not yet gotten a full
7  production there.
8    THE COURT: What about it, Ms. Young?
9    MS. YOUNG: First of all, Patton Boggs represents UBR
10  in the 1782 proceeding that I believe is ongoing in New Jersey.
11  You know, I think it is more appropriate, since Chevron is
12  pursuing the same discovery in that litigation, that it
13  continue to pursue it there and be bound by whatever rulings
14  are made in New Jersey.  It is entirely duplicative.
15    THE COURT: The standards are different; right?
16    MS. YOUNG: Your Honor, the standards may be
17  different, but I believe the relevant documents that they are
18  seeking is all the same.
19    THE COURT: That may be.  But if they are entitled to
20  them in one action and not in the other, the fact that the
21  standards are different matters, doesn't it?
22    MS. YOUNG: Chevron hasn't indicated what it believes
23  Patton Boggs has in its possession that it is not able to get
24  through the 1782 action.
25    THE COURT: Do you normally when you seek discovery,

C9pdchem          Conference                Page 62

1  Ms. Young, tell the other side what it is that you think you
2  can get from them that you don't otherwise have?  I would
3  answer that rhetorical question myself.  I never heard of
4  lawyers doing that.
5    MS. YOUNG: No.  But this is an unusual situation in
6  which a law firm is being subpoenaed for client documents.  I
7  think it is more appropriate for those documents to be sought
8  within the pending 1782 proceeding.
9    THE COURT: Overruled.
10    23.
11    MR. MASTRO: Well, your Honor, again I think the
12  relevance of the documents is clear.  Patton Boggs is refusing
13  to produce anything in this regard even though this was an
14  essential role it played in the conspiracy.  It came up with
15  the cleansing experts' concept and ran with it, and coordinated
16  those cleansing experts to try and whitewash the Cabrera fraud,
17  even though those cleansing experts did no independent work,
18  did not go to Ecuador independently.  The Patton Boggs'
19  coordinating consultant wrote two of their reports -- never
20  disclosed that.  And those experts were never told about the
21  lack of independence of the Cabrera report and largely
22  piggybacked on what Cabrera did, which was not done by Cabrera
23  at all, it was done by plaintiff's consultants.
24    So this is an essential part of the RICO conspiracy
25  and fraud claim that Patton Boggs engineered in every respect.

C9pdchem          Conference                Page 63

1  So we would think it is clearly relevant.  To the extent they
2  think there are privilege claims involved -- although these are
3  testifying experts, hard to imagine what the privilege claims
4  would be -- they can categorically log them.
5    THE COURT: Well, but your request is for all
6  documents relating to the work of these people.
7    MR. MASTRO: Yes, your Honor.
8    THE COURT: And that would include not just documents
9  from UBR or -- I'm sorry, not UBR but the other persons, it
10  would include Patton Boggs' internal stuff, right?
11    MR. MASTRO: Yes.  But, your Honor, we believe and we
12  hope that your Honor will ultimately rule that the whole
13  cleansing expert process, as Judge Francis already ruled in the
14  Count Nine case, was part of a crime fraud and privilege was
15  vitiated because that was part of the crime fraud.  It was the
16  coverup of the Cabrera fraud and the attempt to whitewash it.
17    So we believe there are internal communication on this
18  that will also not be privileged.  We think it is an example
19  of -- it is not simply whether it was in furtherance of a crime
20  fraud, and they didn't necessarily know that it was being used
21  to further a crime fraud.  Here they knew exactly what they
22  were doing, and they are the ones who engineered it to try to
23  cover up the Cabrera fraud and to, you know, salvage the case
24  in a way that was a transparent, in our view, fraud at the end
25  of the day.

C9pdchem          Conference                Page 64

1    So we believe that they should categorically log their
2  internal documents, and when your Honor makes a crime fraud
3  ruling or reviews those internal documents you will see that.
4  I could be quoting chapter and verse of what we already have
5  that I think establishes the whole cleansing expert process and
6  the internal deliberations they had that were a crime fraud.
7  There have been a number of documents produce out of Donziger
8  which I think go to this already.  And Patton Boggs' lawyers
9  admitting exactly what they were doing to cleanse, to try to
10  salvage the Cabrera fraud, and we think their own internal
11  documents will be even more candid on this subject.  So we
12  think this goes really to one of the hearts of the case,
13  because at the end of the day the judgment purports to rely on
14  some of these folks who themselves relied on Cabrera and did
15  nothing independent.  So this really goes to the heart of the
16  fraud in Ecuador.
17    THE COURT: Wasn't there disclosure that they did
18  nothing independent?
19    MR. MASTRO: Their reports do not -- their reports are
20  carefully crafted to give the impression that they reached
21  independent conclusions based on their own work.  There are in
22  one or two them a reference to Cabrera, but they were carefully
23  crafted, working with the Weinberg group, Patton Boggs
24  hand-picked consultants to coordinate them and a group that
25  drafted two of those reports, such that when each of those six

CHEVRON CORP v
STEVEN DONZIGER, ET AL

September 25, 2012

| C9pdchem | Conference | Page 65 |
|---|---|---|

1 cleansing experts actually testified, some of them expressed
2 shock that Cabrera wasn't independent.  All of them admitted,
3 well, I didn't actually do anything independently.  Some of
4 them admitted they wouldn't have reached those conclusions or
5 they viewed them as hypothetical conclusions based on premises
6 that they were given, not on any independent work they did or
7 any independent data they collected.  They just used what was
8 in the Cabrera report, which was drafted by the plaintiffs and
9 with their tainted data.  So they didn't -- they weren't a
10 model of clarity admitting how little they did or that they
11 weren't relying on anybody else.
12　　　THE COURT: Thank you.
13　　　Ms. Young.
14　　　MS. YOUNG: Your Honor, a couple of points here.
15　　　One is that these so-called cleansing experts
16 certainly did disclose their reliance on the Cabrera data.
17 And, in fact, I think almost all of the listed individuals are
18 the subject of various 1782 proceedings around the country, and
19 in none of those proceedings has the Court found a crime fraud
20 exception.
21　　　THE COURT: Judge Francis did, right?
22　　　MR. MASTRO: So did the Weinberg court, your Honor,
23 D.C.
24　　　MS. YOUNG: As the Southern District of Ohio said in
25 the Barnthouse 1782 action --

| C9pdchem | Conference | Page 66 |
|---|---|---|

1　　　THE COURT: May I have an answer to my question?
2　　　MS. YOUNG: I'm sorry, your Honor.
3　　　THE COURT: Judge Francis did, correct?
4　　　MS. YOUNG: I believe that finding was vacated, your
5 Honor.
6　　　THE COURT: By whom?
7　　　MS. YOUNG: According to my counsel, with the Weinberg
8 decision it was vacated.
9　　　THE COURT: Judge Francis didn't write the Weinberg
10 decision, did he?
11　　　Counsel, do you know who Judge Francis is.
12　　　MS. YOUNG: Yes, I do, your Honor.
13　　　May I confer with my client for a minute?
14　　　THE COURT: Yes.
15　　　(Pause)
16　　　MS. YOUNG: Your Honor, it is my understanding, after
17 conferring with counsel, that Judge Francis relied entirely on
18 your Honor's decision on crime fraud, which was vacated by the
19 Second Circuit.
20　　　THE COURT: I haven't rendered a decision on crime
21 fraud, and no such decision has gone to the Second Circuit, let
22 alone been vacated by it.
23　　　Now, Ms. Young, would you identify the three other
24 people at the table with you other than Mr. Leader?
25　　　MS. YOUNG: I stand corrected, your Honor.  This is

| C9pdchem | Conference | Page 67 |
|---|---|---|

1 Eric Westenberger from Patton Boggs, Edward Yennock from Patton
2 Boggs, and Jonathan Peck from Patton Boggs.
3　　　THE COURT: And it was Mr. Westenberger whom you've
4 identified at page 67, lines 19 and 20 of the transcript
5 moments ago as your counsel; is that correct?
6　　　MS. YOUNG: I was referring to Patton Boggs, who is my
7 client.  I misspoke.
8　　　(Pause)
9　　　THE COURT: The objection is overruled.  You can at
10 least schedule the documents.  Then we'll see whether there is
11 crime fraud here.
12　　　All right.  I think this is a good point to break, and
13 we will resume at 2:15 on Thursday.
14　　　OK.  I thank you all.  This has been moving better
15 than I expected.
16　　　MR. MASTRO: Thank you very much, your Honor.  I
17 appreciate all the time.
18　　　THE COURT: Thank you.
19　　　MR. MASTRO: Thank you.
20　　　(Adjourned to 2:15 p m., Thursday, September 27, 2012)
21
22
23
24
25

## A

**ability (1)**
34:7
**able (12)**
16:3;20:7;21:24;
26:15;27:1;30:17;
32:25;34:7,14;41:1,2;
61:23
**absence (2)**
48:21;53:21
**absolutely (1)**
4:11
**accept (3)**
8:9;22:14;24:13
**accepted (1)**
34:2
**access (1)**
52:15
**According (1)**
66:7
**account (1)**
53:11
**accuse (1)**
42:4
**accused (1)**
22:12
**achievable (1)**
24:25
**act (4)**
10:3,24;43:5;48:11
**acted (1)**
12:19
**acting (5)**
10:6,7,12,16,23
**action (5)**
33:23;48:9;61:20,24;
65:25
**actions (3)**
23:4,5;25:7
**active (1)**
27:4
**activity (2)**
22:9;42:5
**actor (2)**
52:14,25
**actual (1)**
13:6
**actually (13)**
7:6;8:12;13:20;15:6;
17:7,15;25:24;32:6;
33:19;50:1;56:5;65:1,3
**add (4)**
7:23;11:21;20:13;
27:20
**addition (2)**
4:8,11
**address (3)**
5:17,23;26:18
**addressing (1)**
5:3
**adds (3)**

47:24;48:1,3
**Adjourned (1)**
67:20
**admission (3)**
29:16,17,17
**admissions (1)**
15:17
**admitted (2)**
65:2,4
**admitting (2)**
64:9;65:10
**advance (3)**
40:4;41:14,21
**adverse (1)**
32:4
**adversely (1)**
46:12
**affect (1)**
5:6
**affirmative (5)**
41:25;42:2,3,16;43:3
**aftermath (1)**
16:19
**again (18)**
3:14;9:2;11:23,24;
20:14,14,21;26:19;
29:8;31:16;38:18;
44:17;46:10;48:24;
52:5,10;58:6;62:11
**against (5)**
4:9;25:25;43:24;
44:7;51:21
**agent (1)**
10:13
**agents (1)**
10:12
**ago (1)**
67:5
**agreed (9)**
8:12;9:10,17,21;
12:3;13:6;24:1;25:14;
28:6
**agreeing (1)**
34:19
**agreement (9)**
9:3,18;10:1;11:3,11;
19:3;21:4;28:7;35:14
**agreements (5)**
30:8,10,19;34:18;
43:6
**Agrio (10)**
4:7;13:12,13;17:17;
34:8;38:15,21,23;43:5;
55:1
**alegato (5)**
13:22;19:8;20:4,8,25
**allegation (1)**
40:1
**allegations (12)**
12:19;17:23;22:9;
39:1,9,24;41:12,20;
43:4;50:22;53:13;
56:19

