THEODORE J. BOUTROUS JR., SBN 132099
  tboutrous@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA  90071-3197
Telephone: 213.229.7000
Facsimile:  213.229.7520

ETHAN DETTMER, SBN 196046
  edettmer@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street
San Francisco, California 94105-0921
Telephone: 415.393.8200
Facsimile: 415.393.8306

Attorneys for Plaintiff
CHEVRON CORPORATION

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| CHEVRON CORP., <br><br> Plaintiff, <br><br> v. <br><br> STEVEN DONZIGER, *et al.*, <br><br> Defendant. | CASE NO. 5:12-80237 MISC CRB NC <br><br> **CHEVRON CORPORATION'S OPPOSITION TO THE NON-PARTY MOVANTS' MOTION TO QUASH SUBPOENAS TO GOOGLE INC. AND YAHOO! INC.** <br><br> **Hearing:** <br> Date:       January 16, 2013 <br> Time:       1:00 PM <br> Place:      Courtroom A, 15th Floor <br> Judge:     Hon. Nathanael Cousins |

Gibson, Dunn &
Crutcher LLP

# TABLE OF CONTENTS

<u>Page</u>

I.      INTRODUCTION ................................................................................................. 1

II.     BACKGROUND ................................................................................................... 3

III.    ARGUMENT ........................................................................................................ 9

       A.    The Does Lack Standing to Challenge the Subpoenas as a Whole and May Challenge Their Application Only to the Accounts that They Own ............................ 9

       B.    The Subpoenas Make Reasonable Requests that Courts Routinely Grant ................. 10

              1.    Courts Routinely Require Production of the Information that Chevron Seeks ...................................................................................................... 10

              2.    The Subpoenaed Information Will Materially Support Chevron's Claims in the RICO Action ............................................................................. 11

              3.    The Subpoenas Are Not Overbroad ................................................................ 12

       C.    The Subpoenas Accord with First Amendment Standards ......................................... 13

              1.    Compliance with the Subpoenas Will Not Infringe Any Right to Anonymity ................................................................................................... 14

              2.    Compliance with the Subpoenas Will Not Infringe Any Right of Association ................................................................................................... 20

       D.    The Subpoenas Do Not Violate the Does' State Law Privacy Interests .................... 22

IV.    CONCLUSION .................................................................................................... 23

Gibson, Dunn &
Crutcher LLP

1

# TABLE OF AUTHORITIES

2

Page(s)

3

## Cases

4

*AF Holdings LLC v. Doe*, No. 12-cv-02416-WHA, 2012 U.S. Dist. LEXIS 75806 (N.D. Cal.
   May 31, 2012) .................................................................................................................... 10

5

*Arista Records LLC v. Does 1-16*, Civ. No. 1:08-CV-765 (GS/RFT), 2009 WL 414060
   (N.D.N.Y. Feb. 18, 2009) ...................................................................................................... 16

6

7

*Arista Records v. Doe 3*, 604 F.3d 110 (2d Cir. 2010) ....................................................... 16

8

*Boyle v. United States*, 556 U.S. 938 (2009)...................................................................... 12

9

*Branzburg v. Hayes*, 408 U.S. 665 (U.S. 1972) ................................................................. 14

10

*Brock v. Local 375, Plumbers Int'l Union of Am.*, 860 F.2d 346 (9th Cir. 1988)........................ 19, 20

11

*Chevron Corp. v. Champ*, Nos. 1:10mc 27, 1:10mc 28, 2010 WL 3418394 (W.D.N.C. Aug.
   30, 2010) .................................................................................................................................. 1

12

*Chevron Corp. v. Donziger*, 768 F. Supp. 2d 581 (S.D.N.Y. Mar. 7, 2011) ..................... 16

13

*Chevron Corp. v. Donziger*, 871 F. Supp. 2d 229 (S.D.N.Y. May 14, 2012)........................... 15, 16

14

*Chevron Corp. v. Donziger*, No. 11 Civ. 0691 LAK (S.D.N.Y.)...................................... 2, 5

15

*Chevron Corp. v. Page*, No. RWT-11-1942, Oral Ar. Tr. at 10:17-21, 11:13-23 (D. Md. Aug.
   31, 2011) ............................................................................................................................... 16

16

*Chevron Corp. v. Salazar*, No. 11 Civ. 3718 (LAK), 2011 WL 2581784 (S.D.N.Y. June 24,
   2011) ........................................................................................................................................ 6

17

18

*Chevron Corp. v. Stratus Consulting, Inc.*, No. 10-cv-00047-MSK-MEH (D. Colo. June 27,
   2011) ........................................................................................................................................ 6

19

*Columbia Ins. Co. v. seescandy.Com*, 185 F.R.D. 573 (N.D. Cal. 1999) ......................... 14

20

*Compaq Comp. Corp. v. Packard Bell Elecs., Inc.*, 163 F.R.D. 329 (N.D. Cal. 1995) ..... 13

21

*Doe I v. Individuals*, 561 F. Supp. 2d 249 (D. Conn. 2008) .............................................. 18

22

*Doe v. 2TheMart.com*, 140 F. Supp. 2d 1088 (W.D. Wash. 2001)............................... 18, 19

23

*Doe v. SEC*, No. 11-mc-80184 CRB (NJV), 2011 WL 4593181 (N.D. Cal. Oct. 4, 2011)......... 11, 18

24

*Erickson v. Microaire Surgical Instruments LLC*, No. 08-cv-5745 BHS, 2010 WL 1881946
   (W.D. Wash. May 6, 2010).................................................................................................. 12

25

26

*Fallon v. Locke*, No. 5:04-cv-3210 RMW, 2005 U.S. Dist. LEXIS 46987 (N.D. Cal. Aug. 4,
   2005) ...................................................................................................................................... 13

27

*Griffin v. Maryland*, 19 A.3d 415 (Md. 2011) .................................................................. 12

28

ii

CHEVRON'S OPPOSITION TO THE NON-PARTY MOVANTS' MOTION TO QUASH –
CASE NO. 5:12-80237 MISC CRB NC

*Heda v. Superior Court*, 225 Cal. App. 3d 525 (Cal. Ct. App. 1990) ................................................. 22

*Hill v. Nat'l Collegiate Athletic Ass'n*, 7 Cal. 4th 1, 39 (1994) ...................................... 21, 22, 23

*Illinois, ex rel. Madigan v. Telemarketing Assocs., Inc.*, 538 U.S. 600 (2003) ................................. 14

*In re Anonymous Online Speakers*, 661 F.3d 1168 (9th Cir. 2011) ...................................... 15, 19

*In re Chevron Corp.*, 633 F.3d 153 (3d Cir. 2011) ........................................................................ 16

*In re Chevron Corp.*, 709 F. Supp. 2d 283 (S.D.N.Y. 2010) ............................................................. 3

*In re Chevron Corp.*, 749 F. Supp. 2d 141 (S.D.N.Y. 2010) ............................................................. 3

*In re Chevron Corp.*, 749 F. Supp. 2d 170 (S.D.N.Y. 2010) ............................................................. 6

*In re Chevron Corp.*, No. 1:10-mc-00021-22 (D.N.M. Sept. 2, 2010) ............................................. 2

*In re Chevron Corp.*, No. 10 MC 00002 (LAK) (S.D.N.Y. Dec. 27, 2010) ...................................... 5

*In re Chevron Corp.*, No. 10-cv-1146-IEG(WMC), 2010 WL 3584520 (S.D. Cal. Sept. 10, 2010) .......................................................................................................................................... 16

*In re Chevron Corp.*, No. 11-cv-24599-MGC-WCT, 2012 WL 3636925 (S.D. Fla. June 12, 2012) ............................................................................................................................................ 1

*In re Chevron Corp.*, Nos. 1:10-mc-00021-22 (D.N.M. Sept. 2, 2010) ......................................... 16

*In re Rhodes Cos. LLC*, 475 B.R. 733 (D. Nev. 2012) ................................................................... 12

*In re Roebers*, No. C12-80145 MISC RS (LB), 2012 WL 2862122 (N.D. Cal. July 11, 2012) ......... 10

*In re United States*, 830 F. Supp. 2d 114 (E.D. Va. 2011) ............................................................. 18

*Insubuy, Inc. v. Cmty. Ins. Agency, Inc.*, No. 11-mc-0008-PHX-FJM, 2011 WL 836886 (D. Ariz. Mar. 9, 2011) ................................................................................................................... 10

*Jerry T. O'Brien, Inc. v. SEC*, 704 F.2d 1065 (9th Cir. 1983) .......................................................... 9

*Kadant Johnson Inc. v. D'Amico*, No. 3:12-mc-00126, 2012 WL 1576233 (D. Or. May 4, 2012) .......................................................................................................................................... 13