**allege (1)**
51:18
**alleged (5)**
5:7;28:18;42:16;
50:4;53:13
**alleges (2)**
51:11;58:3
**alleging (1)**
42:17
**allow (2)**
48:21,22
**almost (2)**
14:21;65:17
**alone (3)**
45:8;56:16;66:22
**along (1)**
22:20
**alter (1)**
5:6
**alternatively (1)**
57:25
**although (3)**
37:4;44:17;63:2
**altogether (1)**
48:17
**always (2)**
24:22,25
**Alyssa (1)**
9:15
**amended (5)**
4:12;51:14,19,25;
52:2
**America (1)**
19:14
**among (2)**
43:4;52:22
**amount (4)**
6:15;29:3;41:20;
56:22
**amounts (1)**
38:25
**analysis (4)**
39:8,15;41:18;56:23
**analyzed (2)**
12:18;40:1
**analyzing (2)**
41:20;56:19
**Andres (1)**
34:20
**anticipating (1)**
16:22
**anyplace (1)**
7:19
**apart (1)**
15:25
**apologies (1)**
60:8
**Apparently (3)**
19:12;30:16;34:21
**appeal (8)**
13:13;16:14,24;17:1;
19:9,17;38:16;39:3
**appear (2)**

7:2;60:1
**appearance (1)**
3:10
**appeared (2)**
4:5;23:23
**appears (3)**
19:5,9,20
**appellate (5)**
17:2,5,9,11;20:10
**application (1)**
15:11
**applications (1)**
8:25
**appoint (1)**
40:14
**appointed (2)**
54:25;55:3
**appointment (2)**
49:21;58:13
**appreciable (1)**
48:15
**appreciate (3)**
3:21;53:8;67:17
**appreciative (1)**
36:9
**approach (2)**
22:15;59:6
**approaching (1)**
6:10
**appropriate (7)**
6:20;10:13;18:5,5;
24:16;61:11;62:7
**area (1)**
21:18
**argued (1)**
13:15
**argument (10)**
5:14;7:13,22,23;
14:6,17;48:14;52:18,
19;53:7
**arguments (1)**
7:21
**arising (1)**
31:9
**arms' (1)**
32:5
**around (6)**
10:23;33:23;34:9;
43:6;45:4;65:18
**arrange (1)**
35:4
**arrangement (3)**
26:25;27:10;33:15
**arrangements (2)**
28:1,13
**arrival (3)**
21:20;22:21;53:15
**aside (1)**
46:16
**asserting (1)**
23:21
**assigned (1)**
60:18

**Associates (1)**
60:14
**assume (2)**
46:14;48:6
**assuming (1)**
58:25
**assumption (1)**
26:13
**attacks (1)**
16:22
**attempt (2)**
43:5;63:16
**attempting (2)**
7:12;52:20
**attempts (1)**
43:17
**attendees (1)**
21:12
**attorney (4)**
21:9;22:17,21;25:15
**attorney-client (1)**
4:16
**attorneys (7)**
5:19;8:6;44:11;
47:22;51:18,22;52:16
**attributable (2)**
50:7,14
**August (1)**
4:20
**authority (5)**
10:3,16;11:1;12:15,
20
**authorized (4)**
10:10,19,19,24
**avocation (1)**
21:1
**aware (4)**
18:11;23:3;40:22;
55:12
**away (4)**
46:19;47:5,6;48:9
**awry (1)**
54:10

## B

**back (9)**
31:18;32:15;39:18;
42:21;43:2;44:1;51:4;
54:20;55:6
**backed (2)**
27:5;35:13
**background (1)**
3:25
**ball (1)**
46:12
**Barnthouse (1)**
65:25
**Baron (1)**
60:14
**based (3)**
31:2;52:12;64:21;
65:5

**basic (1)**
21:24
**basically (3)**
11:16;17:4;60:17
**basis (9)**
6:7;12:13;13:1;
28:10;31:8;48:14;
51:17;52:25;53:24
**bearing (1)**
28:14
**became (4)**
10:20;33:20;55:17;
60:16
**beef (2)**
42:12,13
**began (1)**
43:21
**beginning (2)**
19:20;43:12
**behalf (9)**
4:7,10;10:3,6,7,12,
23,25;53:7
**behaved (1)**
7:17
**behest (1)**
31:2
**believes (1)**
61:22
**benefit (2)**
6:14;27:10
**Berkon (1)**
26:12
**best (1)**
3:19
**better (3)**
19:13,18;67:14
**beyond (2)**
6:25;57:3
**big (1)**
50:12
**Bless (1)**
8:14
**blew (1)**
57:5
**blow (1)**
32:1
**boards (1)**
53:2
**Boggs (89)**
3:3;4:5,11;5:1,11,17;
8:2,4;9:16,17,21;10:6,
13;11:14;12:18;13:11,
14,20;14:1,19;15:13;
16:1,9,20;17:19,22;
18:19;19:3,21;21:7;
22:1;23:7,14;24:8;
25:14;26:12,23,24;
27:9,25;28:14,16,22;
29:7,19;30:12;31:1;
33:13;34:2,17;37:3;
39:25;40:15;41:11,19;
43:21,23;44:5,10,14,
18,20;45:25;46:1,9,13,

18;47:1,3,10;48:6,8;
50:19,21;52:16;54:12;
55:15,19,25;56:7,19;
61:9,23;62:12,25;
64:23;67:1,2,2,6
**Boggs' (28)**
8:22,24;10:3;11:19;
17:15;18:12,15,21;
20:24;21:9,14,21;
29:18;31:2;39:8,23;
41:18;50:17;53:14;
54:13;56:9,15;58:7,14;
59:4;62:18;63:10;64:8
**Boggses (1)**
33:24
**both (5)**
16:6,6;35:3;49:12;
51:9
**bound (3)**
29:15,16;61:13
**Brazil (1)**
23:5
**breadth (1)**
5:6
**break (4)**
3:11,14,14;67:12
**breakdown (1)**
32:25
**bridge (1)**
12:2
**brief (3)**
14:15,18;17:16
**briefed (1)**
49:20
**briefing (6)**
13:21,21,22;19:6,21;
20:10
**Briefly (1)**
11:22
**briefs (2)**
13:12;14:4
**bring (1)**
33:24
**broad (1)**
12:23
**broadened (1)**
57:4
**broader (5)**
7:5;11:3,10;53:8;
54:24
**broadly (2)**
23:23;46:22
**brought (1)**
51:21
**bullshit (1)**
49:24
**bunch (1)**
57:14
**burden (22)**
4:25;5:4,7,23,24;6:1,
13;26:5;45:19;47:15,
25;48:1,3,11,13,15,16;
56:7,17,20,20;57:18

**burdened (1)**
44:20
**burdensome (1)**
4:19
**Burford (14)**
26:24;27:5;30:22,23;
31:1,8;33:1,2,2,3,12;
34:12;35:13,13
**Burford's (1)**
35:17

# C

**Cabrera (39)**
15:15,25;16:4,8;
18:25;39:2;49:20;
54:23,23;55:11,21,22;
56:11,14,16,25;57:1,1,
2,9,12;58:13;59:24,25;
60:17,19,22;62:16,21,
22,22;63:16,23;64:10,
14,22;65:2,8,16
**Cabrera-related (1)**
59:18
**Cabrera's (4)**
58:13;59:25;60:1,23
**call (2)**
15:10;48:18
**called (3)**
13:21;49:2,3,17
**came (8)**
15:4;23:7;31:11;
46:25;53:12;55:19;
58:18;62:14
**camera (1)**
12:10
**campaign (1)**
49:15
**can (13)**
3:19;9:15;18:10;
19:12;21:7;22:9;28:12;
36:24;37:8;47:5;62:2;
63:4;67:9
**Canada (1)**
23:5
**candid (1)**
64:11
**capable (1)**
34:19
**capacities (1)**
34:23
**capital (2)**
31:2,6
**card (1)**
53:15
**care (1)**
9:12
**carefully (2)**
64:20,22
**carve (1)**
39:24
**case (42)**
4:6,12;6:14,21;

10:22;11:19;13:14;
14:16;15:24,25;16:1,
23;19:23;22:23;23:7,
12,22;25:25;31:8,19;
33:8,9,13;34:24;40:10;
42:1,24;43:4,19;44:24;
46:11;47:14;48:4,20;
49:15;52:15,24;56:10;
57:11;63:14,23;64:12
**cases (9)**
27:4;29:25;30:14,15;
43:11,16;44:5;46:20;
54:9
**categorical (5)**
12:3,8;23:17;36:24;
56:21
**categorically (3)**
23:18;63:4;64:1
**category (4)**
55:9,13,14;56:5
**cause (4)**
17:11;53:20;58:20;
59:1
**central (2)**
48:25;49:25
**certain (8)**
4:11;10:22;15:2;
23:2;26:23;29:11;
34:13;45:11
**certainly (11)**
15:23;18:10,11;
22:10;34:23;40:10;
46:21;48:10,13;50:7;
65:16
**chance (1)**
17:8
**change (1)**
20:12
**changes (1)**
13:23
**chapter (1)**
64:4
**charges (6)**
43:24;44:3;46:3;
47:1,3;51:20
**Chernobyl (1)**
49:17
**Chevron (36)**
4:7,9;5:20;8:8;9:20;
21:8,15;22:7;23:25;
24:7,12;25:12;26:2;
30:21;34:7,11,14;37:4,
10,10,16,17;38:19;
39:2,9;42:4;43:20;
44:7,12;51:17,22;
52:15;56:19;57:25;
61:11,22
**Chevron's (6)**
12:19;39:8,23;41:12,
20;44:11
**choice (1)**
28:3
**choices (2)**

15:2,4
**Circuit (2)**
66:19,21
**circumstances (1)**
58:15
**cities (1)**
21:16
**claim (11)**
6:1;12:7,16;23:16,
17;26:20;30:21;34:9;
36:24;45:19;62:25
**claims (8)**
4:20;5:4,23;10:5,15;
50:2;63:2,3
**clarification (1)**
19:10
**clarify (3)**
37:1;40:3;41:8
**clarity (1)**
65:10
**cleanse (2)**
15:15;64:9
**cleansing (16)**
15:1,10,14;16:3;
19:7;20:6,7,25;54:24;
62:15,16,17;63:13;
64:5;65:1,15
**clear (4)**
6:3;7:7;26:4;62:12
**clearly (3)**
23:18;43:19;63:1
**client (4)**
27:17;62:6;66:13;
67:7
**clients (4)**
9:18;11:6,9;58:14
**close (4)**
5:11;43:2;48:18;
53:3
**closer (1)**
60:11
**closing (1)**
14:17
**co-conspirator (4)**
4:12;13:15;28:18;
47:11
**co-conspirators (2)**
33:20;34:6
**co-counsel (2)**
44:19;56:1
**collateral (1)**
32:11
**colleagues (2)**
15:17;46:4
**collect (5)**
5:18;8:4,23;11:25;
27:1
**collected (2)**
27:11;65:7
**colluding (1)**
36:15
**comfortable (1)**
28:1,4

**coming (4)**
15:12,24;16:1;24:8
**commencing (1)**
7:12
**committed (1)**
37:6
**common (2)**
32:7;34:9
**communication (4)**
11:8;24:8;38:13;
63:17
**communications (8)**
9:19;15:20;36:17;
41:12;46:4;56:2,21;
58:8
**company (2)**
35:23;36:2
**compelling (1)**
57:13
**complaint (9)**
4:12;28:19;51:3,7,9,
19;52:1,3;58:3
**complete (1)**
19:18
**completely (1)**
37:2
**compliance (2)**
4:17;7:6
**comply (2)**
41:15;56:23
**complying (1)**
6:1
**composition (1)**
17:2
**comprehensive (1)**
59:24
**computer (1)**
8:25
**concept (2)**
22:20;62:15
**concerned (2)**
4:4;10:2
**conclude (2)**
45:15;48:15
**concluded (1)**
30:15
**conclusion (2)**
7:20;46:18
**conclusions (3)**
64:21;65:4,5
**conducts (1)**
11:14
**confer (2)**
27:17;66:13
**conference (1)**
3:15
**conferring (3)**
12:15;27:21;66:17
**confidentiality (1)**
28:23
**confirm (2)**
9:4;29:13
**confirmation (1)**