*Kremen v. Cohen*, No. 11-cv-05411-LHK (HRL), 2012 WL 2277857 (N.D. Cal. June 18, 2012) .......................................................................................................................................... 10

*Lago Agrio Plaintiffs v. Chevron Corp.*, 409 F. App'x 393 (2d Cir.) ................................................. 3

*London v. Does 1-4*, 279 F. App'x 513 (9th Cir. 2008) ................................................................. 10

*McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334 (1995) ............................................................. 14

*People v. Clevenstine*, 891 N.Y.S.2d 511 (N.Y. App. Div. 2009) .................................................... 12

*People v. Crowson*, 33 Cal. 3d 623 (1983) ..................................................................................... 22

*People v. Stipo*, 195 Cal. App. 4th 664 (2d Dist. 2011) .................................................................. 22

*Perry v. Schwarzenegger*, 591 F.3d 1126 (9th Cir. 2009) ............................................... 20, 21

*Planned Parenthood Golden Gate v. Superior Court*, 83 Cal. App. 4th 347 (Cal. Ct. App. 2000) ................................................................................................................................. 22

*San Antonio Cmty. Hosp. v. So. Cal. Dist. Council of Carpenters*, 125 F.3d 1230 (9th Cir. 1997) ................................................................................................................................. 14

*Sony Music Entm't Inc. v. Does 1-40*, 326 F. Supp. 2d 556 (S.D.N.Y. 2004) ...................... 16, 17, 18

*Thomas v. Hickman*, 2007 WL 4302974 (E.D. Cal. Dec. 6, 2007) ...................................... 13

*TMP Worldwide Adver. & Commc'ns, LLC v. LATCareers, LLC*, No. C08-5019 RBL, 2008 WL 5348180 (W.D. Wash. Dec. 16, 2008) ...................................................................... 10

*United States v. Sattar*, 395 F. Supp. 2d 79 (S.D.N.Y. 2005) ............................................. 14

*USA Technologies, Inc. v. Doe*, 713 F. Supp. 2d 901 (N.D. Cal. 2010) ............................. 18

*Xcentric Ventures, LLC v. Karsen, Ltd.*, No. 11-cv-01055-PHX-FJM, 2012 U.S. Dist. LEXIS 121888 (D. Ariz. Aug. 28, 2012) ................................................................................. 10

**Rules**

Fed. R. Civ. P. 26 .............................................................................................................. 2, 11

Fed. R. Civ. P. 45 .................................................................................................................. 11

Fed. R. Evid. 803(6) .............................................................................................................. 12

Fed. R. Evid. 901(a) .............................................................................................................. 17

**Other Authorities**

9A Charles Alan Wright, Arthur R. Miller, et al., Federal Practice and Procedure § 2459 (3d ed.) ...................................................................................................................................... 13

Gibson, Dunn & Crutcher LLP

1

## I.    INTRODUCTION

2

The subpoenas the movants seek to quash request basic identifying and login information for

3
several email accounts.  Courts routinely allow production of such information—particularly where,

4
as here, that information directly supports a legal claim.  Because Chevron's underlying claims and

5
factual allegations have withstood a motion to dismiss and have been favorably evaluated on

6
summary judgment—and because each account listed in the subpoenas was used in furtherance of the

7
fraud giving rise to those claims—the motion to quash should be denied.

8

This dispute arises from a $19 billion judgment that a group of U.S. plaintiffs' lawyers

9
obtained against Chevron in Ecuador based on decades-old allegations of harm that had been long

10
dispensed by the Ecuadorian government (the "Ecuador litigation").  Courts throughout the United

11
States have concluded that the plaintiffs' lawyers' efforts to prosecute that case have likely been rife

12
with fraud, applying the crime-fraud exception.[1]  One of the keys to uncovering evidence of that

13
fraud has been Chevron's use of lawful process to seek evidence from third parties, because the U.S.-

14
based attorneys who have driven the Ecuador litigation and their allies have engaged in a campaign to

15
frustrate inquiries into their conduct.  For example, the proponents of the Ecuador litigation and their

16
allies resisted discovery from third parties concerning outtakes of *Crude*, a documentary film they

17
financed, claiming that discovery would violate privacy rights and journalistic privileges, and that

18
evidence of an illicit meeting between the Ecuadorian plaintiffs' counsel and a member of the

19
Ecuadorian court's supposedly "independent" Special Master captured on video was "innocuous" and

20
of "no relevance to anything."  Ex. 1.[2]  But when Chevron obtained the discovery, the outtakes "sent

21
shockwaves through the nation's legal communities, primarily because the footage shows, with

22
unflattering frankness, inappropriate, unethical and perhaps illegal conduct."  *In re Chevron Corp.*,

23

_____

24
[1]  *See, e.g.*, *Chevron Corp. v. Champ*, Nos. 1:10mc 27, 1:10mc 28, 2010 WL 3418394, at *6
(W.D.N.C. Aug. 30, 2010) ("[W]hat has blatantly occurred in this matter would in fact be

25
considered fraud by any court."); *In re Chevron Corp.*, No. 11-24599-CV, 2012 WL 3636925, at
*2 (S.D. Fla. June 12, 2012) ("[M]ounds of evidence . . . suggest[ ] that the judgment [obtained in

26
Ecuador was] . . . ghostwritten [and includes] verbatim passages that were taken from various
pieces of the [plaintiffs'] lawyers' internal, unfiled, work product.").

27
[2]  Unless otherwise specified, the cited exhibits are attached to the Declaration of James F.

28
Alexander, filed concurrently herewith.

No. 1:10-mc-00021-JCH-LFG, slip op. at 3-4 (D.N.M. Sept. 2, 2010), Dkt. 77.  Based on the information obtained from these kinds of efforts, Chevron brought suit in 2011 under the Racketeer Influenced and Corrupt Organizations Act and New York state law (the "RICO action"), contending that those plaintiffs' lawyers conspired to defraud Chevron of billions of dollars.  *See Chevron Corp. v. Donziger*, No. 11 Civ. 0691 LAK (S.D.N.Y.).

The subpoenas that the "John Doe" objectors seek to quash here—which were served on Google, Inc. and Yahoo! Inc. on September 19, 2012—are part of Chevron's continuing discovery effort.  Those subpoenas will provide information relevant to core claims in the RICO action, because each of the individual email account owners who bring this motion was intimately involved with the fraud alleged in that action.  These purportedly anonymous Does managed legal and public relations strategies that furthered that fraud, helped the plaintiffs' attorneys tout a fraudulent "independent" expert report in the Ecuadorian court, and worked closely with—and at the direction of—the lead RICO action defendant in furthering the fraud.

As an initial matter, under well-settled principles of law, the Does lack standing to seek to quash the request for information as to accounts that they do not own.  Here, the owners of the majority of the email accounts have not objected to the disclosure of information by Google and Yahoo!, making the Does' attempt to quash the subpoenas in their entirety particularly inappropriate.

And even as to the email accounts that the Does claim to own, the subpoenaed information will provide evidence about the structure and management of the RICO defendants' fraudulent enterprise, will confirm that many of the defendants' fraudulent acts occurred in the United States (thus rebutting the defendants' jurisdictional and extraterritoriality arguments), and is reasonably calculated to help establish how major acts of fraud (such as the creation of the fraudulent expert report and the ghostwriting of the Ecuadorian court judgment itself) were perpetrated.  Because those facts are relevant to claims in the RICO action and are overcome by no privilege, Chevron is entitled to the subpoenaed information.  Fed. R. Civ. P. 26.

The Does, moreover, are incorrect that compliance with the subpoenas would violate their rights to anonymous speech, of association, or of privacy.  The subpoenas seek specific, narrow information that courts routinely direct email providers to disclose.  Chevron's need for such

1   information outweighs any right to anonymity or to association, because the Does are not anonymous

2   in any meaningful sense.  They have freely disclosed their connection to the email accounts at issue,

3   and the First Amendment does not protect the Does' efforts to support a fraudulent scheme.  Nor do

4   the Does possess any cognizable privacy interest.

5       At bottom, this motion is an effort to delay and impede Chevron's legitimate discovery and

6   keep hidden details of the fraud perpetrated by the defendants in the RICO action.  Chevron

7   respectfully requests that the Court deny this motion to quash.

8                                    **II.     BACKGROUND**

9       The background of the Ecuador litigation and RICO action is described in several decisions

10  from the Southern District of New York.  *See In re Chevron Corp.*, 709 F. Supp. 2d 283, 285-90

11  (S.D.N.Y. 2010); *In re Chevron Corp.*, 749 F. Supp. 2d 141, 143-59 (S.D.N.Y. 2010), *aff'd sub nom.*

12  *Lago Agrio Plaintiffs v. Chevron Corp.*, 409 F. App'x 393 (2d Cir.); Ex. 2 at 4-42.  Chevron

13  summarizes that background here.