9:7
**confirming (1)**
9:8
**confused (1)**
14:6
**confusion (1)**
7:23
**connection (6)**
13:12;17:17;21:15;
37:13;39:23;42:6
**considerable (1)**
41:20
**considerations (1)**
6:21
**considered (3)**
4:24;30:16;53:1
**considering (1)**
6:14
**conspiracy (11)**
10:4,15;23:7;26:21;
27:4,7;36:14;48:25;
50:12;62:14,24
**consultant (1)**
35:4,5;62:19
**consultants (2)**
62:23;64:24
**consulting (1)**
60:15
**contain (1)**
22:21
**contained (1)**
14:18
**contamination (2)**
49:22;50:4,7
**contentions (1)**
5:17
**context (4)**
3:24;16:7;52:20;
53:6
**contingency (2)**
26:25;33:14
**contingent (1)**
27:10
**continue (5)**
3:20;17:6;34:14;
50:5;61:13
**continued (1)**
31:16
**continues (1)**
19:2
**continuing (1)**
34:8
**contrary (1)**
25:3
**control (1)**
48:6
**controlled (1)**
25:6
**controversy (2)**
6:15;30:25
**convincing (1)**
7:9;48:21
**coordinate (1)**

64:24
**coordinated (1)**
62:15
**coordinating (1)**
62:19
**copies (1)**
25:24
**core (3)**
50:10,10,11
**corrected (1)**
66:25
**corruption (2)**
58:4,12
**cost (2)**
45:5,8
**counsel (5)**
57:6;66:7,11,17;67:5
**Count (1)**
63:14
**counterclaims (1)**
51:14
**countries (3)**
23:2;29:11,13
**country (3)**
34:9;50:8;65:18
**couple (1)**
65:14
**course (7)**
17:22;18:19;22:15;
25:21;38:24;51:13;
52:17
**COURT (193)**
3:1,2,6,8,19,22;4:6;
8:14,17,19;9:10,12,23;
11:12,22;12:12,21,25;
13:9,16,25;14:1,6,13,
16,20,22;15:5,6,8,11,
12;16:3,14,24;17:13,
24;18:10,11,13,14,21,
24;19:14,24;20:17,21;
21:17;22:6,11;23:20;
24:15,20;25:10,12,16,
20;26:8,10;27:9,13,18,
22;28:3,9,12,15,18;
29:1,9;30:4,7,20;31:14,
21;32:1,4,9,15,20;33:6,
16;34:1,15;35:1,7,10,
16,21,24;36:1,3,9,12,
22,25;37:8,17,20,25;
38:5,10,16,17,22,23;
39:5,10;40:2,8;41:7,9,
15,22;42:2,7,13,21,23;
43:9,11,15,21;44:9,15,
23;45:5,9,22;46:1,5;
47:12,20;48:3,13;
49:10,16,24;50:15,24;
51:1,4,7,23;52:4,9,18;
53:5;54:8,15,19,23;
55:1,2,4,6,15,21;56:4,
24;57:8,24;58:10;
59:11,15,18,20,22;
60:4,9,19,25;61:8,15,
19,25;62:9;63:5,8;

64:17;65:12,19,21,22;
66:1,3,6,9,14,20;67:3,
9,18
**courts (2)**
6:11;38:24
**cover (2)**
10:1;63:23
**covered (1)**
59:11
**coverup (1)**
63:16
**cozy (1)**
47:4
**craft (1)**
17:10
**crafted (2)**
64:20,23
**crafting (1)**
17:11
**create (2)**
21:7;49:25
**crew (2)**
49:4,19
**crime (13)**
22:16;53:21;54:17;
63:14,15,19,21;64:2,6;
65:19;66:18,20;67:11
**criminal (20)**
42:24;43:11,16,17,
24;44:3,6,18;45:3,4,4;
46:3,21;47:1,3;48:7;
51:17,20,25;54:9
**crisis (3)**
55:20,21,22
**critically (3)**
16:2;33:10,19
**crux (1)**
4:13
**currently (1)**
26:1
**custodians' (1)**
56:13
**cut (4)**
7:24;20:14;30:23;
39:20
**cutoff (1)**
20:3

## D

**damage (1)**
55:24
**data (4)**
9:6;65:7,9,16
**dates (5)**
18:21;21:15,20;
22:22,23
**day (3)**
3:20;63:25;64:13
**DC (1)**
65:23
**de (1)**
45:9

**deal (6)**
5:9,16;10:17;20:17;
25:10;55:19
**dealing (4)**
24:4;32:4;43:12;
56:19
**debunks (1)**
50:10
**December (1)**
20:9
**decide (3)**
24:20;32:10;35:18
**decided (2)**
30:14,15
**decision (7)**
4:20;20:11;66:8,10,
18,20,21
**decisions (2)**
40:25;46:3
**defendant (1)**
28:16
**defendants (3)**
36:15;47:10;49:1
**defense (4)**
42:2,14;43:3;50:11
**defenses (3)**
42:1,3,16
**defined (2)**
20:25;42:24
**definitely (1)**
11:10
**definitions (2)**
5:12;54:20
**definitively (1)**
5:3
**defraud (2)**
34:5,6
**defrauded (3)**
30:17;34:13;35:15
**defrauding (1)**
34:10
**degree (2)**
6:4;18:6
**degrees (2)**
53:9;58:14
**deliberations (1)**
64:6
**demanded (1)**
21:8
**denies (1)**
17:22
**deny (1)**
29:13
**departure (2)**
21:20;22:22
**depending (1)**
3:11
**depends (1)**
45:22
**depicts (1)**
49:4
**deposition (2)**
35:17;52:23

**derivative (1)**
16:4
**described (1)**
11:13
**describes (1)**
47:19
**designate (1)**
29:23
**designed (1)**
24:11
**designing (1)**
24:22
**desirable (1)**
24:24
**despite (1)**
53:24
**determine (1)**
22:4
**detriment (1)**
34:11
**difference (4)**
42:9;45:10;55:23;
59:19
**differences (1)**
13:22
**different (5)**
7:2;29:19;61:15,17,
21
**differently (1)**
44:23
**difficult (1)**
24:5
**diligent (1)**
40:20
**directed (1)**
17:15
**directly (2)**
10:11;51:20
**disagreement (2)**
21:6,19
**disaster (3)**
49:6,17;50:14
**disclose (1)**
65:16
**disclosed (2)**
28:25;62:20
**disclosing (1)**
31:18
**disclosure (2)**
4:16;64:17
**disclosures (1)**
29:3
**discovery (15)**
6:12,16;22:12,13;
24:23;30:25;31:9;
32:25;40:20;47:10;
52:13;53:1,16;61:12,
25
**discredited (1)**
18:25
**discretion (1)**
6:11
**discussed (2)**

4:19;56:12
**discussing (2)**
12:14;28:1
**discussion (1)**
24:13
**discussions (3)**
31:18,24;44:18
**dismissed (1)**
51:21
**dispute (5)**
4:13;8:3;13:9;25:13;
27:9
**disputes (1)**
4:23
**distinguished (1)**
5:25
**distraction (1)**
46:23
**district (2)**
6:11;65:24
**divided (1)**
11:16
**docket (2)**
51:12,25
**doctrine (1)**
4:17
**document (9)**
8:24;9:14;16:2;
17:22;37:9;46:8;52:2;
56:13,15
**documents (96)**
4:15;5:18;8:4,21,23;
9:5,20;11:3,7;12:1,10,
14,18,24;13:11;14:25;
15:3,12,16,18,19;
16:10,17,25;17:15,19;
18:10,12,14,15,16;
20:23;23:1,10;24:2,6,
14;25:7,8,15,24;26:20;
28:5;29:20;30:17,24;
31:13;32:24;33:12;
34:11;35:1;36:8,21;
37:9,13;38:24;39:5,8,
13;40:4,10,15,16;
41:13,18;43:25;44:4,
15,21;46:17;48:12;
49:6;50:20;55:25;56:5,
14,16,17,18,18;59:1,
25;61:4,5,6,17;62:6,7,
12;63:6,8;64:2,3,7,11;
67:10
**done (8)**
3:15,16;11:16;30:21;
39:23;41:5;62:22,23
**Donziger (15)**
11:5;15:22;16:17;
25:25;26:6,10;40:12;
49:4,19,21;52:11,13,
23;53:7;64:7
**Donziger's (2)**
44:12;51:10
**doubt (1)**
7:18

**down (2)**
22:14;46:15
**draft (2)**
14:18;19:3
**drafted (4)**
15:9;39:22;64:25;
65:8
**drafting (6)**
14:4,14;15:1,13;
16:2;40:24
**drafts (6)**
13:23;14:7,7,8;
25:16,17
**draw (1)**
26:14
**dress (1)**
3:25
**drew (1)**
3:9
**drive (1)**
15:21
**drop (1)**
46:3
**dropped (2)**
43:18,24
**duces (1)**
4:5
**duped (1)**
33:21
**duplicative (1)**
61:14
**durations (2)**
21:24;22:24
**during (1)**
17:20

**E**

**earlier (5)**
10:21;13:23;38:7;
46:9;58:18
**early (3)**
16:18;18:23;20:3
**Ecuador (24)**
15:14;18:11,14;19:7,
12;21:9,15,23;22:1;
36:16;37:3,12;43:25;
44:3,12;46:10,21;
47:14;48:7;49:23;
50:14;58:4;62:18;
64:16
**Ecuadorian (2)**
16:3;18:20
**Ed (1)**
3:3
**edict (1)**
38:15
**edited (1)**
14:1
**Edward (1)**
67:1
**effectively (1)**
58:11

**efficient (2)**
7:14,20
**effort (2)**
34:14;44:11
**efforts (1)**
30:18
**either (5)**
3:13;27:3;33:17;
34:5;40:13
**elaborating (1)**
41:22
**electronic (2)**
8:23;24:23
**element (3)**
48:25;50:10,11
**else (12)**
9:23;20:5;25:15;
26:5;29:18;30:1;31:19;
41:5;49:11,17;56:25;
65:11
**e-mail (1)**
56:13
**e-mails (1)**
24:4
**emerge (1)**
18:25
**emerged (1)**
40:16
**emerges (1)**
19:1
**enable (1)**
29:23
**encourage (1)**
44:11
**end (3)**
21:11;63:24;64:13
**enforcement (6)**
19:11;23:4,4,8;25:7;
35:6
**engage (1)**
24:13
**engaged (2)**
42:5;49:1
**engineered (2)**
62:25;63:22
**engineering (1)**
19:22
**enlighten (1)**
37:8
**enough (2)**
4:2;41:2
**enterprise (2)**
7:10;31:5
**entirely (2)**
61:14;66:17
**entirety (4)**
10:1;14:11;23:14;
27:1
**entitled (7)**
22:4;23:12,19;31:13;
35:1;50:9;61:19
**enumerated (1)**
5:24

**environmental (4)**
49:16;50:4,7,13
**equation (1)**
53:11
**equipment (1)**
49:8
**era (1)**
55:7
**Eric (1)**
67:1
**escrito (1)**
38:14
**essence (1)**
13:9
**essential (4)**
23:6;34:4;62:14,24
**essentially (3)**
4:14;45:9;58:16
**established (1)**
37:25
**establishes (1)**
64:5
**etc (2)**
40:14,14
**evaluated (1)**
4:21
**eve (1)**
15:12
**even (27)**
4:18;6:12;10:6,21,
25;11:8,8;17:6;19:10,
13;22:17;29:13;31:22;
32:1;46:25;47:18;48:7;
49:8;50:3,19;53:3,20;
56:21;59:5;62:13,17;
64:11
**event (1)**
19:19
**events (5)**
50:17,20,22,23;
54:13
**Everybody (3)**
4:1;29:14;56:25
**evidence (11)**
13:16;14:8;33:7;
41:19;49:18,22;50:1,2,
6,10;57:10
**evidencing (2)**
12:15;41:13
**evident (1)**
23:12
**ex (1)**
49:4
**exact (1)**
52:14
**exactly (8)**
11:14;18:22;31:21;
33:4;40:12;60:21;
63:21;64:9
**examining (1)**
33:17
**example (3)**
24:7;30:23;63:18