14      In 2003, a group of plaintiffs' lawyers sued Chevron in Ecuador on behalf of a group of

15  Ecuadorian plaintiffs (known as the "Lago Agrio plaintiffs" or "LAPs").  Led by New York attorney

16  and RICO action defendant Steven Donziger, the LAPs sought billions of dollars from Chevron for

17  environmental harms allegedly caused by the oil exploration operations of Texaco Petroleum

18  Company ("TexPet") from 1964 to 1990.

19      Documents obtained in discovery over the LAPs' objections, however, show that the LAPs'

20  own scientists had reported to Donziger and his colleagues that their analysis did not support the

21  LAPs' allegations.  For example, one of the LAPs' lead environmental experts told Donziger, "we are

22  not finding any of the highly carcinogenic compounds one would hope to see when investigating the

23  oil pits," Ex. 3 at 1, and "[t]o date I have seen no data which would indicate that there is any

24  significant surface or groundwater contamination caused by petroleum sources in Ecuador," Ex. 4 at

25  1.

26      In response, the LAPs sought to obtain a judgment through fraud.  As part of that effort, the

27  LAPs pressured the Ecuadorian court to appoint Richard Stalin Cabrera Vega as an "independent"

28  "global damages assessment" court expert. Ex. 5 ¶¶ 113, 122, 141.  Far from independent, Cabrera

had been hand-selected by Donziger, who was looking for an expert who would "totally play ball with us and let us take the lead while projecting the image that he is working for the court." Ex. 6 at 30; Ex. 2 at 35 ("Cabrera had been working with the LAPs for some time, and he continued to do so" after he was appointed as the court expert). Donziger and the LAPs used a U.S.-based consulting firm, known as Stratus Consulting, to write Cabrera's "independent" report. Indeed, "there is no genuine dispute as to exactly what happened. As Donziger has admitted, Stratus wrote the bulk of the report adopted by Cabrera and submitted to the court.'" Ex. 2 at 38-39. As the Southern District of New York found, "[t]his uncontradicted evidence demonstrates that the report and subsequent responses filed in Cabrera's name were tainted by fraud." *Id.* at 91.

By hand-picking the court's expert, ghostwriting his report, holding meetings with key government officials to obtain improper government support, and other illicit means, the LAPs gained control over the case and the Ecuadorian court eventually issued a $19 billion judgment in their favor. In keeping with the widespread fraud leading to that judgment, it soon became clear that the LAPs ghostwrote the judgment itself. The judgment includes material copied—including errors and idiosyncrasies—from several of the LAPs' internal, unfiled legal memoranda, emails, documents, and record summaries. Ex. 7 (Expert Report of Michael L. Younger) at 9-17. Multiple experts have concluded that the author of the judgment had access to these internal LAP materials which never were filed with the court. *See, e.g.*, *id.* The Southern District of New York found that this evidence established "serious questions concerning the preparation of the Judgment itself." Ex. 2 at 97. Similarly, the District of Maryland found that this evidence—and the LAPs' failure to offer any explanation for their language appearing in the judgment—constitutes "a sure fire 'pass the smell test' presentation" of "fraudulent activity." Ex. 8 at 11:2-10.

In response to the LAPs' fraud, in February 2011 Chevron sued Donziger and the LAPs in the Southern District of New York (the district from which Donziger directed the activities of the fraudulent enterprise). In the RICO action, Chevron contends that Donziger and the LAPs

CHEVRON'S OPPOSITION TO THE NON-PARTY MOVANTS' MOTION TO QUASH –
CASE NO. 5:12-80237 MISC CRB NC

1    perpetrated a large-scale fraudulent scheme to extort billions of dollars from Chevron through a sham

2    Ecuadorian court judgment.  The suit advances claims under RICO and New York law.[3]

3            To support its claims, Chevron has pursued discovery to uncover evidence of the LAPs' fraud.

4    The LAPs have continually obstructed that effort.  The special master overseeing lead conspirator

5    Donziger's deposition in one discovery action reported to the court that Donziger was continually

6    "unresponsive" and that his answers were "self[-]serving"—and that they remained so despite

7    repeated instructions and orders striking Donziger's answers.  Order at 1-2, *In re Chevron Corp.*, No.

8    10 MC 00002 (LAK) (S.D.N.Y. Dec. 27, 2010) (authorizing the special master "to recommend to the

9    Court the imposition of sanctions, including civil or criminal contempt").  Donziger likewise

10   repeatedly failed to comply with the Southern District of New York's discovery orders.  *See, e.g.*, Ex.

11   12 at 2 (noting failure to produce information about an email account containing "documents of

12   obvious possible relevance").  And one of the LAPs' experts testified that Donziger affirmatively

13   interceded to try to convince him not to testify in the underlying RICO action.  Ex. 10.  Donziger's

14   co-conspirators, accordingly, have followed suit.  For example, after the District of Colorado noted

15   that it would expect a discovery production, internal communications among attorneys for the LAPs

16   stated:  "[W]hy would we indicate that we are willing to produce anything?"  Ex. 11 at 1.  Donziger

17   agreed:  "What's the downside of taking an absolutist position given the longer-term strategy?"  *Id.*

18   That "longer-term strategy" was to seize any opportunity to obstruct discovery and produce only the

19   documents they wanted to at a glacial pace; as Donziger put it, to "fight hard on all fronts all the time

20   and concede nothing, *buy as much time as possible*."  Ex. 13 at 1 (emphasis added).  Indeed,

21   Donziger's co-conspirators even complimented one another for doing "an excellent job of not

22

23

24

25   _____

26   [3]  *See* Ex. 9.  Exhibit 9 will be lodged with the Clerk's Office and Chambers on a CD-ROM.  This
     exhibit is an annotated and hyperlinked version of Chevron's Amended Complaint in *Chevron*
27   *Corp. v. Donziger*, No. 11 Civ. 0691 LAK (S.D.N.Y.).  Chevron has created this document to
     provide easy reference to the exhibits supporting its allegations.  Clicking on an exhibit number
28   within the document will pull up the indicated exhibit.

1    remembering anything" in depositions.  *See, e.g.,* Ex. 14.  Such obstruction has characterized the

2    discovery strategy of the LAPs and their co-conspirators.[4]

3            Because the LAPs have consistently evaded and obstructed discovery, Chevron has been

4    forced to painstakingly uncover information that the LAPs' have concealed.  The subpoenas at issue

5    here are part of those efforts, and seek information about email accounts identified principally

6    through the review of documents recovered from an image of Donziger's hard drive that he was

7    ordered to turn over to Chevron after he failed to produce responsive documents in response to a

8    court order.  Ex. 12.  Specifically, the subpoenas seek information about the user, as well as IP logs

9    and IP address information.  *See* Ex. 15 (Subpoena at 2).  Discovery of such information is critical

10   because the LAPs used email accounts to share documents to further their fraudulent scheme.  For

11   example, to plan for the secret ghostwriting of the purportedly independent expert's report, Donziger

12   and his primary Ecuadorian counterpart, Pablo Fajardo, set up an email account on which they loaded

13   information that each could access.  To hide the fraudulent nature of that information, Fajardo told

14   Donziger "not [to] insert any names in the document," but instead to use the code names "Lagarto 2"

15   and "Lagarto 3."  Ex. 17; Ex. 5 ¶ 141.

16           The Does responsible for the pending motion claim to own only 31 of the 71 email accounts

17   listed in the subpoenas.  *See* Memorandum of Points and Authorities in Support of Motion to Quash

18   ("Mem.") at 3; Dkt. 43-2 ¶ 3.  The Does do not claim that they are authorized to represent any other

19   account holders listed in the subpoena.  *See* Mem. 3.

20           In an apparent effort to allay suspicion regarding their activities, the Does have provided

21   seven declarations from purportedly representative Does.  Each declarant Doe, however, has been

22   intimately involved in the LAPs' fraudulent enterprise:

23   _____

24   [4]   *See, e.g.*, Order on Motions Concerning Allocations of Costs, *Chevron Corp. v. Stratus*
          *Consulting, Inc.*, No. 10-cv-00047-MSK-MEH, Dkt. 335 at 4 (D. Colo. June 27, 2011) (noting

25        that the court "was not given the truth" by attorneys for co-conspirator Stratus Consulting during
          a discovery hearing); *Chevron Corp. v. Salazar*, No. 11 Civ. 3718(LAK), 2011 WL 2581784, at

26        *2 (S.D.N.Y. June 24, 2011) (describing defendants' "thwart or delay" strategy); *In re Chevron*
          *Corp.*, 749 F. Supp. 2d 170, 183-85 (S.D.N.Y. 2010) (holding that the LAPs had waived privilege

27        by repeatedly failing to provide a privilege log, and finding, "that the failure to submit a privilege
          log . . . was a deliberate attempt to structure the response to the subpoenas in a way that would

28        create the maximum possibility for delay"), *aff'd*, 409 F. App'x 393, 396 (2d Cir.).