CHEVRON CORP v
STEVEN DONZIGER, ET AL

September 25, 2012

**examples (1)**
17:18
**except (4)**
5:16;18:4;25:21;
57:15
**exception (4)**
22:17;53:21;54:17;
65:20
**exceptions (1)**
5:13
**exchanges (7)**
10:18;11:4,6;33:2;
35:13;44:5;55:25
**exclude (3)**
12:17;25:23,23
**excluded (1)**
8:10
**Excuse (1)**
27:16;53:13
**execute (1)**
23:8
**executed (3)**
30:8,10;34:18
**exercising (1)**
11:1
**exist (2)**
11:8;40:6
**exists (2)**
12:16;46:7
**expected (1)**
67:15
**expecting (2)**
41:10,15
**expense (1)**
6:13
**expert (7)**
19:7;20:7;40:14;
55:24;58:17;63:13;
64:5
**experts (22)**
15:14;16:4;49:20,21;
54:19,24,25;55:1,2,4,5;
56:2,2,9;57:23;58:18;
62:16,17,20;63:3;65:1,
15
**experts' (1)**
62:15
**expressed (1)**
65:1
**extensive (2)**
6:6,7
**extent (10)**
5:23;6:12;7:2;18:4,
9;23:16;27:11;36:23;
44:14;63:1
**extort (2)**
34:7,14
**extortion (1)**
23:9
**extremely (3)**
31:12;45:24;47:6

---

**F**

**fact (14)**
13:18;17:19;31:17;
37:20;40:8,20;46:13;
52:12;53:12,24;58:6,
10;61:20;65:17
**factor (4)**
53:1,2,25,25
**failure (1)**
42:11
**fair (1)**
8:11
**faith (1)**
31:8
**Fajardo (3)**
11:5;24:8;40:11
**falling (1)**
15:25
**familiar (1)**
52:18
**far (2)**
7:17;57:10
**fashion (2)**
9:6;12:3
**favored (1)**
53:11
**feasible (1)**
3:12
**February (1)**
16:18
**fee (1)**
27:10;33:15
**fell (1)**
55:14
**felt (3)**
33:21;34:12;35:14
**few (2)**
4:2;53:9
**fewer (2)**
5:19;8:7
**fiction (1)**
50:1
**Fifth (1)**
6:24
**fight (1)**
57:3
**fighting (1)**
61:2
**figure (2)**
45:7,8
**figured (1)**
58:1
**filed (6)**
14:9;17:19;19:22;
20:8,9;23:5
**files (3)**
11:19;44:13;59:4
**final (8)**
13:21,22,24;14:15,
16,19;19:7;57:12
**Finally (1)**

---

7:12
**financial (2)**
28:1,8
**financiers (2)**
10:8;27:3
**find (5)**
26:15;39:19;46:7,8;
54:10
**finding (1)**
66:4
**fine (1)**
30:2
**finished (1)**
53:5
**firm (7)**
3:4;26:13,23,24;
27:2;60:15;62:6
**firms (2)**
10:8;33:25
**firm's (1)**
9:6
**firm-wide (1)**
8:24
**First (15)**
4:4,14;5:11;6:6,10;
17:7;19:22;29:23;
37:21;47:22;51:19;
52:2;56:8;57:24;61:9
**fix (2)**
16:21;46:10
**flagged (1)**
39:12
**flashpoint (1)**
57:4
**focus (2)**
5:7;57:19
**focused (1)**
52:13
**folks (1)**
64:14
**follows (1)**
25:2
**foreign (3)**
29:11,13;35:5
**foremost (1)**
6:10
**form (1)**
29:23
**forth (6)**
17:23;21:13;31:18;
40:16;44:1;46:17
**fortunate (1)**
41:2
**found (2)**
54:11;65:19
**four (1)**
39:13
**Fourthly (1)**
6:9
**framework (2)**
5:10;58:17
**Francis (6)**
63:13;65:21;66:3,9,

---

11,17
**frankly (1)**
11:18
**fraud (48)**
10:4,15;15:15,25;
16:7,8,9;19:10;22:17;
23:12;30:11,11;31:12;
33:5;22;34:9;41:19;
42:4,11,17;49:25;
50:12,12;51:11,16;
53:13,21;54:17;56:3;
59:2;60:17;62:16,25;
63:14,15,16,20,21,23,
24;64:2,6,10,16;65:19;
66:18,21;67:11
**fraudulent (7)**
36:16;42:5;43:5;
49:1,18;50:3;54:7
**Friedman (1)**
53:7
**front (1)**
51:23
**full (2)**
15:23;61:6
**fully (3)**
36:9;53:8;58:22
**functioning (1)**
34:22
**fund (3)**
30:13;31:10;32:10
**fundamental (1)**
8:3
**funded (1)**
31:5
**funders (3)**
26:24;30:18;33:20
**funding (16)**
28:13;30:8,10,19,23;
31:1,16,17,17;32:8,22;
33:3;34:13,18;35:4,14
**further (4)**
7:7;38:1;57:12;
63:21
**furtherance (3)**
59:1,5;63:19
**furthermore (1)**
22:16
**futility (1)**
51:15

---

**G**

**gained (1)**
27:11
**gap (1)**
12:3
**garden (1)**
29:22
**gather (3)**
3:6;13:5;52:17
**gathered (1)**
52:16
**gave (4)**

---

31:5;54:5;55:9;
60:19
**general (6)**
3:25;5:12,16;8:1,20;
38:7
**generate (1)**
26:25
**generic (1)**
57:15
**genuine (1)**
50:3
**get-out-of-jail-free (1)**
53:15
**gets (1)**
55:15
**ghostwriting (1)**
16:7;17:6;41:13,21
**ghostwritten (2)**
13:18;58:14
**given (4)**
7:15;24:17;57:10;
65:6
**gives (1)**
6:11
**giving (1)**
39:18
**global (3)**
40:14;55:24;58:17
**glove (1)**
26:12
**God (2)**
4:1;46:14
**goes (19)**
10:11,14;11:13,17,
24;12:6;13:14;18:18;
23:6,10;26:19;27:2;
35:17;38:18;41:25;
47:13;48:25;64:12,15
**good (6)**
25:2;31:8;53:10,20;
60:4;67:12
**government (7)**
29:10,12;36:15,17;
47:2,4,6
**granted (1)**
7:9
**grounds (1)**
51:15
**groundwater (1)**
49:22
**group (2)**
64:23,24
**guess (1)**
26:8
**guys (3)**
34:19;54:4;58:22

---

**H**

**half (1)**
3:13
**halfway (2)**
54:16,17

**hand (1)**
26:12
**hand-picked (1)**
64:24
**happen (2)**
19:14,16
**happened (3)**
50:17;54:3;58:17
**happens (1)**
46:16
**hard (3)**
15:21;37:10;63:3
**Havoc (1)**
49:4
**hear (5)**
7:13;25:2;57:15;
58:22;60:12
**heard (6)**
25:8;47:16,17;56:8;
57:14;62:3
**heart (10)**
10:14;11:17;13:14;
16:9;23:11;26:20;
36:14;47:13;54:16;
64:15
**hearts (1)**
64:12
**heck (1)**
41:23
**held (1)**
29:11
**help (1)**
32:23
**helpful (4)**
5:14;7:14,20;40:1
**helping (2)**
17:10;35:4
**highly (4)**
27:7;35:15;36:18;
61:1
**hit (2)**
46:6,11
**hits (9)**
45:11,13,22;47:16,
16,18,24;57:8,16
**Hold (1)**
19:24
**home (4)**
46:6;53:22;54:16,17
**Honor (111)**
3:17,21;8:12,16,18;
9:2,11,15,25;10:17,20;
11:10,21;12:11,17;
13:8,10,14;14:3;15:18;
16:15;17:1;19:1,17;
20:6,13;21:18;23:1,6,
25;25:5,11;26:3,19;
27:12,14,16,20,23,25;
28:20,22;29:2,6;30:3,6,
9,22;32:22;33:10,18;
34:4,21;35:8,12,19;
36:7,8,13;38:9,12;
40:19;41:8,25;42:10,

15,19,22;43:1,8,10,14,
16,23;45:18,23;47:1,8,
18;48:24;49:12;51:2,6;
52:6,11;54:6,7,22;55:8,
17,19;59:10,13,21,23;
60:7,15;61:16;62:11;
63:7,11,12;64:2;65:14,
22;66:2,5,12,16,25;
67:16
**Honor's (1)**
66:18
**hoodwinked (1)**
31:11
**hook (1)**
48:10
**hope (6)**
7:14,23;21:5;30:25;
51:13;63:12
**host (1)**
21:10
**hostile (1)**
33:2
**hotel (1)**
49:3
**hour (1)**
3:13
**hours (3)**
5:19;8:7,8
**housekeeping (1)**
3:8
**huge (3)**
47:15,16;56:17
**hugely (1)**
47:19
**hurdle (1)**
58:20
**hypothetical (1)**
65:5

**I**

**IBM (1)**
33:17
**idea (1)**
60:5
**identical (3)**
25:21,23;32:18
**identification (1)**
21:21
**identified (7)**
20:4,5,6,8,9;40:4;
67:4
**identify (3)**
22:1;26:2;66:23
**identifying (2)**
21:10,14
**identity (1)**
22:21
**illogical (1)**
58:15
**imagine (3)**
22:11;37:11;63:3
**immunity (3)**

36:19;37:2,23
**impermissibly (1)**
12:23
**implied (1)**
45:24
**implore (1)**
35:12
**import (1)**
47:1
**importance (2)**
6:15,16
**important (8)**
5:7;10:9,21;16:2,15;
33:11,19;46:2
**impression (1)**
64:20
**improper (1)**
22:9
**improve (1)**
19:11
**inappropriate (1)**
50:18
**inception (1)**
45:25
**include (2)**
63:8,10
**included (2)**
55:11,12
**includes (3)**
38:16;49:12;59:17
**including (7)**
13:19;19:9;25:16;
26:23,24;27:4;55:1
**incremental (3)**
45:5,7;48:16
**indebted (1)**
43:9
**indeed (3)**
22:18;33:8;59:4
**independence (1)**
62:21
**independent (7)**
62:17;64:15,18,21;
65:2,6,7
**independently (2)**
62:18;65:3
**indicate (1)**
6:18
**indicated (5)**
12:13;13:2;20:22;
37:19;61:22
**indication (1)**
57:22
**indictment (1)**
3:9
**indictments (1)**
51:17
**indigenous (1)**
10:24
**individual (3)**
5:25;7:4,13
**individuals (3)**
26:22;27:3;65:17

**induce (2)**
30:13,18
**induced (1)**
31:10
**information (12)**
12:6;21:11;22:3;
24:11;28:8,24;29:7,24;
30:1;32:14;52:16,17
**initial (1)**
3:10
**initiate (1)**
43:17
**initiated (1)**
44:7
**inquiry (1)**
32:14
**inspection (1)**
49:5
**inspections (5)**
40:13;49:11,13;55:6,
23
**instance (2)**
6:6;29:23
**instructions (1)**
5:13
**integral (3)**
13:21;34:13;60:16
**integrally (1)**
19:6
**intend (3)**
6:2;7:7,22
**interactions (1)**
11:15
**interest (4)**
3:4;17:24;29:18;
32:7
**interested (2)**
37:5;38:20
**interesting (1)**
11:5
**interests (1)**
26:22
**internal (9)**
15:19;24:7;41:12;
63:10,17;64:2,3,6,10
**internally (1)**
44:19
**interposed (1)**
5:11
**into (5)**
16:16;34:6,13;53:11;
55:14
**introduce (1)**
3:2
**introductory (1)**
57:2
**invade (1)**
11:19
**investigation (1)**
44:6
**investigations (2)**
43:17;44:6
**investing (1)**