Gibson, Dunn &
Crutcher LLP

- **Doe 1:**  The owner of the account cortelyou@gmail.com is apparently Cortelyou Kenney. Kenney interned for Donziger in 2007 and worked at his personal direction.  Ex. 18.  She knew that his strategy involved pressuring Chevron through negative publicity.  She supported this strategy.  Exs. 18, 19.

- **Doe 2:**  The owner of the account firger@gmail.com is apparently Daniel Mark Firger, who interned for Donziger in Ecuador and worked at his personal direction.  Exs. 18, 19.  Donziger asked Firger to help determine in which countries Chevron would be "vulnerable to pressure" as part of Donziger's effort to enforce a fraudulent judgment from Ecuador.  Ex. 19.

- **Doe 3:**  The owner of the account tegelsimeon@gmail.com is apparently Simeon Tegel.  Tegel was from 2005 to 2008 the Communications Director of Amazon Watch, an entity funded and directed by Steven Donziger to facilitate the LAPs' fraudulent scheme.  Tegel publicized and distributed the fraudulent Cabrera report and helped further the LAPs' fraud by writing false letters to news entities.  Exs. 20, 21.

- **Doe 4:**  The owner of the account kevinkoenigquito@gmail.com is apparently Kevin Koenig. Koenig is the Ecuador Program Coordinator for Amazon Watch and has worked with the LAPs in Ecuador.  Ex. 22.  He has also worked with Donziger on pressure campaigns involving New York City and State officials.  Ex. 23.

- **Doe 5:**  The owner of the account ampage@gmail.com is apparently Aaron Marr Page.  Page is an attorney who represents the LAPs.  Doe 5 Decl. ¶ 5.  For years Page has been intimately involved and active in the LAPs' enterprise, and Donziger has stated that Page's work for the enterprise has been "vital."  Ex. 6 at 79.  The District of Maryland has found that documents in Page's possession were copied via "a virtual line-by-line entry on many occasions" into the fraudulent Ecuadorian judgment even the LAPs had not formally submitted those documents to the Ecuadorean court.  Ex. 8 at 10:25-11:1.

- **Doe 6:**  The holder of the account erikmoe66@yahoo.com is apparently Erik T. Moe.  Moe assisted Donziger in his efforts to obtain funding for the LAPs' enterprise.  Exs. 24-26.

- **Doe 7:**  The owner of the account richardclapp@gmail.com is apparently Dr. Richard Clapp.  Clapp worked as a toxicology consultant for the LAPs.  He authored a study that Stratus included in the fraudulent Cabrera report.  Ex. 27.  Stratus was desperate to conceal Clapp's authorship of work appearing in the Cabrera report, and one consultant stated, "We have to talk to Clapp about that 5-pager . . . [i]t CANNOT go into the Congressional Record as being authored by [Clapp]."  Ex. 28.

The Does' brief, moreover, does not accurately describe their involvement in the Ecuador litigation.  For example:

- The brief states that Doe 4, Kevin Koenig, "had no direct connection with the litigation[.]"  Mem. 4.  In fact, Koenig coordinated the pressure campaign against Chevron with Donziger, and apparently shared an office with Donziger.  Exs. 22, 29.  Indeed, Donziger worried about Koenig and Amazon Watch's involvement with the LAPs becoming known, and directed him to conceal this involvement from a Bloomberg reporter, saying, "[d]o not tell [the reporter] we cooperate other than occasional communication . . . [d]o not tell them u work out of our office."  Ex. 21.

Gibson, Dunn &
Crutcher LLP

- Similarly, the brief claims that Doe 6, Erik Moe, "never worked on the litigation[.]"  Mem. 4.  In fact, Moe worked closely with Donziger to try to secure funding for the enterprise, as numerous emails exchanged between Donziger and Moe show.  Exs. 24-26.  Moe may have also approached his own pool of investors on Donziger's behalf.  Ex. 26.

- And, inexplicably, the brief claims that Doe 5, Aaron Marr Page, merely "worked on the litigation in the past."  Mem. 4.  But Page admits in his own declaration that he now represents the LAPs.  Doe 5 Decl. ¶ 5.  Indeed, Mr. Page held himself forth as an attorney for the LAPs when he submitted a letter to testifying Chevron experts Douglas Mackay, Robert Hinchee, and Pedro Alvarez, threatening them if they did not disavow their expert declarations.  Ex. 30.

The non-declarant Does are similarly situated or even more deeply involved with the LAPs.

Those Does generally fall into four categories:

- <u>Attorneys for the LAPs who worked at Donziger's direction</u>.  These include owners of the accounts drewwoods3@gmail.com; drewwoods3@yahoo.com; and lara_garr@gmail.com. *See, e.g.,* Ex. 31 at 23-30.

- <u>Interns for the LAPs who worked at Donziger's direction</u>.  These include owners of the accounts sayjay80@gmail.com; catmongeon@gmail.com; briansethparker@gmail.com; katiafachgomez@gmail.com; goldstein.ben@gmail.com; sara.colon@gmail.com; farihahzaman@gmail.com; jeremylow@gmail.com; courtneyrwong@gmail.com; and kshuk22@yahoo.com.

- <u>Amazon Watch personnel who have coordinated pressure campaign activities against Chevron with Donziger</u>.  These include holders of the accounts marialya@gmail.com; coldmtn@gmail.com; bandawatch@gmail.com; lupitadeheredia@gmail.com; and josephmutti@gmail.com.

- <u>Technical personnel who drafted materials used in the fraudulent Ecuador litigation</u>.  These include holders of the accounts jenbilbao3@yahoo.com and lore_gamboa@yahoo.es.

Despite their claims to anonymity, the vast majority of the Does' email addresses contain either their actual names or initials, and many of the Does repeatedly publicized their association with the LAPs.  Indeed, many of the Does list their email addresses on publicly accessible web sites and have often otherwise publicized their association with the LAPs.  For example:

- Richard Clapp, who claims to be Doe 7 here, lists his email address richardclapp@gmail.com as his contact on various articles and papers he's published online.  Ex. 32.

- Charles Buchanan (who prefers to be known as "Han Shan," after the 9th Century Chinese poet whose name literally translates to "cold mountain") owns the account coldmtn@gmail.com.  Ex. 33.  He also uses "coldmtn" as his handle on Twitter, and his Twitter page links to his page on Huffingtonpost.com, where he operates under his own name.  *See* Exs. 34, 35.

- Thomas Cavanagh owns the email account bandawatch@gmail.com, and uses "bandawatch" as his handle on Twitter, where he routinely operates under his own name.  See Ex. 36.

- Joseph Mutti publicly lists the address josephmutti@gmail.com, along with his name, on a publicly available polemic accusing Chevron of "genocide."  Ex. 37.

- Jennifer E. Bilbao is identified on a publicly available website by her email address jenbilbao3@yahoo.com.  Ex. 38.

- Ben Goldstein's name and his photo appear on Fordham Law School's web site with his email address Goldstein.ben@gmail.com.  Ex. 39.

- Katia Fach Gomez lists her email address as katiafachgomez@gmail.com in an article she published through the University of Zaragoza and numerous other online sources.  Ex. 40.

- Kush Shukla, the apparent owner of kshuk22@yahoo.com, uses Kshuk22 as his Twitter handle.  Ex. 41.

- Brian Seth Parker posted on an online message board about this dispute using the email address briansethparker@gmail.com and also uses briansethparker as his user ID on Facebook.  Ex. 42.

- Lorena Gamboa lists Lore_gamboa@yahoo.es as her email address on the website of an environmental inspection company in Sri Lanka. Ex. 43.

For each account, Chevron seeks to confirm identifying information about the user, as well as IP log and address information.  Ex. 15 (subpoena at 2).  Donziger himself served similar subpoenas on Google and Yahoo!—seeking *his own* user and IP information—in discovery proceedings in the RICO action.  *See* Ex. 44.  Although the RICO defendants' efforts to secure payment from Chevron and its predecessor have been going on since before the Ecuador litigation was filed, the subpoenas seek information generated only since the Ecuador litigation was filed in 2003.  Ex. 15 (subpoena at 2).  That information will support Chevron's RICO claims.  *See* Part III.B.2., *infra*.