34:6
**investors (1)**
33:7
**Invictus (3)**
23:8;31:3;35:6
**involve (1)**
58:8
**involved (13)**
4:6;13:11;14:15;
19:6,9;33:13,17;44:10;
45:25;46:9;55:16,18;
63:2
**involvement (15)**
13:19;14:14,25;15:4;
16:11;17:16;18:15,21;
20:24;50:17,20;54:14;
56:9,10;58:7
**isolating (1)**
56:11
**issue (6)**
10:21;11:25;19:10;
25:15;26:7;32:11
**issued (2)**
38:15,24
**issues (12)**
5:3;6:16,17;10:11;
17:3,5,21;18:1,4;
32:22;46:16;48:20
**item (1)**
51:25
**items (1)**
39:4
**it's- (1)**
22:7

**J**

**Jersey (4)**
61:3,5,10,14
**job (3)**
43:22,24;46:10
**Joe (2)**
27:5,5
**join (1)**
27:3
**joint (2)**
54:4;55:23
**Jonathan (1)**
67:2
**judge (12)**
17:3,4;21:23;22:8;
40:12;49:5;63:13;
65:21;66:3,9,11,17
**judgment (22)**
13:16,17,23,24;14:2,
9,21;16:22;17:4,9;
19:8;27:2,11;36:16;
38:14;39:2;40:5,9;
57:12;58:12,19;64:13
**judgments (3)**
6:19;16:6;38:20
**judgment's (1)**
16:19

**judicial (5)**
40:13;49:10,13;55:6,
23
**jurisdiction (1)**
10:11
**jurisdictional (1)**
23:22
**justice (1)**
44:3
**justify (1)**
22:25

## K

**keep (1)**
31:10
**keeping (1)**
22:8
**Keker (1)**
26:13
**kept (1)**
31:5
**key (2)**
19:6;22:3
**killed (1)**
46:20
**kind (4)**
23:15;46:12;47:14,
16
**knew (7)**
14:4;15:16,17;16:11,
12;40:12;63:21
**knowing (1)**
15:25
**knowledge (5)**
15:6;40:5;41:14,21;
52:24
**known (1)**
19:14
**knows (5)**
4:1,1;14:1;29:14;
44:12
**Kohn (3)**
27:5,5;34:12

## L

**lab (2)**
49:3,4
**lack (1)**
62:21
**Lago (10)**
4:7;13:12,13;17:17;
34:8;38:15,21,23;43:5;
55:1
**Lago-related (1)**
40:25
**language (4)**
19:13,18;20:12;45:3
**LAPs (8)**
10:4,6,12;15:14;
34:14;35:5;44:7;47:4
**LAPs-related (1)**

**large (2)**
47:23;58:9
**largely (1)**
62:21
**last (1)**
47:20
**late (1)**
19:23
**later (10)**
7:5;12:8;16:22;
19:11;25:9;30:15;
31:11;33:21;43:18;
50:23
**latter (1)**
4:8
**law (6)**
3:4;10:7;34:1,9,25;
62:6
**lawsuit (1)**
29:17
**lawsuits (1)**
4:9
**lawyer (3)**
34:20,22,23
**lawyers (8)**
7:16;10:22;13:20;
21:14,21;43:25;62:4;
64:8
**lead (1)**
45:16
**LEADER (11)**
3:2,7,17,21;8:15,16;
9:10,11;17:13;26:11;
66:24
**learn (1)**
41:2
**learned (2)**
50:22;53:16
**least (7)**
4:23;6:3;8:10;20:23;
26:13;59:7;67:10
**leave (1)**
45:10
**led (2)**
43:18;53:11
**left (2)**
50:8,9
**legal (4)**
5:20;6:22;8:21,23
**length (1)**
32:5
**less (1)**
8:8
**letters (1)**
33:3
**lied (1)**
50:13
**life (3)**
24:24;34:22,24
**lifeblood (1)**
31:6
**light (3)**

**6:20;7:2,6**
**likelihood (2)**
45:15;57:16
**likelihoods (1)**
48:19
**likely (11)**
6:14;7:8,8;12:23;
45:17;46:4,15,24;
55:25;56:18;58:8
**limit (5)**
6:11;7:3;8:13;39:3;
40:8
**limitation (6)**
8:9;12:22;30:7;
37:18,20,21
**limited (6)**
30:10,24;35:11;
45:20;47:15;55:12
**limits (1)**
31:20
**lines (1)**
67:4
**list (9)**
8:10,13;17:20;20:16,
20,20;55:9,13;56:8
**listed (2)**
55:13;65:17
**lists (1)**
32:19
**literally (1)**
14:18
**litigate (1)**
33:23
**litigation (33)**
4:1,6;5:20;7:18;8:8;
11:14,16;13:13;17:17;
18:20;19:5;21:15;28:2,
14,17,25;29:5,24;
30:14;32:7;34:8;37:7,
12,16;38:21,23;43:5;
46:2;50:18;52:17;
57:19;58:7;61:12
**litigations (2)**
34:9;37:10
**little (4)**
11:18;19:18;32:16;
65:10
**location (1)**
48:12
**locations (1)**
21:11
**log (22)**
4:18,22;5:18;6:7;
8:5;12:2,8;21:7,8,14,
19;22:20,21;23:17;
25:18;36:24;38:4;
39:25;41:11;56:22;
63:4;64:1
**logged (1)**
12:7
**logging (4)**
11:25;12:3;44:20;
56:20

**logical (3)**
26:13;47:1;58:5
**long (5)**
9:7;22:3;46:12;55:9;
56:8
**Look (7)**
17:24;19:24;21:19;
45:13;56:24;58:5;
60:11
**looking (3)**
9:20;24:10;56:13
**looks (1)**
59:23
**loop (1)**
43:2
**loosely (1)**
37:4
**lot (6)**
17:5;39:5,7;57:8,16;
59:3
**lunch (2)**
3:11,14

## M

**main (1)**
8:6
**maintained (1)**
9:5
**major (2)**
6:6;14:12
**makes (2)**
42:9;64:2
**making (3)**
15:17;53:9;57:12
**management (2)**
8:25;56:15
**managing (1)**
3:3
**manipulate (1)**
20:12
**manipulation (1)**
17:6
**manipulative (1)**
49:2
**manner (2)**
7:15;13:16
**many (8)**
16:19;33:24;40:17,
22;44:15;45:22;50:2;
53:10
**Master (1)**
17:18
**MASTRO (113)**
8:12,18;9:1,2,3,23;
11:13,21,23;13:8,10;
14:11,14,24;16:15;
17:1,23;18:9,24;19:1,
16;20:4,6,19;21:1,17,
18;22:25;23:1;25:4,5,
11,19;26:3,9,19;27:12,
14,20,23;29:1,2,25;
30:2,9,22;32:21;33:10,

**18;34:4,21;35:3,8,11,
19;36:1,2,7,11,13,23;
38:9;40:2,7,18,19;
41:24,25;42:3,10,15,
22;43:1,10,14,16,23;
45:15,18,23;46:25;
47:13;48:24;49:12;
51:2,6,9;52:2,6,9;54:6,
19,22,25;55:3,8,17,22;
59:10,13,17,21,23;
60:7,15,21;61:1;62:11;
63:7,11;64:19;65:22;
67:16,19**
**Mastro's (1)**
47:20
**material (4)**
5:6;6:23;14:19;
48:20
**materials (1)**
11:18
**Mathison (1)**
54:20
**matter (5)**
4:18;6:22;9:5;18:17;
41:5
**matters (4)**
5:8;6:12;52:13;
61:21
**may (36)**
7:2;11:21;14:7;19:2,
5,20;24:24;28:3;31:23;
32:1,22;35:8;39:14,14;
41:5,8;43:25;45:13;
47:25;48:19;53:16,16,
17,17,18,19;57:24,25;
58:17;59:3,5;60:12;
61:16,19;66:1,13
**maybe (8)**
28:12;32:9,9,10;
34:12;53:19;54:2;
57:22
**mean (12)**
7:15,16;12:17;17:25;
26:10;28:3;37:15;
38:24;40:8;48:5;56:11;
57:2
**meaning (1)**
13:24
**meaningful (1)**
32:13
**means (2)**
8:5;47:3
**media (1)**
29:11
**meet (1)**
22:8
**meet-and-confer (3)**
9:20;17:20;37:4
**meeting (4)**
21:22,23;22:23;24:9
**meetings (3)**
21:11,22,24
**membership (2)**

26:21;27:8
**memo (1)**
15:10
**memory (1)**
40:11
**mentioned (1)**
51:9
**merit (1)**
31:4
**merits (1)**
31:19
**met (2)**
21:21;22:2
**mid-2010 (2)**
15:11;20:8
**might (6)**
6:25;7:1;18:6;23:3;
24:11;32:23
**million (1)**
26:25
**millions (1)**
31:2
**mind (1)**
5:9;6:11;7:25
**minimis (1)**
45:10
**minimize (1)**
18:6
**minimum (1)**
28:22
**minute (1)**
66:13
**mirrors (1)**
49:24
**misapply (1)**
52:21
**misconduct (2)**
22:12,17
**misrepresentations (1)**
30:12
**misspoke (1)**
67:7
**misstated (1)**
8:7
**mixed-fee (1)**
33:14
**model (1)**
65:10
**modifications (1)**
17:9
**modified (3)**
12:13;13:4,6
**modify (4)**
7:3;13:2;20:23;
60:12
**moment (1)**
6:25
**moments (1)**
67:5
**money (3)**
33:11,12,14
**more (24)**
3:6;7:11;10:7;11:19;

23:23;25:8;27:20;
32:16;34:23,24;35:8;
38:7,25;41:3,4;46:15,
22,24;53:9;56:6;59:24;
61:11;62:7;64:11
**morning (3)**
3:23;53:10;57:15
**most (4)**
5:2,7;22:11;56:12
**motion (8)**
15:10;17:16;20:7,10,
11,25;21:1;39:2
**motions (4)**
13:12;15:1;16:20;
19:12
**motive (1)**
28:15
**motives (1)**
26:22
**move (3)**
8:14,19;19:17
**moved (1)**
57:3
**moving (2)**
19:10;67:14
**much (6)**
38:7,20;45:19;46:15;
47:17;67:16
**must (3)**
7:14;15:7;33:3
**myself (1)**
62:3

## N

**nail (2)**
15:20;61:3
**named (2)**
4:11;13:15
**names (1)**
32:19
**narrative (1)**
4:3
**narrowing (2)**
18:5;37:6
**national (1)**
33:25
**nearly (1)**
54:17
**necessarily (4)**
15:19;47:9;55:12;
63:20
**need (11)**
17:7;18:12;22:13;
26:2;27:16;29:7;33:4;
41:11;45:3;46:6,8
**needed (1)**
31:6
**needs (2)**
6:7,14
**nevertheless (4)**
13:24;14:2,20;15:7
**New (5)**

10:13;61:3,5,10,14
**Newberry (1)**
3:3
**next (1)**
58:25
**Nextant (2)**
35:22;36:2
**nice (1)**
46:19
**Nine (1)**
63:14
**nine-document (1)**
48:4
**nine-figure (1)**
27:10
**Nobody (1)**
35:16
**nodding (1)**
57:6
**noise (1)**
27:6
**none (1)**
65:19
**non-Ecuadorian (1)**
19:5
**nor (1)**
29:13
**normally (2)**
52:17;61:25
**number (35)**
4:9,24;8:20;9:14;
13:5;15:9;21:4;22:25;
23:21;25:1,3,6,12;
26:16;32:17;35:21,22;
38:6;41:11,23;42:23;
43:11;45:11;47:15,16,
23;48:1;51:5,6;52:2,
10;58:9;59:9,14;64:7