### III.    ARGUMENT

**A.      The Does Lack Standing to Challenge the Subpoenas as a Whole and May Challenge Their Application Only to the Accounts that They Own**

A litigant lacks standing to challenge a subpoena issued to a third party, unless the litigant possesses a personal right or privilege regarding the documents sought.  *Jerry T. O'Brien, Inc. v. SEC*, 704 F.2d 1065, 1068 (9th Cir. 1983), *rev'd on other grounds*, 467 U.S. 735 (1984).  Nor may a litigant challenge a subpoena based on the alleged rights of others when those others do not challenge

1  the subpoena.  *See TMP Worldwide Adver. & Commc'ns, LLC v. LATCareers, LLC*, No. C08-5019

2  RBL, 2008 WL 5348180, at *1 (W.D. Wash. Dec. 16, 2008).

3        The Does own only 31 of the 71 email accounts identified in the subpoenas to Google and

4  Yahoo!.  *See* Mem. 3.  The Does do not identify any right or privilege that they may have as to the

5  remaining 40 accounts.  And the other account holders have chosen not to object to Chevron's

6  requests or have resolved their concerns about the subpoenas with Chevron.  The Does therefore lack

7  standing to challenge the subpoena's application to the accounts that they do not own, and their

8  motion to quash must be limited to the accounts that they do own.  *See TMP Worldwide Adver.*, 2008

9  WL 5348180, at *1; *Insubuy, Inc. v. Cmty. Ins. Agency, Inc.*, No. 11-mc-0008-PHX-FJM, 2011 WL

10  836886, at *2 (D. Ariz. Mar. 9, 2011); *see also Kremen v. Cohen*, No. 11-cv-05411-LHK (HRL),

11  2012 WL 2277857, at *3 (N.D. Cal. June 18, 2012).  The Does' request to quash the subpoenas in

12  their entirety (*see, e.g.*, Mem. 9, 24-25) must thus be denied, and their request must be confined to

13  accounts they own.

14  **B.    The Subpoenas Make Reasonable Requests that Courts Routinely Grant**

15        **1.    Courts Routinely Require Production of the Information that Chevron Seeks**

16        For each of the Does' accounts, Chevron seeks only two categories of information:  (1) user

17  identification information, and (2) usage information such as IP logs and IP address information.  *See*

18  Ex. 15 (subpoena at 2).  Such information is routinely sought from email service providers in civil

19  discovery.  *See, e.g., In re Roebers*, No. C12-80145 MISC RS (LB), 2012 WL 2862122, at *3 (N.D.

20  Cal. July 11, 2012) ("Internet Service Providers and operators of communications systems are

21  generally familiar with this type of discovery request.").  And courts consistently uphold subpoenas

22  seeking such information.  *See, e.g., London v. Does 1-4*, 279 F. App'x 513, 514-16 (9th Cir. 2008)

23  (affirming denial of motion to quash subpoena on Yahoo! seeking documents disclosing IP address

24  from which email accounts were created).[5]   Critically, the subpoenas do not seek the contents of

---

26  [5]  *See also AF Holdings LLC v. Doe*, No. C 12-02416 WHA, 2012 U.S. Dist. LEXIS 75806, at *2-3
27  (N.D. Cal. May 31, 2012) (granting early discovery of IP log for purpose of learning identity of
   allegedly infringing IP address holder); *Xcentric Ventures, LLC v. Karsen, Ltd.*, No. CV 11-
   01055-PHX-FJM, 2012 U.S. Dist. LEXIS 121888, at *1-3 (D. Ariz. July 23, 2012) (denying
28  motion to quash subpoena seeking IP address information from Google).

email communications. *See Doe v. SEC*, No. 3:11-mc-80184 CRB (NJV), 2011 WL 4593181, at *4 (N.D. Cal. Oct. 4, 2011) ("addressing information" is less protected than content of communications).

### 2. The Subpoenaed Information Will Materially Support Chevron's Claims in the RICO Action

The information that Chevron seeks, moreover, is well within the bounds of information that it is entitled to pursue in the RICO action. The Federal Rules provide that a party is entitled to discover information "that is relevant to [its] claim[s]" and "reasonably calculated to lead to the discovery of admissible evidence." Fed. R. Civ. P. 26(b)(1).[6] Information concerning the Does' accounts is directly and materially relevant to Chevron's claims.

As summarized above, each declarant Doe was involved in the LAPs' scheme against Chevron, and each non-declarant Doe is similarly situated. The subpoenaed information about the Does' accounts will directly support Chevron's RICO action claims in several ways.

First, the subpoenaed information will show whether certain account holders had access to the RICO defendants' internal documents and data. The RICO defendants and their affiliates established email accounts to store and exchange documents in furtherance of the fraud. Ex. 5 at ¶ 141. Such accounts were used to plan the ghostwritten "independent" expert report. *Id.* Whoever wrote the $19 billion judgment, moreover, had access to the RICO defendants' unfiled documents. Information about who had such access—and when they may have accessed those documents—will provide information about how those documents came to be filed as the work of the "independent" court expert and how some of that information was found verbatim in the $19 billion judgment itself. *See* Exs. 15, 16; Ex. 2 at 27-30.

Second, IP information will prove that substantial portions of the RICO predicate acts originated in the United States. That is critical because—although the RICO defendants' scheme was designed by U.S. lawyers, carried out largely in the United States, and directed at a U.S. victim—the

---

[6]  *See also* Fed. R. Civ. P. 45, 1946 advisory committee's note (a subpoena has "the same scope as provided in Rule 26(b)"); 1970 advisory committee's note ("[T]he scope of discovery through a subpoena is the same as that applicable to . . . the other discovery rules.").

Gibson, Dunn & Crutcher LLP

1  RICO defendants have contended that Chevron's complaint seeks an extraterritorial application of

2  RICO.  Ex. 45 at 10-13.

3      Third, identifying information about the owners of the accounts—which were used to further

4  the various RICO predicate acts of extortion, wire fraud, and money laundering—will provide

5  evidence regarding the structure and management of the RICO enterprise.  That evidence is essential

6  to a RICO claim.  *See Boyle v. United States*, 556 U.S. 938, 951 (2009).

7      Fourth, although Chevron likely knows the Does' identities, Chevron remains entitled to

8  regularly collected business records to substantiate those identities at trial.  *See, e.g.*, Fed. R. Evid.

9  803(6).  Courts have grown increasingly suspicious of internet evidence that is not properly

10 authenticated and have required guarantees of authenticity before admitting such evidence.  *See, e.g.*,

11 *Griffin v. Maryland*, 19 A.3d 415, 421 (Md. 2011); *People v. Clevenstine*, 891 N.Y.S.2d 511, 514

12 (N.Y. App. Div. 2009).  Chevron is entitled to show the jury who the relevant account users are.  The

13 subpoenaed documents will provide Chevron with the needed evidence.

14         **3.      The Subpoenas Are Not Overbroad**

15     The Does contend that the subpoenas are overbroad because together they seek information

16 about 71 email accounts over the course of nine years and because much of the information sought is

17 irrelevant to Chevron's claims.  Mem. 24-25.  The Does also complain about a non-Doe account

18 holder who Chevron has removed from its subpoena.  *See* Mem. 5, 15, 21-22; Declaration of Rebecca

19 Gray ¶ 19 & Ex. J.  But, as already explained, the Does possess standing to challenge the subpoenas

20 only as to the accounts that they own.  *See* Part III.A., *supra*.  As a result, their arguments as to other

21 email account owners are not properly before this Court.

22     But even as to accounts that they own, the Does lack standing to quash based on undue

23 burden or relevance because the email service providers, not the Does, bear the burden of responding

24 to the subpoenas.  *See In re Rhodes Cos.*, 475 B.R. 733, 740 (D. Nev. 2012) ("[O]nly the party

25 subject to the subpoena may bring a motion to quash under Rule 45(c)(3)(A).").[7]  The overbreadth

26

27 [7]  *Erickson v. Microaire Surgical Instruments LLC*, No. 08-cv-5745 BHS, 2010 WL 1881946, at *2
    (W.D. Wash. May 6, 2010) ("A party generally does not have standing to object to a subpoena

28  served on a nonparty on grounds of the undue burden imposed on the nonparty, especially where
                                                                    *(Cont'd on next page)*

1    cases cited by the Does do not allow them to depart from settled principles of standing.  Indeed, in

2    both cases the Does cite to show that a "non-party may contest [a] subpoena on irrelevancy grounds"

3    (Mem. 24), the non-party *had been subpoenaed* and therefore possessed standing to challenge the

4    subpoena.  *See Compaq Computer Corp. v. Packard Bell Elecs., Inc.*, 163 F.R.D. 329, 333, 335-36

5    (N.D. Cal. 1995); *Fallon v. Locke, Liddell & Sapp LLP*, No. 5:04-cv-3210 RMW, 2005 U.S. Dist.

6    LEXIS 46987, at *3, *12-13 (N.D. Cal. Aug. 4, 2005).

7         Nor is there any force to the argument that the subpoenas are overbroad as applied to the

8    Does.  The subpoenas seek only information that remains in Google's and Yahoo!'s custody or

9    control since the underlying Ecuador litigation began in 2003.  Ex. 15 (subpoena at 2).  Chevron has

10   also advised that it is willing to narrow its requests to ensure that the subpoenas yield only relevant

11   information.  Gray Decl., *passim*.  Chevron has agreed, for example, to tailor the time ranges for its

12   request to ensure that the information produced covers only the time periods during which the Does

13   associated with the LAPs.  *Id.*  The Does, however, have provided no sworn evidence to permit the

14   time ranges to be narrowed.