## O

**object (1)**
23:18
**objection (25)**
8:1,20,22;12:5;13:3,
4;21:2;23:20;24:19;
25:20;26:14;35:25;
37:2,23;38:2,3,5;41:7;
48:16;50:24;54:1,12;
59:8;60:3;67:9
**objections (13)**
5:1,5,10,12,12,15,16;
7:3,13,22;8:2;23:22;
34:17
**objects (1)**
23:14
**obligation (1)**
24:17
**obliged (1)**
5:18
**obtain (1)**
32:25
**obtaining (1)**

33:20
**obvious (1)**
17:21
**Obviously (5)**
3:3;26:10;42:10;
43:18;56:12
**occurred (3)**
10:18;17:6;50:14
**o'clock (1)**
3:18
**off (4)**
30:23;31:20;48:10;
60:22
**offered (1)**
21:13
**official (1)**
38:13
**officials (2)**
36:15,17
**Ohio (1)**
65:24
**OK (30)**
3:19;9:12;13:5,9;
17:24;18:7,8;20:18,21;
21:4;22:25;25:1,19,20;
30:4,7;31:17;37:25;
38:5,10;40:2;41:6;
42:13;43:15;48:23;
52:4;54:2,11;59:20;
67:14
**once (3)**
7:11,11;48:24
**one (34)**
4:10;5:22;6:13;
11:21;13:6;15:10;18:6;
20:13;21:7;22:20;
24:15;27:20,22;32:15,
22;34:10;35:8;40:9,16;
42:16;43:1;46:7;51:4;
53:23,25;54:15;55:10;
56:12;57:1;59:16;
61:20;64:12,22;65:15
**ones (5)**
39:13,16;41:1;43:18;
63:22
**one-word (1)**
45:6
**ongoing (1)**
61:10
**only (18)**
8:6;15:21;16:17;
21:6,18,20;26:13;
29:24;33:22;34:8;39:1;
53:25;56:14,18,18;
58:8;59:18;61:3
**opinion (2)**
17:11;19:19
**opinions (2)**
19:13;40:24
**opposed (3)**
25:8;41:13;51:15
**opposite (2)**
32:6;52:14

**oral (3)**
5:14;7:22,22
**order (10)**
7:7;22:18;28:23,23;
29:3,4,22;38:14;49:5;
60:12
**ordered (3)**
7:1;52:11;53:1
**orders (2)**
38:19;40:24
**original (2)**
49:10,13
**others (12)**
21:23;30:12;31:9;
34:12;39:14,20;44:5;
50:16;52:11;55:13;
56:1;59:5
**otherwise (7)**
6:18;13:3;21:2;
45:12;46:18;60:13;
62:2
**ought (3)**
6:3,9;57:10
**out (22)**
14:19;15:3,12;16:4;
17:14;24:20;26:15;
27:5;29:5;32:9,14;
33:19;35:14;39:19,21,
24;46:24,25;49:3;
52:20;58:1;64:7
**outlet (1)**
29:12
**outside (2)**
12:19;28:25
**outtakes (1)**
49:19
**outweighs (2)**
6:13;48:11
**over (8)**
4:13;15:15;16:5,8;
19:21;26:25;56:14;
58:20
**overall (4)**
6:1;48:1,3;60:2
**overarching (1)**
46:2
**overbroad (1)**
38:13
**overcoming (1)**
53:20
**overlap (4)**
59:14,22,24;60:8
**overlooking (1)**
58:10
**overrule (6)**
13:3,3,24:19;26:14;
38:10;59:7
**overruled (9)**
25:20;38:5;41:7;
48:16,17;51:1;54:15;
62:9;67:9
**oversees (1)**
17:4

**own (7)**
4:9;41:6;49:20;50:3;
55:4;64:10,21

# P

**Pablo (1)**
24:8
**page (4)**
8:1;9:13;54:10;67:4
**pages (4)**
5:1,5,11,24
**Pallares (2)**
42:24,25
**panel (3)**
17:2,2,5
**paper (3)**
15:15;16:5,8
**paragraph (1)**
51:19
**paragraphs (6)**
51:12,19;52:4,6,7,7
**part (21)**
4:14;6:6;14:12,13;
15:5,5;23:6;30:10,11;
33:21;34:4,5;43:20;
49:25;55:22;60:16,19,
22;62:24;63:14,15
**parte (1)**
49:4
**participants (2)**
22:24;27:4
**participated (3)**
16:21;34:24;35:3
**particular (5)**
38:19;56:1,2;57:18;
59:1
**particularly (1)**
33:8
**parties (13)**
7:15,16,16,17;11:15;
13:5;22:11;24:19;31:6,
7;32:21;34:10;47:23
**parties' (1)**
6:15
**partner (1)**
3:3
**party (2)**
15:9;32:5
**passed (1)**
60:22
**passing (1)**
13:1
**path (1)**
46:15
**Patton (118)**
3:3;4:5,11,25;5:11,
17;8:1,4,22,24;9:16,17,
21;10:3,6,13;11:14,19;
12:18;13:11,14,20;
14:1,19;15:12;16:1,9,
20;17:15,19,22;18:12,
15,19,21;19:3,21;

20:24;21:7,9,14,21;
22:1,23:7,14;24:8;
25:14,26:12,23,24;
27:9,25;28:14,16,22;
29:7,18,19;30:12;31:1,
2;33:12,24;34:2,17;
37:3;39:8,23,25;40:15;
41:11,18,19;43:21,23;
44:5,10,14,17,20;
45:25;46:1,9,13,18;
47:3,9;48:6,8;50:17,19,
21;52:16;53:14;54:12,
13;55:15,19,25;56:7,9,
15,19;58:6,14;59:3;
61:9,23;62:12,18,25;
63:10;64:8,23;67:1,1,2,
6
**Pause (11)**
20:1;26:17;27:15,19,
24;28:21;36:5;42:18;
51:24;52:8;66:15;67:8
**payment (3)**
28:2,24,24
**payroll (1)**
60:24
**Peck (1)**
67:2
**penalty (1)**
21:8
**pendency (1)**
44:2
**pending (3)**
4:10;47:2;62:8
**people (12)**
10:24,25;16:12;
23:21;26:11;30:13;
55:9,18;57:14;58:2;
63:6;66:24
**people's (1)**
24:5
**percipient (1)**
52:24
**perfection (1)**
24:24
**perfectly (3)**
22:12;26:15;57:21
**perform (2)**
24:1;42:11
**perhaps (1)**
59:12
**period (2)**
20:3;57:3
**perjury (1)**
21:9
**permit (1)**
15:14
**permitted (1)**
51:13
**person (2)**
35:3;58:16
**personal (1)**
10:11
**persons (4)**

10:15;55:3,14;63:9
**persuade (1)**
28:12
**persuaded (1)**
33:6
**photographs (1)**
21:12
**piece (1)**
29:24
**pieces (1)**
14:24
**pierce (1)**
22:18
**piggybacked (1)**
62:22
**place (3)**
37:21;46:24;58:5
**plainly (1)**
6:9
**plaintiff (5)**
4:8,9;7:5,8:9;54:16
**plaintiffs (8)**
4:7;13:25;29:6;33:1,
3;60:16,17;65:8
**plaintiff's (4)**
13:19;30:13;33:1;
62:23
**plaintiffs' (4)**
13:19;17:8;49:13;
60:23
**planning (1)**
31:24
**played (3)**
13:20;17:10;62:14
**pleading (6)**
17:17;42:7,14;51:8,
10,11
**pleadings (1)**
13:12
**please (1)**
52:5
**plus (1)**
54:23
**pm (1)**
67:20
**point (17)**
9:3,22;10:21;16:17;
17:14;18:5;21:19;27:5;
36:25;39:10,19;40:17;
47:21;53:8;57:2;58:23;
67:12
**points (3)**
4:2;34:13;65:14
**poorly (2)**
44:3;47:9
**portions (1)**
14:9
**position (3)**
27:13;29:10,12
**positive (1)**
21:25
**possession (1)**
61:23

**possible (2)**
7:10;58:23
**possibly (3)**
6:4,5;48:20
**post-appellate (1)**
20:11
**post-judgment (3)**
19:8;20:10;21:1
**posture (2)**
6:21;8:5
**potential (4)**
13:7;28:2,24;48:12
**potentially (4)**
11:2;24:6;26:20;
58:9
**power (1)**
25:14
**PR (1)**
49:15
**practical (1)**
6:19
**practice (2)**
20:10,11
**practicing (1)**
34:25
**precluded (1)**
43:7
**predate (1)**
50:20
**predated (3)**
53:14;54:13;56:9
**predates (1)**
58:6
**predecessors (1)**
42:5
**predicate (2)**
48:10;51:18
**prejudice (4)**
7:5;12:14;13:2;
20:21
**premise (1)**
47:8
**premises (1)**
65:5
**preparation (7)**
13:11;14:25;16:11,
21;17:16;18:16;20:24
**prepared (2)**
22:12;39:4
**present (2)**
6:21;8:5
**pressure (1)**
23:9
**presumably (1)**
45:12
**pretty (3)**
38:20;40:23;57:13
**primarily (2)**
8:24;19:4
**principal (1)**
52:25
**prior (2)**
49:21;60:2

**private (1)**
49:6
**privilege (29)**
4:16,18,20,21,25;
5:4;6:7;8:5;12:7,9,24;
13:1;17:21;18:1,4,7;
22:18,19;23:16,16;
31:22;36:23;38:4;
53:17,18;56:22;63:2,3,
14
**privileged (8)**
9:18;11:17;12:1;
31:21;36:18;56:18;
58:8;63:18
**probable (2)**
58:20;59:1
**probably (5)**
3:15;11:4;45:3;
46:22;60:11
**probative (2)**
33:8;48:20
**problem (16)**
3:17;9:1;12:16;
20:19;24:12;25:18;
26:3;27:23;29:1,4,22;
30:4;32:18;39:14,16;
57:18
**problematic (1)**
39:17
**problems (2)**
16:22;24:22
**proceed (2)**
7:25;57:12
**proceeding (2)**
61:10;62:8
**proceedings (7)**
3:4;44:18,22;48:7,8;
65:18,19
**process (12)**
7:12,19;13:20;14:5;
15:16;16:8,17;17:10;
56:1;58:4;63:13;64:5
**processor (1)**
33:16
**procure (1)**
36:15
**procured (1)**
13:17
**produce (14)**
5:18;9:21;18:13,15;
23:24;25:14;28:6;
34:17;36:21;41:6;61:2,
4;62:13;64:7
**produced (4)**
25:24,24;61:3,5
**producing (2)**
28:4;29:19
**product (16)**
4:16,20;9:19;11:17;
12:18;13:24;14:19;
25:18;31:23;32:2;41:6;
46:16;53:18,19,19,20
**production (10)**

4:18;7:1,6,8;12:10;
15:21;26:1,6;35:11;
61:7
**productive (1)**
6:25
**productively (1)**
29:21
**professionals (2)**
5:19;8:6
**Progress (1)**
8:18
**proper (1)**
4:24
**properly (3)**
4:21;10:6,9
**propose (1)**
39:15
**proposed (3)**
51:10,14;52:13
**proposes (1)**
8:4
**proposition (1)**
58:12
**prosecuted (1)**
46:1
**prosecution (2)**
43:18;44:11
**prosecutions (1)**
46:21
**prosecutor (1)**
47:2
**prospects (1)**
19:11
**protected (3)**
4:15;53:17,18
**protection (1)**
32:2
**protective (4)**
28:23;29:3,4,22
**prove (3)**
33:4;58:19,20
**proves (1)**
50:11
**provide (4)**
9:17;14:7;21:24;
31:2
**provided (2)**
13:15;20:16
**providencia (1)**
38:15
**providing (1)**
31:16
**pull (1)**
42:19
**pulling (2)**
32:9;42:15
**pure (1)**
31:15
**purely (2)**
6:22;41:18
**purports (1)**
64:13
**pursue (1)**