15        The party seeking to quash a subpoena bears the burden of demonstrating that the subpoena is

16   overbroad or unduly burdensome.  *See, e.g.*, *Thomas v. Hickman*, No. 1:06-cv-00215-AWI-SMS,

17   2007 WL 4302974, at *6 (E.D. Cal. Dec. 6, 2007); 9A Charles Alan Wright, Arthur R. Miller, et al.,

18   *Federal Practice and Procedure* § 2459 (3d ed.) (note 7.1 accompanying text).  Here, however, the

19   Does have refused to provide *any* sworn testimony explaining what periods are allegedly relevant and

20   what periods are allegedly irrelevant with regard to their email addresses.  As a result, they fail to

21   meet their burden to establish that the subpoena is overbroad.

22   **C.    The Subpoenas Accord with First Amendment Standards**

23        The Does next contend that the subpoenas violate their First Amendment rights to anonymity

24   and to association.  Mem. 9-23.  This argument also has no merit.

25

26   *(Cont'd from previous page)*

27   the nonparty itself has not objected."); *Kadant Johnson Inc. v. D'Amico*, No. 3:12-mc-00126,
     2012 WL 1576233, at *4 (D. Or. May 4, 2012) (rejecting defendants' argument that subpoena

28   was "unduly burdensome" and sought "irrelevant" and "confidential information").

1       **1.     Compliance with the Subpoenas Will Not Infringe Any Right to Anonymity**

2             **a.     The Right to Anonymity Does Not Apply Here**

3       The First Amendment protects anonymity when it will provide "a shield from the tyranny of

4       the majority," *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 357 (1995), or will "foster open

5       communication and robust debate" by eliminating the burdens of others "knowing all the facts about

6       one's identity," *Columbia Ins. Co. v. Seescandy.com*, 185 F.R.D. 573, 578 (N.D. Cal. 1999). Those

7       rationales for protecting anonymity disappear where, as here, a speaker's identity is publicly known.

8       In those circumstances, the speaker simply has not made the protected "decision to remain

9       anonymous." *McIntyre*, 514 U.S. at 342.

10       In this case, accordingly, the Google and Yahoo! subpoenas do not affect the Does' right to

11      anonymous speech because the so-called "Does" are not anonymous. That is of their own doing: At

12      least 25 of the 31 Does used their names or initials when creating the addresses associated with their

13      email accounts. And many Does have long publicized their use of these particular email addresses or

14      their association with the LAPs. *See* Part II, *supra*. Through their very public activities, the Does

15      have affirmatively chosen *not* "to remain anonymous." *McIntyre*, 514 U.S. at 342. The long-public

16      nature of their activities, moreover, belies any claim that the Does need protection from a "danger" of

17      having their association with the LAPs "exposed." Because the Does advertised their identities and

18      involvement with the LAPs, there is no basis for their artificial claim to anonymity.

19       More fundamentally, although the Does cast their association with the LAPs as one of

20      political speech or advocacy, *e.g.*, Mem. 9, 16, the record is clear that many were employed by

21      Donziger and others provided significant assistance to the LAPs' fraudulent enterprise. *See* Part II,

22      *supra*. The First Amendment does not protect fraud or associations that further a conspiracy. *See,*

23      *e.g.*, *Illinois, ex rel. Madigan v. Telemarketing Assocs., Inc.*, 538 U.S. 600, 612 (2003); *San Antonio*

24      *Cmty. Hosp. v. So. Cal. Dist. Council of Carpenters*, 125 F.3d 1230, 1239 (9th Cir. 1997).[8] The

25      Court should reject this effort to keep illicit activities concealed.

26

27

28
      [8]  *McIntyre*, 514 U.S. at 357; *Branzburg v. Hayes*, 408 U.S. 665, 697 (1972) (declining to afford
        First Amendment protection to the "concealment of crime"); *United States v. Sattar*, 395 F. Supp.

*(Cont'd on next page)*

Gibson, Dunn &
Crutcher LLP

CHEVRON'S OPPOSITION TO THE NON-PARTY MOVANTS' MOTION TO QUASH –
CASE NO. 5:12-80237 MISC CRB NC

1

2

              **b.**     **Chevron's Interest in Disclosure Outweighs Any Claimed Right to Anonymity**

3

4

       Even if the Does had any claim to anonymity, Chevron's interest in discovering the limited subpoenaed information would outweigh it.

5

6

7

8

9

10

11

       When ruling on a motion to quash that seeks to preserve the movant's anonymity, a court must balance the need for disclosure against First Amendment interests. *See In re Anonymous Online Speakers*, 661 F.3d 1168, 1176-77 (9th Cir. 2011). The Ninth Circuit has not prescribed a single standard to guide that balancing, but has instead emphasized "that the nature of the speech should be a driving force [in each case] in choosing a standard by which to balance the rights of anonymous speakers in discovery disputes." *Id.* at 1177. "The specific circumstances surrounding the speech serve to give context to the balancing exercise." *Id.*

12

13

14

15

16

17

18

19

20

21

22

       As already explained, the First Amendment does not protect the Does' efforts to further fraudulent activity or to aid a conspiracy. Thus, this Court should apply what the Ninth Circuit has described as "the lowest bar that courts have used" in considering whether to order disclosure of an anonymous speaker's identity:  it should consider whether "the claim for which the plaintiff seeks the disclosure" meets "the motion to dismiss or good faith standard." *Anonymous Online Speakers*, 661 F.3d at 1175. Here, the Southern District of New York has denied the RICO defendants' motion to dismiss Chevron's claims (*see Chevron Corp. v. Donziger*, 871 F. Supp. 2d 229 (S.D.N.Y. May 14, 2012) (Westlaw version)) and has found that there is no genuine dispute of material fact with respect to many of Chevron's core allegations regarding the RICO defendants' fraud and misconduct in the Ecuador litigation (*see* Ex. 2)—conclusively showing that Chevron meets the low disclosure standard.

23

24

25

       Even if this Court were to apply the higher "prima facie standard," Chevron would meet that standard as well. The Second Circuit has adopted a test that weighs the need for disclosure against First Amendment interests by asking courts to consider:  (1) the prima facie strength of the plaintiff's

26

---

*(Cont'd from previous page)*

27

28

    2d 79, 101 (S.D.N.Y. 2005) ("The First Amendment lends no protection to participation in a conspiracy, even if such participation is through speech.").

claims of injury; (2) the specificity of the discovery request; (3) the absence of alternative means to obtain the subpoenaed information; (4) the plaintiff's need for the information; and (5) the movant's expectation of privacy in the subpoenaed information. *Arista Records LLC v. Doe 3*, 604 F.3d 110, 119 (2d Cir. 2010) (citing *Sony Music Entm't Inc. v. Does 1-40*, 326 F. Supp. 2d 556, 564-65 (S.D.N.Y. 2004)). Applying that analysis, courts have denied motions to quash subpoenas seeking discovery of defendants' identifying information where the balancing of these factors overall led to the conclusion that the objecting party was not entitled to protection. *See, e.g.*, *Arista Records LLC v. Does 1-16*, No. 1:08-CV-765 (GS/RFT), 2009 WL 414060, at *6, *29-30 (N.D.N.Y. Feb. 18, 2009), *aff'd*, 604 F.3d 110 (2d Cir. 2010).

Here, these factors both separately and collectively support disclosure.

*First*, Chevron has made a strong showing of a prima facie claim of actionable harm. In denying the LAPs' motion to dismiss and in finding that evidence that the Ecuador litigation was "tainted by fraud" was "uncontradicted" on summary judgment, the District Court presiding over the underlying case has conclusively established a prima facie claim of actionable harm. *See Chevron Corp. v. Donziger*, 871 F. Supp. 2d 229 (S.D.N.Y. 2012); Ex. 2. Indeed, *seven* federal courts have determined that the RICO defendants committed fraud sufficient to pierce the protection against discovery of attorney-client privileged documents.[9] The Second Circuit has held that the first factor may be satisfied by only a well-pleaded complaint and a supporting exhibit and declaration. *Arista*

---

[9] *See In re Chevron Corp.*, 633 F.3d 153, 166, 168 (3d Cir. 2011) (holding that Chevron had made a "prima facie showing of a fraud that satisfies the first elements of the showing necessary to apply the crime-fraud exception to the attorney-client privilege" and remanding for *in camera* review); *In re Chevron Corp.*, No. 11-24599-CV, 2012 WL 3636925, at *14, *16 (S.D. Fla. June 12, 2012) (granting Chevron's motion for discovery of information "pertain[ing] to a large scale fraud upon an American corporation"); *Chevron Corp. v. Page*, No. RWT-11-1942, Oral Arg. Tr. at 10:17-21, 11:13-23 (D. Md. Aug. 31, 2011) (applying crime-fraud exception to attorney-client privilege); *Chevron Corp. v. Donziger*, 768 F. Supp. 2d 581, 636 (S.D.N.Y. 2011) ("There is ample evidence of fraud in the Ecuadorian proceedings."); *In re Chevron Corp.*, No. 10-cv-1146-IEG(WMC), 2010 WL 3584520, at *6 (S.D. Cal. Sept. 10, 2010) (applying crime-fraud exception); *In re Chevron Corp.*, Nos. 1:10-mc-00021-22, slip op. 3-4 (D.N.M. Sept. 2, 2010) (noting evidence of the "inappropriate, unethical and perhaps illegal conduct" by LAPs' attorneys); *Chevron Corp. v. Champ*, Nos. 1:10-mc 27, 1:10-mc 28, 2010 WL 3418394, at *6 (W.D.N.C. Aug. 30, 2010) (applying crime-fraud exception because "what has blatantly occurred in this matter would in fact be considered fraud by any court.").