61:13
**pursuing (2)**
47:2;61:12
**put (10)**
3:23;12:1;15:14;
16:3;17:23;21:13;
23:17;36:24;43:7;57:1
**putting (1)**
46:16
**put-up (1)**
46:10

**Q**

**quite (3)**
19:16;38:8;48:20
**quote-unquote (1)**
10:24
**quoting (1)**
64:4

**R**

**raise (2)**
20:15;25:22
**raised (4)**
16:20;20:19;42:1,3
**ran (2)**
49:2;62:15
**Rana (1)**
60:14
**rather (3)**
6:21;22:11;38:20
**reached (5)**
9:3;21:4;46:19;
64:20;65:4
**read (2)**
12:14;60:5
**realize (2)**
31:11;54:20
**really (23)**
3:12;6:5;7:18;10:7,
14,24;11:24;12:5;16:7;
19:2;20:20:14;26:8;
27:6;37:5,7;46:19;
48:14;49:16;57:5;
60:23;64:12,15
**reason (12)**
7:9;23:3;25:2,4;
29:15;30:9;33:22;38:1,
10;44:19;48:21;57:17
**reasonable (7)**
24:1,14,18,18,21;
57:21;58:15
**reasonably (1)**
48:18
**reasoning (1)**
52:12
**reasons (4)**
4:19;6:13;16:6;
45:18
**recall (2)**
10:20;49:19

**received (1)**
8:13
**recent (1)**
34:24
**recently (1)**
34:23
**recognized (1)**
44:1
**recommendation (1)**
46:18
**record (7)**
15:5,6,7;18:10,11,
14;43:7
**recordings (1)**
21:12
**records (1)**
23:15
**recruited (2)**
26:23;27:3
**redacted (5)**
9:18;10:1;11:3,11;
28:7
**redaction (1)**
28:10
**redrafting (1)**
14:15
**reduce (2)**
18:6;32:12
**reference (3)**
51:3,16;64:22
**referred (1)**
14:17
**referring (3)**
24:8;42:7;67:6
**refers (1)**
54:25
**reflect (5)**
13:18;15:3;16:10;
35:13;46:12
**reflected (1)**
44:3
**reflecting (1)**
43:25
**reflects (1)**
47:9
**refusing (2)**
61:2;62:12
**regard (5)**
4:25;10:9;15:18;
39:9;62:13
**regarding (1)**
37:9
**rejecting (1)**
53:6
**relate (5)**
23:10;26:21;39:2;
40:4;50:20
**related (11)**
7:17;11:15;17:15;
18:15;32:22;37:15;
38:21,22;51:20;55:22;
56:16
**relates (8)**

26:6;28:13;37:2,7;
38:12,13,23;50:16
**relating (18)**
16:25;19:7;20:24;
22:23;23:2;25:7;28:1,
24;35:2;39:6,8;41:12,
21;42:4;50:22;56:14;
59:25;63:6
**relationship (1)**
47:4
**release (2)**
43:6;53:14
**relevance (9)**
6:22;12:6;13:13;
23:11;36:7,12;48:19;
57:23;62:12
**relevant (24)**
6:12;10:4;11:2;
23:19,23;27:7;29:17;
30:20;31:12;35:15;
36:18;43:8,19;44:4,21;
45:24;47:7,19;48:9,12;
53:2;61:1,17;63:1
**reliance (1)**
65:16
**relied (3)**
8:24;64:14;66:17
**religious (1)**
3:17
**rely (1)**
64:13
**relying (1)**
65:11
**remaining (1)**
21:6
**remains (2)**
4:10;25:13
**remarkable (1)**
14:8
**remediated (1)**
50:9
**remediation (4)**
42:6;51:11,16;53:14
**remember (1)**
58:11
**rendered (1)**
66:20
**repeated (1)**
17:25
**repeatedly (1)**
20:15
**repeating (1)**
20:22
**report (6)**
38:14;58:13;60:19,
22;62:21;65:8
**reported (1)**
29:11
**reports (6)**
20:7;60:1;62:19;
64:19,19,25
**represent (1)**
10:3

**representation (4)**
37:3,11,12,14
**representations (1)**
31:3
**represents (2)**
26:11;61:9
**Republic (1)**
37:3,12
**request (21)**
7:8;9:14;10:2;12:12,
23;13:4;17:14,22;19:7;
24:16;37:6,9;38:7,12;
39:19;40:24;41:10;
44:24;50:16;56:23;
63:5
**requested (2)**
12:4;17:20
**requests (1)**
25:9;28:22;60:8
**require (2)**
7:5;22:17
**requires (1)**
56:22
**resolution (1)**
5:5
**resolve (3)**
5:3;6:2;32:23
**resolves (2)**
38:2,3
**resolving (1)**
6:17
**resources (1)**
6:15
**respect (13)**
5:22;13:6;22:19,22;
25:3;48:5;52:10,19;
53:13;54:16;57:16,18;
62:25
**respects (6)**
4:21;5:4,20;19:21;
46:22;50:2
**respond (5)**
22:10;37:19;39:4;
50:19;52:11
**respondent's (1)**
24:17
**responding (1)**
48:1
**response (1)**
41:10
**responses (1)**
8:2
**responsible (1)**
19:4
**responsive (4)**
37:13;51:8,10,11
**restrict (1)**
29:25
**result (2)**
27:1;47:24
**results (2)**
49:2;53:12
**resume (3)**

3:11,14;67:13
**resuscitate (1)**
56:3
**retainer (2)**
9:17;28:6
**retention (5)**
10:1,17;11:3,11;19:3
**reveal (1)**
29:5
**revealed (2)**
16:1;31:23
**review (4)**
12:10,11;56:22;
57:11
**reviewing (2)**
8:13;44:20
**reviews (1)**
64:3
**rewrote (1)**
14:17
**rhetorical (1)**
62:3
**RICO (18)**
10:15,22;23:11;
26:20;27:7;28:14,16;
31:12;34:5;36:15;
47:10;48:9,11,25,25;
50:11;51:18;62:24
**right (44)**
3:13,22;8:15,17;
11:7,17;20:2;26:9;
28:19;30:4;32:20;
35:19,24;36:11;37:14,
23;38:8;39:1,18;40:7;
42:23,25;43:13,22;
44:16;45:9,10;46:5;
48:5;52:9,25;53:2;
54:15;55:16;56:24;
57:5,24;59:15;60:9,20;
61:15;63:10;65:21;
67:12
**risk (1)**
18:25
**role (6)**
13:21;14:3;17:8,10;
46:2;62:14
**room (1)**
49:3
**rule (4)**
5:15;6:10;7:21;
63:12
**ruled (1)**
63:13
**ruling (9)**
5:14;18:2;25:3,6;
38:14;59:15;60:9,13;
64:3
**rulings (8)**
6:18,22;7:4;12:8;
38:19;53:9;60:2;61:13
**run (1)**
46:6
**running (2)**

10:23;49:4

---
**S**
---

**salvage (3)**
56:3;63:23;64:10
**same (10)**
25:17;35:25;36:12;
54:12;59:16,17;60:9;
61:4,12,18
**Sand (1)**
49:7
**satisfied (1)**
48:13
**save (2)**
18:3;34:17
**saw (2)**
19:4;52:24
**saying (7)**
16:12;19:19;29:19;
39:12;40:11;46:11;
57:15
**scale (1)**
36:16
**scene (4)**
46:2;53:15;55:19;
58:18
**schedule (2)**
45:13;67:10
**scheduled (2)**
3:9;59:6
**scheme (5)**
31:5,10;34:5,5;43:20
**school (1)**
34:1
**science (1)**
50:13
**scientific (2)**
49:18;50:2
**scope (13)**
4:24;6:20;7:3;10:2,
2;11:2;18:3;26:21;
27:7;32:12;37:6,21;
60:2
**search (14)**
6:8;24:1,5,11,14,18,
18,21,23;45:3,6;47:24;
50:19;56:11
**Searching (4)**
24:4;44:25;45:1,2
**second (3)**
19:24;24:16;46:13;
66:19,21
**Secondly (2)**
4:13;5:22
**secretaries (1)**
5:21;8:21,23;9:5,9
**Section (1)**
52:23
**sections (1)**
14:18
**seed (3)**
31:2;33:11,14

**seek (2)**
41:17;61:25
**seeking (5)**
7:5;13:10;23:1;
52:15;61:18
**seem (2)**
6:25;46:13
**seems (4)**
6:25;22:3;23:23;
45:23
**Selva (1)**
49:2
**sense (1)**
40:21
**sensible (1)**
5:2
**sensitive (1)**
28:7
**sentencia (1)**
38:14
**separate (6)**
18:16;21:8;24:15;
37:2,7,11
**separately (2)**
9:6,6
**September (1)**
67:20
**serious (1)**
10:5
**serve (1)**
9:9
**served (4)**
4:5;5:1;35:4;60:5
**server (1)**
9:7
**serves (1)**
40:11
**set (1)**
24:4
**settlement (1)**
43:6
**settling (3)**
55:1,2,5
**several (3)**
6:12;41:1;50:16
**shakedown (1)**
23:9
**shock (1)**
65:2
**shocked (1)**
40:22
**shortly (1)**
5:15
**show (8)**
13:23;14:20;15:5;
18:12;31:1;33:4,12;
34:12
**showed (1)**
50:4
**shown (1)**
53:20
**shows (2)**
14:2;50:10

**side (5)**
13:19;33:2;55:4;
57:1;62:1
**sign (1)**
60:12
**signed (1)**
21:8
**significance (1)**
45:16
**significant (2)**
56:22;58:14
**silly (1)**
26:8
**similarity (1)**
14:8
**simple (1)**
53:12
**simply (1)**
63:19
**single (3)**
21:14;39:25;55:24
**situation (2)**
52:15;62:5
**six (1)**
64:25
**slightest (1)**
57:9
**slightly (2)**
8:7;60:12
**small (1)**
47:25
**smoke (1)**
49:24
**Snaider (1)**
34:20
**Snaider's (1)**
35:23
**snookered (1)**
33:7
**so-called (6)**
11:6;16:3;20:25;
31:3;54:24;65:15
**solve (2)**
12:15;39:15
**solves (1)**
30:4
**somebody (4)**
29:18;31:16;45:12;
46:9
**somehow (2)**
14:20;47:6
**someone (1)**
31:17
**someplace (1)**
30:1
**sometimes (2)**
33:20,21
**soothsayer (1)**
40:21
**sorry (5)**
14:6;15:2;27:14;
63:9;66:2
**sought (4)**

4:15;5:6;6:23;62:7
**Southern (1)**
65:24
**sovereign (3)**
36:19;37:1,22
**speak (1)**
9:15
**specific (4)**
5:5;17:19;38:6;
39:13
**specifically (2)**
20:5;40:9
**specifications (5)**
5:2,25;6:24;7:4,13
**specifics (1)**
56:6
**specify (1)**
38:19
**speculation (1)**
31:15
**speculative (1)**
32:12
**spent (1)**
41:19
**spoke (1)**
17:18
**stake (1)**
6:16
**stand (1)**
66:25
**standard (2)**
29:22;58:16
**standards (3)**
61:15,16,21
**starkly (1)**
19:1
**start (2)**
7:25;21:11
**started (1)**
3:22
**starts (1)**
3:13
**stated (1)**
37:5
**statement (3)**
8:11;14:16;38:14
**States (3)**
24:9;29:9;46:23
**stay (1)**
39:10
**step (1)**
21:25
**sticking (1)**
45:5
**still (3)**
12:23;17:21;56:22
**stop (2)**
20:22;46:14
**stopped (2)**
31:1,16
**stopping (1)**
35:16
**story (2)**