1    *Records LLC*, 604 F.3d at 123.  Chevron has gone well beyond that showing.  Many courts have

2    concluded that the fraud alleged here in fact took place.  *See* note 1, *supra*.

3              *Second*, Chevron has made a narrow and specific discovery request concerning the Does.

4    Chevron has sought specific account usage and user documents that will "lead to identifying

5    information" (*Sony Music*, 326 F. Supp. 2d at 566) that will assist Chevron's efforts to establish

6    where the Does were located when RICO predicate acts took place, to learn details about the structure

7    and management of the RICO enterprise, and to uncover further use of computers in connection with

8    the fraudulent "independent" expert report and ghostwritten $19 billion judgment.  *See* Exs. 15, 16;

9    Ex. 2 at 27-30.  Chevron has not sought a broad swath of information—such as the *contents* of the

10   Does' emails—but has instead served narrow requests that have withstood frequent judicial scrutiny.

11   *See* Part III.B.1., *supra*.

12             *Third*, Chevron has been unable to obtain the specific information sought in the subpoenas

13   through other means.  Chevron has pursued multiple discovery actions to obtain information about

14   the relationships between the RICO defendants and non-parties, and the relevant interactions between

15   the two groups.  Despite those efforts, Donziger, the LAPs, and their agents and co-conspirators have

16   repeatedly prevented Chevron from accessing much of that evidence.  *See* Part II, *supra*

17   (summarizing some of the efforts to evade and obstruct discovery).  Given that obstruction, the

18   subpoenas here are the best calculated means—and are, indeed, necessary—to allow Chevron to

19   obtain the information that the LAPs have continually concealed.  At most, the Does suggest that

20   Chevron should seek these facts from the RICO defendants themselves.  But computer users do not

21   often record IP login information, much less the login information of the computers of those who

22   work with them.  In fact, in this very case, Donziger was forced to subpoena Yahoo! to obtain access

23   to the exact kind of information Chevron seeks *about his own account*.  *See* Part II, *supra*.  Seeking

24   this information from Google and Yahoo! is not only the most direct way to proceed; it is the only

25   way to ensure that the information has sufficient indicia of reliability to make it admissible.  *See* Fed.

26   R. Evid. 901(a).

27             *Fourth*, the subpoenaed information is important to Chevron's claims in the RICO action.

28   Chevron already has obtained thousands of emails sent to and from the RICO defendants and those

1   associated with them, including the Does.  These emails provide evidence of fraud, extortion, and

2   other misconduct.  As explained above, the identities of the email account users involved—and the

3   location from which those users operated—will assist Chevron establish where the Does were located

4   when RICO predicate acts took place, to learn details about the structure and management of the

5   RICO enterprise, and to obtain details about the fraudulent expert report and judgment.  *See* Part

6   III.B.2., *supra*.

7   　　　*Fifth*, the Does have only a "minimal expectation of privacy" in the subpoenaed material.

8   *Sony Music*, 326 F. Supp. 2d at 566.  Almost all of the Does used their own names or initials in the

9   email addresses associated with their accounts; others disclosed their identities publicly in other

10   ways.  And the Does used email services that warn users that their identifying information will not be

11   kept private if it is subpoenaed.  Ex. 46, 47.  That agreement—particularly when coupled with the

12   Does' efforts to publicize their identities and actions—renders the Does' privacy interest "minimal,"

13   *Doe I v. Individuals*, 561 F. Supp. 2d 249, 254 (D. Conn. 2008) (finding "minimal" expectation of

14   privacy based on a similar internet service provider warning), and readily overcome by the need for

15   disclosure.  *See also Doe v. SEC*, No. 11-mc-80184 CRB (NJV), 2011 WL 4593181, at *4 (N.D. Cal.

16   Oct. 4, 2011) (noting that courts "routinely reject the argument that subscribers have a privacy

17   interest in their account information" and rejecting motion to quash subpoena that "d[id] not seek the

18   content of any of Movant's communications but rather 'addressing information' that will allow the

19   SEC to identify Movant"); *In re United States*, 830 F. Supp. 2d 114, 131-33 (E.D. Va. 2011) (holding

20   that petitioners had no expectation of locational privacy in IP logs when they voluntarily transmitted

21   their IP addresses to Twitter).

22   　　　Because all factors weigh strongly in favor of disclosure, the Does' "right to remain

23   anonymous"—if it could even be said to apply here—must "give way to [Chevron's] right to use the

24   judicial process to pursue" their claims.  *Sony Music*, 326 F. Supp. 2d at 567.

25

26

27

28

1    The Does ask this Court to apply a four-part standard articulated by a judge in the Western

2    District of Washington in *Doe v. 2TheMart.com*, 140 F. Supp. 2d 1088 (W.D. Wash. 2001).[10]

3    Chevron satisfies this standard too:  The *2TheMart.com* test looks to whether:  (1) the subpoena was

4    issued in good faith and not for an improper purpose; (2) the information sought relates to a core

5    claim; (3) the identifying information is directly and materially relevant to that claim; and

6    (4) information sufficient to establish that claim is unavailable from any other source.  140 F. Supp.

7    2d at 1095.[11]  As already explained, the subpoenaed information relates to a core claim, that

8    information is directly and materially relevant to that claim, and Chevron has shown that it cannot

9    obtain that information from another source.  Chevron therefore satisfies the second, third, and fourth

10   *2TheMart.com* factors.  And, in seeking the subpoenaed information, Chevron has acted in good

11   faith:  Chevron has well-supported RICO claims, the accounts at issue were used by persons who

12   were extensively involved in the RICO defendants' illicit enterprise, and Chevron has been willing to

13   work with the Does to tailor its request to uncover only relevant information.  This is more than

14   enough to support the subpoenas under *2TheMart.com*.

15   Indeed, the Ninth Circuit has described the *2TheMart.com* standard as "fall[ing] somewhere

16   between the motion to dismiss and the prima facie standards" in the extent to which it favors

17   disclosure.  *Anonymous Online Speakers*, 661 F.3d at 1176.  That description apparently rests on the

18   fact that—unlike the prima facie standard—*2TheMart.com* does not focus on whether a plaintiff has

19   established a prima facie case, but instead merely *balances* whether the subpoena was "issued in

20   *good faith*" (a clearly lower bar) against other factors.  Because Chevron satisfies the higher prima

21   facie standard, it *a fortiori* satisfies the *2TheMart.com* standard.

22

23   _____

24   [10]  The Does contend that this Court "followed" the *2TheMart.com* "four-part test" in *USA
     Technologies, Inc. v. Doe*, 713 F. Supp. 2d 901 (N.D. Cal. 2010).  Not so:  *USA Technologies*

25   cited *2TheMart.com* once—for the basic proposition that "'The right to speak anonymously
     extends to speech via the Internet.'"  *Id.* at 906 (quoting *2TheMart.com*, 140 F. Supp. at 1092-
     93).  *USA Technologies* never even referred to the *2TheMart.com* standard.

26

27   [11]  The Does are wrong to contend that, to obtain disclosure, a plaintiff "must show" that it prevails
     on all four *2theMart.com* factors.  Mem. 13.  To the contrary, the court in *2theMart.com*

28   described its test as an overall balancing analysis of several factors, not four elements that must
     all be met.  *See* 140 F. Supp. 2d at 1095-97.

CHEVRON'S OPPOSITION TO THE NON-PARTY MOVANTS' MOTION TO QUASH –
CASE NO. 5:12-80237 MISC CRB NC

Gibson, Dunn &
Crutcher LLP

### 2.      Compliance with the Subpoenas Will Not Infringe Any Right of Association

The Does also cannot avoid enforcement of the subpoena based on their freedom of association, because they cannot make a "*prima facie* showing of arguable [F]irst [A]mendment infringement" that would result from the disclosure of information about their email accounts. *Brock v. Local 375, Plumbers Int'l Union*, 860 F.2d 346, 349 (9th Cir. 1988) (internal quotation marks omitted).