15:24,24
**straightforward (1)**
40:23
**strategy (6)**
11:20;19:22;23:8,9;
31:24;35:6
**Stratus (2)**
15:12;49:7
**strike (1)**
6:4
**striking (1)**
13:6
**strongly (1)**
35:12
**structure (2)**
26:22;27:7
**student (1)**
34:2
**stuff (3)**
58:1;60:5;63:10
**style (1)**
14:4
**subject (11)**
3:8;11:5;12:24;
23:15;38:2,3;42:13;
47:18;58:22;64:11;
65:18
**subjects (1)**
23:3
**submission (3)**
15:13;18:24;54:4
**submissions (2)**
16:25;59:18
**submit (1)**
20:7
**submitted (7)**
13:25;14:1,16,20;
15:7;16:2,20
**subpoena (9)**
4:4,13,17,24;5:2,7,
10,13,25;6:2,20;8:2;
32:13;44:24;48:2;
52:12;60:6
**subpoenaed (1)**
62:6
**subsequent (1)**
15:1
**subsequently (2)**
19:8;49:14
**substantial (7)**
3:4;4:23;6:4;7:18;
9:3;19:21;59:14
**substantially (1)**
4:15
**sufficiently (1)**
45:17
**suggest (3)**
32:22;46:7;47:15
**suggested (3)**
24:2,10;53:25
**summary (2)**
58:11,19
**support (2)**

34:7;50:1
**supporting (1)**
52:22
**Suppose (2)**
12:12;42:8
**supposedly (1)**
10:23
**Sure (5)**
9:25;22:16;25:15;
41:9;54:22
**surely (1)**
40:14
**surprising (2)**
57:9,11
**suspect (2)**
39:16;58:16
**suspicions (1)**
41:5
**sustain (4)**
7:3;23:20;33:22;
38:1
**sustained (5)**
21:2;34:10;35:7;
36:3;54:1
**sustaining (1)**
34:16
**sweep (1)**
53:2
**system (1)**
56:15

### T

**table (1)**
66:24
**tainted (1)**
65:9
**talk (2)**
56:6,20
**talked (1)**
38:8
**talking (7)**
6:5;18:2,3;20:2;
49:20;55:10;57:13
**target (1)**
24:6
**targeted (1)**
40:24
**team (9)**
17:8;30:13;40:25;
44:2;49:13;55:11;
59:25;60:1,23
**technical (2)**
55:11;60:23
**tecum (1)**
4:5
**telling (2)**
47:3;57:11
**tells (2)**
15:24;58:7
**temporarily (1)**
20:23
**term (1)**

45:6
**terminate (1)**
7:21
**terminating (1)**
40:13
**terms (8)**
24:11,23;26:4;35:11;
44:25;45:1,2;57:15
**terrorists (1)**
29:10
**test (1)**
49:2
**testified (1)**
65:1
**testifying (1)**
63:3
**testimony (1)**
49:7
**testing (4)**
49:1;50:3,3;54:7
**tests (2)**
49:8,18
**Texaco (2)**
50:8,14
**Texpet (1)**
53:14
**thereafter (1)**
19:2
**thereby (1)**
34:6
**therefore (3)**
10:8;36:20;47:23
**Third (2)**
6:3;34:10
**Thirdly (1)**
4:23
**third-party (5)**
30:11;31:12;33:5,7,
22
**though (4)**
4:10;29:13;62:13,17
**thought (3)**
51:7,8;54:8
**three (4)**
17:18;39:12;60:11;
66:23
**thumb (1)**
36:16
**Thursday (2)**
67:13,20
**thus (2)**
7:17;9:8
**times (3)**
21:11;22:23;34:21
**timing (2)**
46:21;54:13
**today (7)**
4:4;5:16;6:6;7:4;
13:1;18:2,2
**today's (1)**
3:4
**told (3)**
3:12;39:17;62:20

**took (3)**
14:19;19:21;53:11
**tooth (2)**
15:20;61:3
**top (1)**
56:13
**touching (1)**
31:19
**towns (1)**
21:16
**transcript (1)**
67:4
**transparency (2)**
16:16,18;17:12
**transparent (1)**
63:24
**transparently (1)**
19:16
**travel (7)**
21:7,16;23:2,10,15;
24:5;25:8
**traveled (2)**
21:9,14
**trial (1)**
17:3
**tried (1)**
56:3
**trip (1)**
22:22
**trouble (1)**
45:17
**true (3)**
34:1;44:17;48:4
**trumpet (1)**
50:5
**trumpeted (1)**
50:5
**try (13)**
5:9;12:2;15:4,15;
16:4,8,21;19:10;31:4;
34:7;62:16;63:22;64:9
**trying (9)**
11:19;14:3;20:12,14;
22:4;32:12;44:7;45:25;
61:5
**turned (1)**
16:4
**turns (1)**
49:21
**two (18)**
5:13;8:11;15:9;
17:18;23:22;24:15;
39:12;43:11;45:18,21,
23;47:22;51:17,21;
56:24;62:19;64:22,25
**twofold (1)**
4:14
**type (2)**
47:18,24
**types (1)**
24:14

### U

**UBR (4)**
60:15;61:9;63:9,9
**UBR-related (1)**
61:6
**Uhl (1)**
60:14
**ultimately (5)**
7:1;9:8;20:3;51:21;
63:12
**unclear (1)**
9:19
**under (5)**
19:3;21:8;35:22;
48:11;52:23
**underlay (1)**
38:7
**understood (7)**
6:9,19;18:8,18;
28:20;30:6;37:15
**undue (2)**
5:24;6:2
**unduly (1)**
4:18
**unfolded (1)**
48:7
**unhelpful (1)**
46:23
**unique (1)**
5:25
**United (3)**
24:9;29:9;46:23
**universe (3)**
15:23;45:20;54:24
**unkind (1)**
17:25
**Unless (5)**
6:18;7:9;25:2;59:6;
60:12
**unnecessary (1)**
46:23
**unraveling (1)**
16:9
**unreasonable (1)**
58:23
**unrelated (1)**
37:11
**unusual (1)**
62:5
**unwilling (1)**
24:12
**up (19)**
9:13;11:16,24;13:23;
14:2,20;16:17;19:25;
20:14;24:5,10;42:15,
19;46:17;54:2,11;57:5;
62:14;63:23
**use (2)**
29:21,24
**used (5)**
8:24;24:7;49:3;

63:20;65:7
**useful (1)**
3:23
**using (2)**
30:1;45:3

## V

**vacate (1)**
49:5
**vacated (4)**
66:4,8,18,22
**valid (1)**
12:7
**variety (1)**
29:22
**various (3)**
11:15;18:16;65:18
**Veiga (1)**
42:24
**verse (1)**
64:4
**version (1)**
28:9
**victory (1)**
19:18
**video (1)**
21:12
**view (3)**
57:21;58:23;63:24
**viewed (1)**
65:5
**virtually (1)**
18:18
**visited (1)**
21:16
**vitiated (1)**
63:15
**Viva (1)**
49:3

## W

**wants (1)**
22:7
**waste (1)**
7:23
**way (10)**
22:23;33:23;39:15,
24;40:9;46:7;52:16;
53:22,23;63:24
**ways (2)**
13:17;24:2
**weighed (1)**
39:25
**Weinberg (4)**
64:23;65:22;66:7,9
**welcome (1)**
3:6
**weren't (2)**
65:9,11
**Westenberger (2)**
67:1,3

**What's (2)**
9:1;47:1
**whitewash (2)**
62:16;63:16
**whole (8)**
14:18;21:10;49:15,
15;57:2,14;63:12;64:5
**widely (1)**
44:1
**willing (1)**
39:3
**win (2)**
16:22;19:12
**wish (2)**
8:23;26:18
**withdrawn (1)**
25:12
**withdrew (2)**
30:16;33:2
**within (4)**
4:3;56:15;60:2;62:8
**without (15)**
4:21,25;7:4,22;8:10;
10:16;12:14,22;13:2;
20:21;33:11,11,16;
34:3;57:12
**witness (3)**
50:21;52:14,24
**won (1)**
19:11
**word (5)**
14:21,21;22:14;
33:16;45:4
**words (2)**
13:6;38:25
**work (24)**
4:16,20;9:19;11:16,
17;12:17;13:24;17:3;
24:20;25:18;31:23;
32:1;39:23;41:6;46:16;
53:18,19,19,20;55:18;
62:17;63:6;64:21;65:6
**worked (3)**
8:7,8;17:10
**working (5)**
5:19;26:11,12;60:16;
64:23
**works (1)**
11:20
**world (7)**
10:23;29:12,14;
33:23,24;50:5,6
**worry (1)**
49:23
**worth (1)**
7:19
**write (1)**
66:9
**writing (4)**
38:15,23,25;40:24
**written (4)**
4:2;13:17;41:16,17
**wrote (2)**

60:21;62:19

## Y

**years (1)**
50:8
**Yennock (1)**
67:1
**York (1)**
10:13
**YOUNG (92)**
9:15,16;11:12,13;
12:12,17,22;17:13,14;
18:8,18,23;21:6;22:6,
7;23:21,25;25:14,17;
26:1;27:16,25;28:6,11,
13,16,20;29:6;30:5,6;
31:14,15,23;32:3,6,11,
18;35:22,25;36:22;
37:1,15,18,24;38:3,12,
18;39:1,7,22;40:3;
41:8,10,17;44:9,10,17;
45:2,7,24;47:20,22;
48:5;50:15,16,25;52:9,
10;53:4;54:12;56:4,5;
57:7,22;58:6;61:8,9,16,
22;62:1,5;65:13,14,24;
66:2,4,7,12,16,23,25;
67:6

## 1

**1 (2)**
9:14;41:4
**10 (5)**
32:17,18,23;34:17;
35:12
**11 (1)**
34:19
**11,000-plus (1)**
56:16
**12 (2)**
35:21,22
**128 (1)**
51:12
**13 (1)**
36:4
**138 (1)**
51:12
**14 (3)**
38:6;41:11;59:14
**15 (7)**
41:23;43:2;51:5,6;
52:9,10;54:1
**16 (3)**
42:23;43:11;54:8
**17 (3)**
48:23;54:3,4
**1782 (11)**
19:22;25:25;46:20;
47:23;52:23;61:3,10,
24;62:8;65:18,25
**1782s (1)**

43:13
**18 (3)**
54:2,11,11
**186 (3)**
5:1,5,24
**19 (5)**
54:10,19;59:24;
60:10;67:4
**199 (2)**
51:19;52:7

## 2

**2 (2)**
3:18;13:5
**2:15 (2)**
67:13,20
**2:30 (1)**
3:10
**20 (4)**
50:8;55:14;59:9;
67:4
**2009 (1)**
19:23
**2010 (7)**
18:23;19:2,5,20;
20:3,9;57:20
**2012 (1)**
67:20
**21 (1)**
59:22
**213 (2)**
51:20;52:7
**22 (2)**
56:13;60:14
**23 (1)**
62:10
**24th (1)**
4:20
**26b2C (1)**
6:10
**27 (1)**
67:20

## 3

**3 (3)**
3:15,18;21:4
**33,000 (1)**
56:14
**34-defendant (1)**
3:9
**37 (2)**
5:11;9:13

## 4

**4 (3)**
22:25;25:3,6
**400 (1)**
26:25

## 5

**5 (1)**
23:21
**50 (3)**
5:19;8:7,8
**50-hour (1)**
8:13
**52 (1)**
5:1
**561 (1)**
51:12
**567-1 (1)**
51:12

## 6

**6 (1)**
25:1
**67 (1)**
67:4
**69 (2)**
51:19;52:7

## 7

**7 (2)**
8:1;25:12

## 8

**8 (2)**
5:16;8:1

## 9

**9 (6)**
5:17;8:20;26:16;
32:23;34:17;35:11