To begin with—and as explained above—the Does' identities have been disclosed. The Does, moreover, freely associated themselves and their identities with the LAPs for long ranges of time during which the LAPs were perpetrating massive fraud. The genie has left the bottle:  Nothing about *re*-disclosure of the Does' identities could hamper their associational freedom.

Indeed, if disclosure could have harmed the Does at all, that (self-inflicted) harm would have already occurred. Yet the Does do not identify any harm that has ever hampered their associational freedom. The Does have in most cases long publicized their association with the LAPs and were open about their identities during that association. *See* Part II, *supra*. Yet the Does do not show that their open involvement with the LAPs caused them to face harassment, threats, or anything else that chilled their speech. *See* Dkt. 43-3 to 43-9, *passim*. The absence of such harm stands in stark contrast to the baseless speculation set forth in the Does' declarations. Simeon Tegel (Doe 3), for example, states that he believes that compliance with the subpoenas would "chill [his] activities" and "intimidate" him. Dkt. 43-5 ¶¶ 9-10. That speculation, however, is inexplicable in light of Tegel's long public association with the LAPs (he worked for the Donziger-funded Amazon Watch from 2005 to 2008), which has apparently never caused him such harms. *See, e.g.*, Ex. 48. Even if Tegel had experienced such harms, of course, they would not be protected by invoking the freedom of association here:  He unmasked himself and forfeited any right conceal his identity. Similarly baseless are claims—such as those by Kevin Koenig—that disclosure of IP address information would "allow [Chevron] to track [his] physical movements," and could be used to "harass or intimidate . . . or worse." Dkt. 43-6 ¶ 9. IP logs can provide information as to the general location from which an email address was accessed *in the past*. They do not enable one to "track" a person's movements or to divine anyone's current or future whereabouts.

Gibson, Dunn & Crutcher LLP

1    Even if the Does could make a prima facie showing of potential harm, moreover, Chevron has

2    a compelling interest in the subpoenaed material, the subpoenaed information "is rationally related

3    to" that interest, and the subpoenas are "the least restrictive means of obtaining the desired

4    information." *Brock*, 860 F.2d at 350 (internal quotation marks omitted); *see Perry v.*

5    *Schwarzenegger*, 591 F.3d 1126, 1140 (9th Cir. 2009) (setting forth same standard).

6    Indeed, the Does seem to concede the compelling need for disclosure, acknowledging that

7    "[t]he government may well have a compelling interest in making sure that parties to litigation

8    receive the information they need to properly litigate their cases in the interest of the fair

9    administration of justice." Mem. 21.  Although the Does contend that "the scope of Chevron's

10   subpoenas far exceed[s]" its compelling interest, *id.*, they cite months-old quotations about the

11   subpoenas and an account holder (Jon Heller) who was removed from the subpoena, Mem. 21-22 &

12   n.15.  But the fraud at issue has been going on for decades, and the subpoenas request information

13   only for the time period since the Ecuador litigation began.  The Does, moreover, have failed to offer

14   evidence as to a period of time when they were *not* supporting that effort.  The Does also ignore, once

15   again, the clear law that they lack standing to complain about the subpoena's implications for other

16   account holders.  *See* Part III.A., *supra*.

17   The subpoenaed information is rationally related to Chevron's interest in the subpoenaed

18   material—indeed, as explained in detail above, it is "highly relevant" (*Perry*, 591 F.3d at 1141) to

19   Chevron's claims in the RICO action.  *See* Part III.B.2., *supra*.

20   Finally, the subpoenas are the least restrictive means of obtaining the desired information.

21   Chevron has been otherwise unable to obtain the information sought in the subpoenas.  It has pursued

22   multiple discovery actions to obtain information about the relationships between the RICO

23   defendants and non-parties.  Despite its efforts, Donziger and the LAPs have prevented Chevron from

24   accessing much of that evidence.  And the Does are wrong to contend that Chevron can obtain such

25   information from the RICO defendants.  Mem. 24.  The LAPs do not keep IP log-in information.

26   Indeed, Donziger himself subpoenaed Yahoo! to obtain this information for his own account.  Ex. 44.

27   That fact undermines the Does' assertions that Chevron can obtain the subpoenaed information from

28

1  the RICO defendants.  The subpoenas are the least restrictive means—and are, indeed necessary—to

2  allow Chevron to obtain the information that the LAPs have continually concealed.

3  **D.      The Subpoenas Do Not Violate the Does' State Law Privacy Interests**

4          Finally, the Does are wrong to contend that the subpoenas infringe any state law right to

5  privacy.  To prevail on such a privacy claim, the Does would need to establish:  (1) that they have a

6  protected privacy interest in the subpoenaed information; (2) that they have a reasonable expectation

7  of privacy in that information; and (3) that the subpoenas are a serious invasion of their privacy.  *See*

8  *Hill v. Nat'l Collegiate Athletic Ass'n*, 7 Cal. 4th 1, 39-40 (1994).  Even if they could make that

9  showing, the need for disclosure outweighs the Does' interests.  *See id.* at 40.

10          First, the Does have waived any privacy interest in the requested information because,

11  "without coercion," each Doe "disclosed a significant part of the communication or has consented to

12  such disclosure."  *Heda v. Superior Court*, 225 Cal. App. 3d 525, 530 (Cal. Ct. App. 1990).  Here, the

13  Does disclosed all the requested information to Google or Yahoo!.  *See People v. Stipo*, 195 Cal.

14  App. 4th 664, 668 (2d Dist. 2011) ("[A] person has no legitimate expectation of privacy in

15  information he voluntarily turns over to third parties" such as "subscriber information conveyed to

16  Internet providers." (internal quotation marks omitted)).  And the Does have largely identified

17  themselves by publicly disclosing their email addresses or by including their names in the addresses

18  themselves.[12]

19          Second, the Does "ha[ve] no legitimate expectation of privacy" in "subscriber information

20  conveyed to Internet providers."  *Stipo*, 195 Cal. App. 4th at 668 (internal quotation marks omitted).[13]

21  Indeed, "e-mail and Internet users have no expectation of privacy in the to/from addresses of their

22  _____

23  [12]  In *Planned Parenthood Golden Gate v. Superior Court*, 83 Cal. App. 4th 347 (Cal. Ct. App.
    2000) (*see* Mem. 23-24), the court found a privacy interest based on "*specific evidence* that"
24  disclosure could have resulted in both "unique and very real threats not just to . . . privacy" but
    also to individuals' "safety and well-being."  *Id.* at 361 (emphasis added).  The requested
25  information there included residential addresses from unknown employees.  The Does, by
    contrast, are known, their work for the LAPs' has been highly public, and (as the Does admit) IP
26  addresses convey only "approximate information about [one's] location."  Mem. 7.

27  [13]  *Stipo* concerned the Fourth Amendment, but the right to privacy under the California Constitution
    "has never been held to establish a broader protection than that provided by the Fourth
28  Amendment."  *People v. Crowson*, 33 Cal. 3d 623, 629 (1983).

Gibson, Dunn &
Crutcher LLP

CHEVRON'S OPPOSITION TO THE NON-PARTY MOVANTS' MOTION TO QUASH –
CASE NO. 5:12-80237 MISC CRB NC

1   messages or the IP addresses of the websites they visit." *Id.* at 669.  All of the requested information

2   has been disclosed to third parties and therefore the Does have no reasonable expectation of privacy.

3   　　　　Third, the subpoenas make reasonable, routine requests that do not invade privacy.  *Compare*

4   Part III.B.1., *supra* (noting that courts routinely allow production of the information requested here)

5   *with Hill*, 7 Cal. 4th at 43 (urine testing was "an intrusive act" and "unique").

6   　　　　In any event, Chevron has a strong interest in the subpoenaed information, which will

7   materially support its underlying legal claims.  The Does can overcome that interest only "by

8   showing there are feasible and effective alternatives" for obtaining that information.  *Hill*, 7 Cal. 4th

9   at 40.  The Does identify no alternatives for obtaining the information that Chevron seeks.

10   **IV.　　CONCLUSION**

11   　　　　For the foregoing reasons, the Does' motion to quash should be denied.

12

13   DATED: January 2, 2013

　　　　　　　　　　　　　　　　　　　GIBSON, DUNN & CRUTCHER LLP

14

15   　　　　　　　　　　　　　　　By:　　____/s/ Ethan Dettmer_____

16   　　　　　　　　　　　　　　　　　　Ethan Dettmer

17   　　　　　　　　　　　　　　　Attorneys for Plaintiff
　　　　　　　　　　　　　　　　　CHEVRON CORPORATION

18

19

20

21

22

23

24

25

26

27

28