Pages 1 - 53

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Nathanael M. Cousins, Magistrate Judge

|  |  |  |
|---|---|---|
| Chevron Corporation, | ) ) ) | No. MC12-80237 CRB (NC) |
| Plaintiff, | ) ) | |
| vs. | ) ) | |
| Steven Donziger, et al, | ) ) | |
| Defendant. | ) ) ) | |
| | ) | |

San Francisco, California
Wednesday, January 16, 2013

**TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND RECORDING**

**APPEARANCES:**

For Plaintiff:

        Gibson, Dunn & Crutcher, LLP
        333 South Grand Avenue
        Los Angeles, CA 90071-3197
  **BY:**  **THEODORE J. BOUTROUS, JR.**
        **ATTORNEY AT LAW**

For Defendant Donziger:

        Keker & Van Nest, LLP
        633 Battery Street
        San Francisco, CA 94111
  **BY:**  **WILLIAM S. HICKS**
        **ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Transcribed By:    Stacy Wegner
                Transcriber
                smwtyping@yahoo.com
                (502)603-2776

**APPEARANCES:    (Continued)**

For Non-Party Movants:

                        Electronic Frontier Foundation
                        454 Shotwell Street
                        San Francisco, CA 94110
            **BY:**  **MARCIA HOFFMAN**
                **ATTORNEY AT LAW**

| | |
|---|---|
| 1 | <u>Wednesday, January 16, 2013</u>                    1:36 p.m. |
| 2 | |
| 3 | **THE CLERK:**  Calling Miscellaneous 12-80237, Chevron |
| 4 | Corporation versus Steven Donziger, et al. |
| 5 | **THE COURT:**  Good afternoon.  Come on forward. |
| 6 | Don't be shy. |
| 7 | **MR. BOUTROUS:**  Good afternoon, Your Honor.  Ted |
| 8 | Boutrous for Chevron. |
| 9 | **THE COURT:**  Good afternoon, Mr. Boutrous. |
| 10 | **MS. HOFFMAN:**  Good afternoon, Your Honor.  Marcia |
| 11 | Hoffman for the Non-Party Movants. |
| 12 | **THE COURT:**  Good afternoon. |
| 13 | **MR. HICKS:**  Good afternoon, Your Honor.  Bill Hicks |
| 14 | from the law firm of Keker & Van Nest. |
| 15 | We represent the Donziger Defendants in the |
| 16 | underlying RICO action.  Here today I'm here to speak on |
| 17 | behalf of all of the Moving Defendants. |
| 18 | **THE COURT:**  Thank you, Mr. Hicks.  Good afternoon. |
| 19 | **MR. HICKS:**  Good afternoon. |
| 20 | **THE COURT:**  All right. |
| 21 | **MS. HOFFMAN:**  Your Honor, if it's -- |
| 22 | **THE COURT:**  Yeah. |
| 23 | **MS. HOFFMAN:**  -- all right with you, I was hoping |
| 24 | that perhaps we might deal with a motion to quash on behalf |
| 25 | of the Non-Party Movants first because I think we can dispose |

1  of some issues hopefully very quickly and easily that are not

2  common to everybody here.

3      **THE COURT:**  I appreciate that.  I am actually going

4  to start with Mr. Boutrous for Chevron just on -- and I want

5  to get your views on it too.  They filed the notice of -- the

6  action in New York encouraging me to wait until Judge Kaplan

7  and the court there in New York have ruled.

8      And one, I wanted to see if there's an update on

9  that request, and to see if there's any views from the other

10 parties on that particular procedural component.

11     **MR. BOUTROUS:**  Yes, Your Honor.  Thank you.

12     The briefs, I think, just our -- our response

13 briefs were filed last night to that because I don't think we

14 have a hearing date yet, and really, however the Court wants

15 to proceed, we're fully briefed here.

16     Some of the issues that the Does and the -- the

17 Defendants raise regarding what Judge Kaplan is thinking or

18 doing, I think, are better decided by him, but we're prepared

19 to argue today on any issue the Court wants to hear and --

20 and ready to go.

21     **THE COURT:**  Great.  I appreciate that.  Let me hear

22 from the other -- other parties as well about the -- the

23 timing question of here versus New York.

24     **MS. HOFFMAN:**  Your Honor, I think you should go

25 ahead and decide this motion now for two reasons.

1    The first is that there's binding Ninth Circuit

2  precedent that disposes of this issue, which is *Perry versus*

3  *Schwarzenegger*, and that is not binding precedent in the

4  action in New York, and so I think that there could be

5  potentially some possibility for inconsistent results, even

6  if you wait.

7    So I think what Judge Kaplan does is not something

8  that it -- you're -- you're in two different situations in

9  terms of applying legal precedent.

10    The second reason is because we are bringing an

11  independent California State Constitutional claim that we're

12  not bringing in New York, and so no matter what you're going

13  to be deciding that exclusively, and Judge Kaplan is not --

14  not looking at that question.

15    So I think it makes the most sense for you to just

16  go ahead and decide this motion.

17    **THE COURT:**  Now, even assuming everything you've

18  said is true, one approach might be to wait to see what Judge

19  Kaplan does on the -- on the issues or -- and I may

20  ultimately disagree with him that he -- or ignore everything

21  he says, but wait to see what he says on the issues that are

22  in common and then know that there's California law that

23  might be applied, or Ninth Circuit law that would be special

24  here and that I might be better served to wait and see what's

25  in common and then do an overlay, but I -- I hear what you're

1  saying.

2          Mr. Hicks, any -- any thoughts on the procedural

3  order of things?

4          **MR. HICKS:**  No.  I -- I -- I agree that -- that --

5  that Your Honor should decide the motion now, and we're --

6  we're prepared to argue.  I think it makes at least -- at

7  least -- at least makes sense to, you know, hear the motion

8  now and --

9          **THE COURT:**  Yeah.  I am going to hear everybody's

10  arguments and -- but I am inclined to -- probably to take

11  them under submission and to think about them a little bit,

12  but we'll see how the argument goes, and I appreciate

13  everyone's preparation and all the substantial briefs that

14  have been filed.

15          So with that, let me turn back to Ms. Hoffman, I

16  think, and have her argue first as the Moving Party.

17          And Mr. Boutrous, we'll, of course, give you a

18  chance to respond following her.

19          **MR. BOUTROUS:**  Great.  Thank you, Your Honor.

20          **THE COURT:**  You may sit down.

21          **MS. HOFFMAN:**  Your Honor, this case can be decided

22  by relying on the straightforward application of just two

23  cases.

24          The first is *Perry versus Schwarzenegger*, which is

25  a case decided by the Ninth Circuit.  It's binding precedent.

1 And that case stands for the -- the proposition that

2 individuals seeking discovery, parties seeking discovery face

3 a high bar when they're seeking information that impinges

4 upon the First Amendment right to association.

5       Here, Chevron is seeking nine years of identity and

6 email usage information about 101 email accounts.  And this

7 information includes details about the identities and the

8 activities of dozens of activists and lawyers and scholars

9 and journalists, among others.

10       And the common thread that these people -- that

11 runs through all of these people's activities is that they

12 are engaged in environmental activism, which is political

13 speech that is highly protected by the First Amendment.  And

14 they have a First Amendment right to associate with each

15 other in order to advance their political ideas and beliefs.

16       And these subpoenas threaten to deter those

17 activities, and they, as -- as the declarations that we've

18 put forward in support of our motion show, these people feel

19 harassed by this, and there is a possibility that their

20 future political activities are -- are going to be chilled by

21 this.

22       And so under *Perry*, what we look to is a two -- a

23 two-prong framework.  The first question is whether the

24 disclosure of the information that Chevron seeks is likely to

25 result in harassment, membership withdrawal or chilling of

1  the political expression of -- of the individuals that I

2  represent.

3        And those individuals have submitted seven

4  declarations indicating that all of these factors are

5  present.  They -- they feel harassed.

6        At least one Doe said that she decided not to

7  accept work because she didn't want to make herself a further

8  target of Chevron.  One Doe indicated a fear for personal

9  safety, and many of these Does said that moving forward

10  they don't expect that they would continue to -- to engage in

11  active -- in environmental activist activities if they, you

12  know, feel that Chevron is going to be mapping their

13  associations and -- and perhaps tracking their movements over

14  time.

15        So our clients have met their burden.  Now, that

16  means that the burden shifts to Chevron to show that the

17  information that they seek is rationally related to a

18  compelling state interest and the discovery requests are the

19  least restrictive means of obtaining that information.

20        Now, Chevron does not have a compelling interest

21  and -- and -- and the state does not have a compelling

22  interest in forcing these people to be subject to this kind

23  of invasion.

24        Chevron has done extensive discovery in this case.

25  It has obtained a tremendous amount of information, and it

1  can -- it can make its claims without having to obtain this

2  information as well, and it hasn't shown otherwise.

3        Chevron has pointed out that it has faced some

4  discovery battles in this litigation and -- and surely that's

5  true, but it's also obtained a tremendous amount of -- of

6  discovery, which I think Mr. Hicks can discuss more -- more

7  directly as somebody who represents a party to this case.

8        There's no indication that it needs -- that -- that

9  Chevron needs this information to make its case, and this

10  certainly these -- these subpoenas are not the least

11  restrictive means of obtaining information it hope -- it

12  hopes for anyway.

13        On their face, we're talking about subpoenas that

14  seek nine years of details about these people's lives.  As a

15  practical matter, we understand from Google and Yahoo! that

16  in the ordinary course of their business they only retain

17  about a -- about a year of data anyway.  And so basically

18  what we're --

19        **THE COURT:**  And that cuts against you.  In some

20  ways if --

21        **MS. HOFFMAN:**  Well --

22        **THE COURT:**  If only a year would be produced, then

23  maybe the harm is not so great?

24        **MS. HOFFMAN:**  Well, let me put it this way.  I

25  believe that on their face seeking nine years of data is

1   absurd.  On the face of the subpoena, seeking nine years of

2   data is absurd, but that aside, what they're actually likely

3   to get is a year of data, dating from the -- the issuance of

4   the subpoenas.

5           Now, as far as I understand, the operative subpoena

6   was issued in October of 2012.  That means that what they're

7   actually likely to get, should the ISPs comply, is data from

8   October 2011 to October 2012.

9           And that would be a data -- a range of data that's

10  completely irrelevant to the claims in this case.  The

11  complaint was filed months before that.  So I don't see how

12  that data could be remotely relevant to proving what they're

13  trying to prove.

14          **THE COURT:**  Now, one aspect, and you have a number

15  of element to your motion, is overbreadth.

16          **MS. HOFFMAN:**  Uh-huh.

17          **THE COURT:**  And -- and one response to that from

18  Chevron, as well, that can be -- that can be addressed

19  through (inaudible) means of limiting the request.

20          So instead of nine years, I could say I'm going --

21  I'm going to limit it to one year, so we're not even going to

22  look for documents for -- beyond a year, or it's also an

23  observation that not every one of the Does responding to

24  these are identically situated.  Some of them are closer to

25  the litigation than others.

1    And one approach might be to say well, all right.

2 We're going to pick the five that are most closely tied and

3 would be people that did possess relevant information, and

4 we're going to address the overbreadth concerns by targeting

5 this to these five or what -- certain number of people for

6 this period of time and for these topics.  And that would

7 address the concerns -- substantially address, not a hundred

8 percent, but substantially address your concerns.

9    Why wouldn't that with a sufficient protection for

10 the interests and -- and be kind of a fair middle-ground

11 here?

12    **MS. HOFFMAN:**  Well, Your Honor, I understand how --

13 how you might think that that might address the overbreadth

14 concern, but -- but there are other concerns too.  There are

15 legally required tests that Chevron needs to meet that it

16 hasn't.  And those tests meet -- require, among other things,

17 that Chevron not be able to get this information from

18 anywhere else.

19    And unless it can show definitively as for each --

20 as to each and every one of these Non-Party's email addresses

21 that it absolutely was not able to get that information

22 anywhere else, it's not entitled to this information under

23 these -- under these First Amendment standards.

24    And so I think that simply narrowing the subpoena

25 simply wouldn't address all of the issues that we've raised

1   here.

2        **THE COURT:**  All right.  I think you said there were

3   two cases you wanted me to focus on?

4        **MS. HOFFMAN:**  Yes.

5        **THE COURT:**  *Perry* was one of them.  What was the

6   second one?

7        **MS. HOFFMAN:**  The second one is called *Doe versus*

8   *2TheMart*, and it was just a couple of months ago cited with

9   approval by the Ninth Circuit in a case called *Mount Hope*

10  *Church v. Bash Back!*

11       And this is the test that we use when a litigant --

12  a private litigant is seeking the identity of a non-party to

13  litigation.  So this is not a situation where Chevron is

14  seeking identifying information about defendants.  It's

15  seeking identifying information about non-party witnesses,

16  and so the proper test is *2TheMart*.

17       And Chevron has suggested that the Court perhaps

18  look to other tests, specifically *Arista* in the Second

19  Circuit, and the test articulated by *See's Candy* here in the

20  Northern District of California, but those tests are not

21  appropriate because those are tests that courts have

22  developed in situations where litigants are seeking

23  identifying information about parties to litigation.  You

24  know, they're -- they're seeking to figure out who it is that

25  they want to sue, for example, right.  They just don't know

1   what the person's identity.

2          So this is a totally different situation.

3   Basically, there are two buckets.  We're not in the *Arista*

4   bucket or the *See's Candy* bucket.  We're in the *2TheMart*

5   bucket because we're talking about non-parties to the

6   litigation.

7          Now, under *2TheMart*, the Court weighs four factors

8   in determining whether it's appropriate for a litigant to be

9   able to get identifying information about a witness.

10         Factor one is whether the information is relevant

11  to a core claim or defense.

12         Factor two is whether identifying information is

13  directly and materially relevant to the core claim or

14  defense.

15         Number three is whether that information is

16  unavailable from any other source.

17         And number four is the question of whether the

18  subpoenas are issued in good faith and not for any improper

19  purpose.

20         And under this test, Chevron -- Chevron loses.  And

21  if --

22         **THE COURT:**  They disagree.  They say that they

23  satisfy each of those tests, even if that is the right

24  standard.

25         **MS. HOFFMAN:**  Well, actually, they -- they -- they

1  -- they tried to meet the *Arista* test, which, as I explained,

2  is not the right test.  They never tried to meet the *2TheMart*

3  test.

4      **THE COURT:**  I'm going predict that Mr. Boutrous is

5  going to say they satisfied it, but I -- but I'll give him a

6  chance.

7      **MS. HOFFMAN:**  Well, if you look at the papers, Your

8  Honor, you see that they never did the analysis.  And the

9  reason why I think that is is because I don't think that they

10  can meet that test, and so they tried to choose another test

11  and say the court should follow that one, but it's simply the

12  wrong test.

13      And if you do the *2TheMart* analysis, I -- I think

14  that you'll find that Chevron has not made its burden and the

15  identifying information it seeks should not be turned over.

16      **THE COURT:**  All right.  Thank you very much.

17      **MS. HOFFMAN:**  Thank you.

18      **THE COURT:**  Mr. Hicks, anything to add?  Does Mr.

19  Hicks have anything he wants to add on that side of the --

20      **MR. HICKS:**  Would you like me to speak now or

21  (Inaudible - - due to simultaneous colloquy.)

22      **THE COURT:**  If you'd like, I'd like to have -- get

23  you your side of the --

24      **MR. HICKS:**  Well, to begin with, you know, I -- I

25  agree with EFF's argument.  We -- we join it.  I just wanted

1  to add a few quick remarks.

2          First is, you know, I think we need to look -- take

3  these -- these subpoenas and put them in perspective. You

4  know, these -- these -- these -- these two subpoenas are not

5  -- they did not -- they were not served in a vacuum. They're

6  part of a large -- a large struggle, to -- to put it mildly.

7          **THE COURT:** To stay the least.

8          **MR. HICKS:** And Chevron has taken just an

9  extraordinary amount of discovery in -- in this matter. I

10 mean, I think that much is -- is undisputed.

11         Even before filing the -- the RICO complaint, they

12 spent a year doing discovery. I think they -- they initiated

13 23 or so 1782 proceedings. Of course, one of those 1782

14 proceedings was the Donziger matter before Judge Kaplan in

15 the Southern District of New York.

16         It's well known that Donziger provided incredible

17 amounts of discovery in that case. He -- he -- he provided

18 tens of thousands of documents. He -- he -- he imaged his

19 hard drives. His -- his associate imaged his hard drives,

20 provided them to Chevron, complete with wedding pictures and

21 all.

22         You know, they -- Donziger testified in deposition

23 for 16 days, you know, including about, you know, email

24 account information.

25         There were some questions about some -- some seldom

1  used email accounts.  To provide full discovery, he

2  subpoenaed ISPs, including Yahoo! and Google, to obtain

3  information about certain accounts, including certain

4  accounts that are at issue in this case.  To the extent that

5  there's any responsive information, Chevron already has it.

6  Okay.

7          He also authenticated more than 10,000 documents

8  that -- that were -- that were produced on -- on his hard

9  drive so, you know, Chevron just got an incredible treasure-

10 trove of information from that 1782 proceeding.

11         Chevron has also taken extensive discovery in -- in

12 the RICO case.  They have served dozens of third party

13 subpoenas.  They -- they served third party subpoenas to --

14 to -- to four of the account holders here, including Lara

15 Garr, Andrew Woods, Brian Parker and Aaron Page.  All of

16 those people testified in depositions, including about email

17 information, so Chevron has that -- that information as well.

18         As -- as part of party discovery, Chevron in our

19 case has served, you know, hundreds of -- of -- of requests

20 for production.  They've served over a thousand requests for

21 admission, including over 600 requests for admission targeted

22 to authentication issues.  I understand that those do not

23 overlap with the, you know, 13,000 or so documents that were

24 authenticated in the 1782 proceeding.

25         Bottom line here is that, despite Chevron's

1    protests, it has sought and obtained truly unprecedented

2    amounts of discovery in -- in -- in our case and all over the

3    country.

4            To the extent these subpoenas seek any kind of

5    relevant information, it's very likely that Chevron already

6    has it or will obtain it during the normal course of

7    discovery without having to, you know, subpoena Non-Parties.

8            On top of that, we now know that Yahoo! and Google

9    only retain this IP address information for a year or so.  As

10   -- as Ms. Hoffman was explaining, you know, counting back

11   from the -- the service date in -- in -- in -- in this case,

12   you know, we end up with IP information, you know, in

13   September, October 2011 period, which is, you know, six,

14   seven months after the allegedly fraudulent judgment issued,

15   six, seven months after, you know, Chevron filed suit in the

16   RICO case.

17           I mean, our -- our position, not surprisingly, is

18   that IP address information postdating the judgment just has

19   absolutely no -- no relevance here, and worth noting also

20   that -- that Chevron in our case has taken the position that

21   at least as a -- as a default matter, it does not intend to

22   provide discovery after the date of the judgment, you know,

23   with -- with extensions here and there, depending on the

24   request, but as -- you know, as a default principle, you

25   know, it's not prepared to provide discovery after -- after

1    the date of the judgment, you know.

2            And I think it would be disingenuous for them to

3    claim now, and I don't know that they do, but I think it

4    would be disingenuous if they do so contend that, you know,

5    what's good for the goose is not good for the gander and, you

6    know, they can just go ahead and serve third party subpoenas,

7    and then there's just no limit to -- to the amount of

8    discovery that they can -- that they can obtain.

9            **THE COURT:** Well, what if I address that aspect of

10   the overbreadth by saying -- all right, we'll go with the

11   goose and gander metaphor -- I'm only ordering production of

12   materials from before the judgment.

13           And if no such documents, no such information

14   exists at Google and Yahoo!, all right, then no harm has been

15   done on the privacy front because no information has been

16   produced, but stuff after is irrelevant or -- or borderline

17   relevant if it's outweighed by these other privileged and

18   confidentiality concerns.

19           The period earlier would arguably be more relevant,

20   but may not even exist, so why not fashion a remedy that sort

21   of goes in that direction?

22           **MR. HICKS:** I think that's right, but there's --

23   there's still the issue of -- of identifying information and

24   that's -- that's a different category of the subpoena. And,

25   you know, I think EFF has rightly spoken about the dangers of

1    -- of outing people who are engaged in advocacy efforts.

2          But the bottom line for us is that, you know, we're

3    concerned here that the purpose of these subpoenas is not

4    truly to obtain relevant information that Chevron needs to

5    prove its case.

6          We're -- we're concerned that these subpoenas are -

7    - are part and parcel of a broader effort of Chevron,

8    basically, to go after anybody who has ever done anything on

9    behalf of -- of -- of the case, has ever associated with

10   Donziger in any way, and that, you know, ultimately the

11   result is that, you know, participation in -- in the advocacy

12   process is chilled.

13         We just don't think it's a proper use of the

14   subpoena power.

15         **THE COURT:**  All right.  Thank you very much.

16         Mr. Boutrous.

17         Ms. Hoffman, I'm going to give you a chance for the

18   last word so --

19         **MS. HOFFMAN:**  Well, I wanted to correct something

20   that I said earlier, Your Honor, if you don't mind.  I -- I -

21   - I said something that was not quite right.

22         **THE COURT:**  All right.  Go ahead and correct.

23         **MS. HOFFMAN:**  So I said that Chevron did not even

24   attempt to meet the -- the -- the *2TheMart* test, and I was

25   incorrect about that, and I'm sorry.

1    They did -- they do attempt to meet it in a very

2  cursory fashion.  They still fail under it, as far as I'm

3  concerned, for the reasons that I said earlier, but I just

4  wanted to clarify that they did at least try.

5    **THE COURT:**  Very good.  And -- and I'm about to be

6  -- be confirmed that Mr. Boutrous thinks that they've

7  satisfied it.

8    **MR. BOUTROUS:**  Yes.  I will get to that, Your

9  Honor.

10    **THE COURT:**  And -- and Mr. Boutrous, you can

11  particularly address anything you wish to, but the timing

12  aspect of discovery post-judgment and prejudgment, and the

13  assertion that Google and Yahoo! only have retained a year of

14  information anyways, so sort of your views on that.

15    Of course, I'm looking at this and -- and know from

16  other aspects of the case this is just one small part of a

17  very, very large global litigation, and I think the most

18  important question here is doesn't Chevron already have

19  enough information to -- to use what it has to support its

20  interests?

21    And isn't this information -- even if it is

22  relevant in a legal sense, is it repetitive, duplicative, and

23  not necessary, in light of the confidentiality and other

24  concerns expressed by the Moving Parties?

25    **MR. BOUTROUS:**  I will definitely address those

1   issues, Your Honor, because we -- we are sensitive to -- to

2   all those issues. I -- I think I'll -- maybe I'll start --

3   I'd like to put this in context because a major gap in

4   counsel's presentation, both of them, was what are the issues

5   at stake in the RICO case? Why do we need this information?

6          So I thought I'd start with what are we actually

7   seeking and why do we need it. If I make those -- and I will

8   address the *Perry* case, which I argued so I know something

9   about it, so I'll address those standards, and also the

10  *2TheMart* case.

11         And I'd like to hand up -- and I've given copies to

12  counsel -- a couple of documents. Well, one is a Yahoo! --

13  the -- the response to Mr. Donziger's -- so the Court can see

14  the kind of information we're talking about seeking.

15         And then it's another Supreme Court decision,

16  *Taylor versus Sturgell*, which goes to some of the standing

17  and representation issues.

18         So let me start, Your Honor, with, you know, why we

19  think these motions should be denied, but to put this in

20  context what's this all about.

21         First, we are seeking very limited information from

22  Yahoo! and Google. We're not seeking emails. We're not

23  seeking substantive communications. We're not seeking

24  anything, other than the I -- the -- the addresses and the IP

25  -- the IP log-in information and the like and address and

1 usage information.

2       So first of all, this is not some big First

3 Amendment battle about intruding on political speech. This

4 is not a big political battle about privacy.

5       The First Amendment does not create a right to

6 engage in fraud. There's no right to privacy to engage or to

7 assist or to participate in a racketeering enterprise. And

8 there's no right to anonymous speech to participate in a

9 racketeering enterprise.

10       And our -- our lawsuit in the Southern District of

11 New York, which no one mentioned, is all about what we think

12 is the -- is the -- a massive fraud to extort and get $19

13 billion from Chevron, so that's the core of the case.

14       And there are multiple issues to which this

15 information is directly relevant. We wouldn't be bothering

16 you. We wouldn't file subpoenas if we didn't think we needed

17 the information, and I'll -- I'll come back to even more

18 detail why we need it.

19       The -- the -- the information we're seeking, the IP

20 address, the log-in information, is routinely compelled by

21 courts. It's routinely provided by Yahoo! and Google. They

22 have a system that is all set up to provide the information.

23 They are not objecting to these subpoenas, and so it's --

24 it's a common routine thing. Mr. Donziger himself obtained

25 some of the information today.

1     And there's -- there's no First Amendment or

2  privacy interest.  The California Court of Appeal in the

3  *Stipo* case on privacy said there's no privacy right to this

4  information.  This is something that all these individuals

5  gave to a third party.  They gave to Yahoo! and Google their

6  -- their information about their computer and that

7  information.

8     The user agreements say "We will respond to

9  subpoenas and produce this information if -- if we are asked

10  to produce it in a legal proceeding," so everybody is on

11  notice.

12     **THE COURT:**  They're on notice, but, of course,

13  they've now objected to it and they're asking the Court to

14  quash it so --

15     **MR. BOUTROUS:**  Exactly.  And -- and -- and also,

16  Your Honor, I want it clear.  I respect the notion that we

17  have to have a balance between privacy.  I -- you know, I --

18  we understand that.  Chevron understands that.  So we

19  understand there's a balance.  And -- and the problem is none

20  of the tests that counsel mentioned, none of the First

21  Amendment principles, privacy principles apply to this case,

22  and I'll -- I'll explain why.

23     First, the notion that these 31 individuals who --

24  that counsel represents -- Ms. Hoffman represents are labeled

25  "John Does" and "Jane Does."  They give all the other John

1  Does and Jane Does in the world a bad name because we know

2  who they are.

3          Some of them -- I'll give you an example.  Mr. Page

4  -- and I'm not disclosing anything because he signed a John

5  Doe declaration -- ampage@gmail.com is his email address, and

6  he signed this declaration with that as though no one would

7  know who he is.  It's clear who he is.

8          We know who every one of these individuals are.

9  There's no -- they publicly affiliated themselves with the

10 case.  They're not anonymous speakers.  They're identities

11 are known.  Many of them we have documented it in detail, so

12 I won't go through it in the brief, but on their Facebook

13 pages, in their email address themselves, these are anonymous

14 speakers.  These are people who are using their names in

15 their email addresses, so that whole line of anonymous

16 speaking doesn't apply to begin with.

17         The other point, and I think the Court alluded to

18 this, these are not strangers and innocent bystanders, at

19 least according to our lawsuit, which -- which I'll come a

20 back to what the claims are, but these are lawyers.

21         Mr. Page is a lawyer for the Plaintiffs.  He's --

22 but he's listed here as a John Doe witness or John Doe

23 individual when there's a document in the record -- it's

24 Exhibit 30 to our response to the Does' motion -- where he

25 sent a letter to our expert witnesses on behalf of the RICO

1   Defendants, Lago Agrio Plaintiffs, threatening them for their

2   testimony. So this isn't some intrusion on to -- to people

3   who have nothing to do with the case.

4         These are people -- interns, lawyers, people who

5   have been helping with the pressure campaign from Amazon

6   Watch, from what is known as the Amazon Defense Front who

7   have helped -- and we have -- as counsel so helpfully

8   provided, we have a treasure-trove of evidence, and the

9   evidence shows, we believe, that this has been a fraud. That

10   they're using these pressure campaigns.

11         We have Mr. Donziger on tape saying that this is

12   what they're going to do.

13         **THE COURT:** But that cuts both ways. If you have a

14   treasure-trove of documents, information already, the

15   question is why do you need more, given you already have

16   collected a lot?

17         **MR. BOUTROUS:** Let -- let me go right to that

18   point, Your Honor, because here is why we need this

19   information.

20         The Court -- I know the Court is familiar, since

21   I've been here before on this case with you, that -- with the

22   general parameters -- but I'll give you two examples of why

23   we need it.

24         At the end -- and -- and as part of our discovery,

25   one aspect of it was -- and -- and the Defendants and the

1  third party, a filmmaker, objected on First Amendment

2  grounds.  Said we are harassing anybody who -- the exact

3  arguments he just made.

4        They've made that argument many times, and -- and

5  we've prevailed virtually every time and obtained the

6  information, and we've obtained a treasure-trove of

7  information, but it's led us to the brink of truly exposing

8  in graphic detail one of the most massive litigation frauds

9  in -- in world history.

10        And we want to use this information in term -- sort

11  of traditional gumshoe process to -- to dot -- you know,

12  follow the dots, follow the trail, follow the trail from New

13  York where Mr. Donziger is all the way to Ecuador to show --

14  we already have significant evidence -- but to really button

15  it up that the RICO Defendants ghostwrote this supposedly

16  independent expert's report, Mr. Cabrera.

17        And I think this Court has dealt with some of the

18  issues on this but --

19        **THE COURT:**  I have.

20        **MR. BOUTROUS:**  -- throughout the case early on they

21  touted it to Congress.  Mr. Donziger testified to Congress

22  that the best evidence of the -- Chevron's wrongdoings, this

23  assessment by the court-appointed neutral expert, here's his

24  report, $27 billion worth of damages.  They said it to

25  courts.  They said it publicly.  They said it to members of

1   the Senate, Congress, to try to pressure Chevron into

2   buckling under under this.  And they had Amazon Watch and all

3   these other groups helping them do that.

4        The Crude outtakes, which the Court is familiar

5   with, that was a subpoena.  First Amendment objections made.

6   Claims of harassment made.  We got the 600 hours of outtakes,

7   and it showed that they ghostwrote that report.  It showed

8   them meeting with the supposed neutral expert.  We got their

9   other documents that show their participation in that.

10       But we now want to figure out how they engineered

11  as part of their racketeering scheme, which we're arguing in

12  our RICO case, how they did that.  How did they get the

13  information to Mr. Cabrera?

14       We have some of the email accounts here we know

15  were used as part of that, but the -- we're seeking

16  information -- I don't think Ms. Hoffman represents anyone

17  there -- but we don't know whose identity it is.  I'll come

18  back to that standing question if the Court gives me a

19  chance.

20       But -- so we want to, one, further show which

21  computers with the IP addresses.  We can show which computers

22  went on to these email accounts, and we think there's many of

23  these dummy accounts.  The Court is probably familiar.

24       People engaged in crimes and elicit behavior often

25  create these email accounts.  They don't send emails to each

1    other.  They all go -- they log into them, drop off

2    documents, come off the email set.  Then the other person

3    goes in, looks at the document.  It's a way to conceal elicit

4    behavior, and we have those here.  We have a couple of them

5    where we -- we know they engaged in exactly that behavior.

6              So we want to further demonstrate in court before a

7    jury that they ghostwrote this report as part of a fraud to

8    get the judgment in Ecuador and as part of the ongoing fraud

9    that's going on right now that they tried to enforce the

10   judgment with respect to the report.

11             But probably more importantly, Your Honor, for our

12   purposes -- and this is something I don't think has really

13   been put before this Court yet.  We have evidence that they

14   not only ghostwrote that report, but that they ghostwrote the

15   judgment, the 19 dollar -- 19 million -- $19 billion

16   judgment.

17             And several courts, including Judge Kaplan, have

18   said we've raised serious questions.  That's going to be an

19   issue.  They -- we think that they wrote the very judgment

20   they're now going around to Canada and Brazil and Argentina.

21   They won't come to the United States.

22             They won't come to this court, which is very close

23   to Chevron's headquarters where there's a lot of money they

24   can try to attach.  They won't come here because we have

25   evidence that U.S. District Courts have said strongly suggest

1   that they wrote the very judgment they're trying to enforce.

2          We have evidence of that through a couple of

3   reasons.

4          One, we have evidence that documents internal files

5   from Mr. Donziger, from the -- from the Plaintiff's team

6   somehow made it into the judgment.  They were never filed in

7   court.  We -- but -- but they're in the judgment.

8          We also have expert forensic evidences that

9   documents how it appears this judgment was ghostwritten by

10  the Plaintiff's lawyers.

11         So now we want to find how the information was

12  transmitted, and we believe it was through internet accounts

13  and email accounts.

14         So this is classic investigative techniques, and so

15  these accounts -- that's what we're really -- the -- the --

16  the most important thing we want to do -- we think we may be

17  able to trace it from someone in the United States, or their

18  computer, all the way to Ecuador into the courtroom or

19  someone working with the judge to ghostwrite this judgment.

20         THE COURT:  That's all -- I want you to get to the

21  timing issue.

22         MR. BOUTROUS:  Yeah.

23         THE COURT:  All that narrative you're just sharing

24  sounds like irrelevant things that occur that were

25  prejudgment, the drafting of the judgment, communicating this

1    information.

2            Why is discovery post-judgment relevant for this

3    (Inaudible - - due to simultaneous colloquy.)

4            **MR. BOUTROUS:**  Well, we think, one, cover-up

5    activities.  We -- we have -- you know, we cite an email, I

6    think, in a -- it's in the response to the Doe motion where

7    when the lawyers in Ecuador realize we were hot on the trail

8    of exposing the Cabrera fraud, he wrote an email to -- I

9    believe to Mr. Donziger, but to others, but we have the email

10   it's in the record here, where he says "If this is exposed,

11   we're going to go to jail."

12           And from that point on -- and that was, you know, a

13   little bit before the judgment -- but from that point on we

14   have internal documents that show the -- the -- the RICO

15   Defendants were doing whatever they could to cover things up

16   to -- to hold back information.

17           That's one of the reasons we need this information.

18   We can't get this information any other way.  We cannot

19   pinpoint which computers were used, how the information was

20   ultimately funneled, which we believe happened, to the

21   judgment -- into the judgment without this technological

22   proof.

23           And -- and with respect to the -- the current

24   situation, we -- part of our argument in New York is this an

25   ongoing fraud.  If someone tries to enforce a judgment they

1    know is a product of fraud, that they know they wrote, and

2    that they know has evidence that they illicitly put into the

3    court secretly under false pretensions, that's a fraud.

4    That's part of the racketeering enterprise.

5            So evidence coming up to the present, we believe,

6    is -- is -- is a relevant. It's not a goose for the gander

7    issue. And that's one of the issues I think Judge Kaplan has

8    been grappling with, and we -- we just want the evidence to

9    be -- get put on the record so -- so we can -- we can get a

10   trial on these issues.

11           The -- the other part of this that I wanted to

12   emphasize, Your Honor, is that the -- the -- the RICO

13   Defendants argue that aren't enough contacts. That this is

14   an extraterritorial application of RICO.

15           We say that's ridiculous because Mr. Donziger was

16   in New York much of the time. Many things happened in the

17   United States. But evidence that we can show that there were

18   communications made between computers that were used here in

19   the United States, emails that were sent, individuals in the

20   United States logging on to these -- these email accounts,

21   which we believe were drop boxes for potentially documents

22   that were improperly going to the court, linking that to the

23   United States.

24           The IP address and the log-on information will help

25   -- will allow us to figure out where the person was, what

1  country at least, when they went on to that email site.

2          So if we -- we can use that to show people in the

3  United States were directly communicating information into

4  the court into the judgment as part of the fraud.

5          **THE COURT:**  I'd like you to address the overbreadth

6  argument in this way.  The part of Ms. Hoffman's argument was

7  Plaintiffs are seeking nine years of information from many,

8  many individuals.  You already have a lot of information, so

9  this is overkill.

10          And one response to that might be to limit the

11  information I'll say all right, we'll all do a compromise

12  here.  I'll give you some percentage of what you're asking

13  for, but ask you to prioritize and say well, here's the --

14  you know, this is the part that you most need, have the

15  highest need for with at least to damage.

16          If I were to encourage that approach, what would be

17  the part of this request that you would find most valuable to

18  your client to accomplish, if I were to say I'm going to give

19  you some but not all?

20          **MR. BOUTROUS:**  Couple thing, Your Honor.

21          One, there are several accounts we would identify -

22  - well, first, they're not represented by Ms. Hoffman so

23  they're -- they only represent 31 of the accounts, so the

24  other accounts we would say there's no restrictions.  There's

25  no standing.  They don't represent the people.  And some of

1  those accounts are accounts we believe clearly were these

2  dummy accounts, so that would be helpful to us.

3        So if we took those -- there's 31 people they

4  represent.  Take the rest of them off the table.  That's --

5  that's significantly helpful.  And I can come back to the

6  standing issue if the Court would like me to.

7        Second, there are -- we went back nine years

8  because that's when the -- the action was filed.  That's when

9  the fraud began.  We recognize and it sounds -- we're not

10  just necessarily disputing -- in fact, it looks they have

11  information from Google or Yahoo! or both that this

12  information isn't kept for significant amounts of time.

13  We'll take what we can get, you know, and -- and -- so we

14  would take whatever they have, if it only goes back a year.

15        But I think there may be information that goes back

16  farther, for example, when someone opens up the account.  The

17  original information would at least give the country, give

18  the -- the -- the -- the place -- the -- the -- the -- the

19  identifying information we need, so those sorts of thing

20  would -- would be very helpful.

21        I also think, Your Honor, this -- this issue -- the

22  notion -- I think it's -- it's compelling as an advocacy tool

23  to say we're trying to out people who are engaged in

24  political speech.  You know, I don't like the sound of that,

25  if that's what we were trying to do.

1       But as I said, these are not anonymous speakers.

2  These are not people engaged in a political campaign like in

3  *Perry*.  These are people who we allege were in some way, some

4  of them at least, many of them, part of the scheme, or at

5  least in some fashion wittingly or unwittingly participating

6  in the scheme.

7       And the fact that they were engaged in

8  communications online doesn't make discovery any less

9  appropriate.  If this Court -- if I came in and said, "Your

10 Honor" -- nobody likes to have discovery served on them and a

11 third party doesn't like that, but it's always to a certain

12 degree an intrusion on your communications with other people,

13 and that's what we have here.

14      It's not enough to say, "I communicated on these

15 issues.  Now you're trying to get my communications, or at

16 least some information."  We're not even try to get the

17 content, but that's what happens every day in every discovery

18 request.

19      **THE COURT:**  Well, you're right.  I mean, this --

20 the Federal Rules direct that the Court should give extra

21 scrutiny to a third party request, and it's exactly for that

22 reason.

23      This case has an additional overlay, which is this

24 is one part of an international litigation with multi-fronts

25 and multi-parties and -- and allegations going in various

1    directions of fraud.

2           And -- and a lot of discovery has already occurred,

3    and the question is, in that context, should I be permitting

4    more discovery, and if so what protection should be afforded?

5           **MR. BOUTROUS:** And I understand, Your Honor. Let

6    me -- maybe that's a good place for me to turn to the -- to

7    the *Perry* case and the tests and the specific arguments, if

8    the Court will let me go --

9           **THE COURT:** Go ahead.

10          **MR. BOUTROUS:** -- go -- ramble on a little bit

11   longer?

12          **THE COURT:** Please.

13          **MR. BOUTROUS:** You know, first, let me start with

14   the *Perry* case because, as I mentioned, I argued that in the

15   Ninth Circuit. I dealt with the issues on remand with Chief

16   Judge Walker and Magistrate Judge Spero.

17          The *Perry* discussion is extraordinarily narrow on

18   this issue. I mean, it -- we -- we -- I think we obtain

19   something like a hundred thousand pages of documents and --

20   and this was not this loose group of people we believe were

21   at least pulled into a racketeering enterprise. This was the

22   protectmarriage.com, the political entity that -- that ran

23   the campaign for Proposition 8, and I was representing the

24   Plaintiffs.

25          So we -- so we subpoenaed their documents for a

1   variety of reasons, but to show in part that there were

2   improper biases that led to Proposition 8.

3          Footnote 12 of the decision, you know, in -- it's

4   on page 1144 of the *Perry* case -- really puts it all

5   together.  The Court said, "We're only" -- and this is their

6   own italics.  They said, "We emphasize that our holding is

7   limited to private internal campaign communications

8   concerning the formulation of campaign strategy and

9   messages."

10         The Court went on to say that it was "Focusing on a

11   small core group of the leadership."

12         We had a lot of litigation about who that

13   ultimately was during the trial, but who the leadership of

14   the campaign, so it was a core group of people in an

15   identified political entity, a campaign, and that's where the

16   Court applied this burden shifting test.

17         So it didn't apply to people who happened to be

18   communicating with protectmarriage.com, who would have, I

19   think, a stronger argument than these so-called Doe

20   Defendants -- Doe Movants.

21         The Court also said, "Our holding is, therefore,

22   limited to communications among the core group of persons

23   engaged in the formulation of campaign strategy and

24   messages."

25         And -- and then remanded to Chief Judge Walker and

1   Judge Spero to figure out who that was and how it played out.

2          That's the test.  The Court went on (inaudible) and

3   then it attached a document -- one of the documents that I

4   had given the Court at the argument of one of the proponents

5   of Proposition 8, one of the people who put the ballot on the

6   -- the initiative on the ballot, and he was communicating,

7   engaged in core political speech.  And we obtained this

8   document, and the Court said, "This kind of document must be

9   produced."  So we're talking about an extraordinary

10  situation.

11         In the other cases, for example, the -- the *Dole*

12  case that the -- the other side cites involved union

13  political activities of a group.

14         The other cases involve lists of membership.  That

15  -- that it could chill someone if they joined a political

16  group to compel disclosure of the political groups.

17         That's not what we have here.  This is litigation,

18  number one.  Litigation is supposed to be transparent and

19  public and open.  It's not supposed to be anonymous.  We

20  don't allow anonymous litigation.

21         We shouldn't really allow lawyers in a case to file

22  something in court as a John Doe when they represent some of

23  the people who are involved in the case, which is what

24  happened here, but it's different than political advocacy,

25  number one.

1    Now, litigation is a form of speech and a form of

2  petitioning government, but it's done according to another

3  set of rules.  You -- you -- there are rules of accuracy in

4  what you say.  There's openness.  And, you know, the -- the

5  bottom line is it's different than the kind of political

6  campaign, pure political speech, very limited in terms of

7  what was -- was said to not be discoverable in the *Perry*

8  case.  That test just does not apply here.

9    If it did -- and if we did apply it, there -- these

10  people are not members of an organization.  They're not the

11  core group members of an organization.  They're not

12  formulating internal messages.

13    We're not seeking any content from them.  We're not

14  seeking internal, external messaging or any content from

15  them.  So we win under *Perry*, go and away.  There's just no

16  question about it.  It doesn't apply to this situation.

17    **THE COURT:**  Well, talk about politics though.  I

18  mean, this is a case that involves a sovereign nation.  It's

19  got -- more than one.  It's got -- there's litigation in

20  multiple countries going on.  There's some international

21  arbitration going on.  I know not involving Mr. Donziger

22  necessarily, but the overall (Inaudible - - due to

23  simultaneous colloquy.)

24    **MR. BOUTROUS:**  Yes.

25    **THE COURT:**  And it's got the Court's attention in

1   Washington D.C., as -- as both parties have referred to

2   testimony that's been taken there.

3          I mean, this is not a run-of-the-mill contract

4   dispute where there's a subpoena going to a third party.

5          It's -- I'm -- I'm not sure I agree with your

6   assessment this is a -- sorry -- that *Perry versus*

7   *Schwarzenegger* was a political case involving elections and

8   this is something that's agnostic and commercial.

9          Isn't this also a very political case where there

10  should be heightened concerns about the First Amendment

11  activities?

12         **MR. BOUTROUS:**  Well, here though, Your Honor, I

13  think the big distinction -- again, I think there is a

14  distinction because that was a -- you know, a campaign, so

15  it's probably the zenith of political discourse, and you had

16  the entity that was running the campaign, so that's -- on the

17  spectrum, it's way up here.

18         Here, yes, part of the strategy that Mr. Donziger

19  and his team used was to make this is a political issue to

20  try to pressure Chevron through lobbying the Senate, the SEC,

21  we believe, making repeated false statements that are

22  criminal, but that was part of the strategy, but -- but yes,

23  so there are other implications.

24         But then look at the group of people that we're

25  talking about, if you take the *Perry* case.  Let's assume they

1   get in the door.  That there's -- there's a political element

2   to this.  Then they would have to be core persons at the helm

3   of the organization or running the political operation.

4          Then they would have to -- the -- the only thing

5   that would be off limits would be messaging strategy internal

6   documents, not things that were communicated to the outside

7   world, and we're not seeking any content.  We're not seeking

8   their emails.

9          We're not seeking -- I think that's been a bit of -

10  - they -- the -- the suggestion that we really want to get

11  what they're saying.  We don't.  We just want those numbers

12  that are on that Yahoo! example I gave you that show when

13  someone logged on to a website and which computer matching

14  the ISP address, so we can -- we can further put together

15  what we think is really a nefarious scheme to corrupt justice

16  in Ecuador against -- against Chevron.

17         And so it's -- it's -- it's not that there's not

18  any speech involved here.  It's not that there's not some

19  political overtones.  It's that the Court's balanced things,

20  and it's really -- it's a very limited window of material

21  that's taken off limits.

22         And -- and in -- in the -- the *Perry* case, too,

23  there was this issue of people who had participated and might

24  not want their identities exposed.  And as I -- and as I said

25  here, we -- we don't -- the Court didn't even say that that

1   was off limits in -- in *Perry*.  The Court didn't say somehow

2   keep things secret for people who -- we had a big battle over

3   that.

4          And so it -- it -- even in that context where we

5   had a political campaign, the Ninth Circuit did not say that

6   that kind of information could be shielded.

7          And here, as I mentioned, the 31 people who have

8   moved as John Does, we know their identity, and we know it

9   from their own activity.

10          **THE COURT:**  Do you know all 31?

11          **MR. BOUTROUS:**  We -- I think we -- we know all 31.

12          **THE COURT:**  You wanted to address the standing

13   issue, and let me --

14          **MR. BOUTROUS:**  Yes.

15          **THE COURT:**  -- give you that -- that chance.

16          **MR. BOUTROUS:**  Thank you very much, Your Honor.  On

17   the standing issue, first, the -- and I'll address maybe the

18   -- the Defendants first.

19          The Defendants only have standing with respect to

20   the subpoenas to themselves.  The subpoenas are to Yahoo! and

21   Google.  To the extent they have interests that are

22   implicated, they can come in and -- and assert them.

23          The only real interest they've seemed to assert

24   really is -- is a -- sort of a privilege or something about,

25   you know, the fact that there's a privilege as to where they

1    might have been work.  There's no case that supports that,

2    and -- and -- and there's no privilege as to facts about

3    where an attorney might have been at some point.

4           But as to standing to assert the rights of everyone

5    else, they have no standing whatsoever.  They don't represent

6    those people.  There's no such thing as third party standing

7    to block a subpoena to someone else.  The cases are very

8    clear on that.

9           With respect to the other -- the Does, they go even

10   farther.  They list out a test about representational

11   standing, and that's why I wanted to bring the Court the

12   *Taylor versus Sturgell* case.

13          Article III of the Constitution does not allow

14   someone from an advocacy group who doesn't represent or know

15   third parties out in the world to come into federal Court and

16   say "I'm -- I'll go a good job.  I'll act zealously.  The

17   issues are the same," with -- without representing those

18   people.

19          The *Taylor* case was this virtual representation

20   case, and the Court unanimously in an opinion by Justice

21   Ginsburg said, "There are very limited situations where we

22   will say a lawyer or another party represents someone not

23   before the Court, class actions."

24          This isn't a class action, so they have absolutely

25   no standing.  There's no case for controversy regarding other

1   people.  They speculate about why people might not have

2   objected.  That's not even close to meeting Article III

3   standing or giving them a right to make arguments regarding

4   people who aren't before the Court.

5        And maybe I'll finish with the two -- the

6   *2TheMart.com* case because in that case -- first, the Ninth

7   Circuit has not adopted that standard, but we meet it.  The

8   Ninth Circuit mentioned the standard and mentioned a variety

9   of other standards.  We've laid them out, but for all the

10  reasons we -- I just laid out, we meet the standard.

11       First, the subpoena was issued in good faith.  As

12  I've laid out, we have a very proper important purpose and a

13  significant case.  It goes right to the cores of our claims

14  that are being adjudicated in the Southern District of New

15  York.

16       And Judge Kaplan rejected the motion to dismiss

17  those claims, and found at the summary judgment stage many

18  our claims about fraud are uncontradicted.  That -- that we

19  have foreshown uncontradicted evidence that fraud tainted the

20  Ecuadoran proceeding, so it's a good faith request for

21  information.  That's standard one on *2TheMart*.

22       Two, this information relates to our RICO claims

23  for the reasons I mentioned, to -- to connect the dots

24  between the -- the ghostwriting of the judgment, the

25  ghostwriting of the expert report, to show the connections to

1  the United States, and also just to -- to understand how the

2  racketeering enterprise is managed, structured and operated

3  to commit what we believe is a fraud.

4        And -- and, as I mentioned, third, the information

5  we seek, which is narrow, relates directly to that. That's

6  what it would allow us to do. That's all we want it for. So

7  it -- that meets the third test.

8        And then, finally, we cannot obtain this

9  information from anyone else. Nobody will provide us all

10 their IS -- IS information and their -- the -- the things

11 that are on that Google printout or Yahoo! printout you can

12 only get from the service provider.

13       We have -- we have taken a lot of discovery and

14 we've been trying to -- to -- to close the loop here and --

15 and -- and connect all the dots between what's been

16 happening. This is the only place we can get it, so we -- we

17 narrowly target it to take substance off the table, but we

18 meet that *2TheMart.com* test.

19       That case, Your Honor, that was a classic example

20 where the identity -- that was an identity case. It was a

21 derivative action where the -- the Defendant -- a shareholder

22 derivative action. The Defendant said that anonymous posters

23 who had posted things about the company caused the stock to

24 drop.

25       And the Court said "Well, their identities don't

1    matter.  It's what they said."

2           Therefore, the connection between the identity and

3    the -- the -- the issue at stake was too tenuous, and so the

4    Court said there was no basis for -- for revealing their

5    identities.

6           That's much different situation than we have here

7    where we know everybody's identity, and the issues go right

8    to the core of our claim in New York.

9           **THE COURT:**  All right.  Thank you very much.

10          **MR. BOUTROUS:**  Thank you, Your Honor.

11          **THE COURT:**  Ms. Hoffman, I'll give you the last

12   word.

13          And if you could -- one thing I did not question

14   about was the standing question --

15          **MS. HOFFMAN:**  Yes.

16          **THE COURT:**  -- and your -- your thoughts on that

17   (Inaudible - - due to simultaneous colloquy.)

18          **MS. HOFFMAN:**  Would you like me to take that first?

19          **THE COURT:**  If you would, please.

20          **MS. HOFFMAN:**  Sure.  So Your Honor, as you see in

21   our reply, because standing was raised for the first time in

22   opposition, there is a precedent out there that -- that shows

23   that -- excuse me -- please let me get my notes in order.

24   All right.

25          There's a doctrine called the Third Party Standing

1   Doctrine, and it is something that tends to be applied

2   especially in First Amendment cases because the -- the

3   interests there are -- are so important and grave.

4           And basically, what the Third Party Standing

5   Doctrine says is that when there are practical obstacles that

6   prevent others from asserting their own rights, then it's

7   okay for a third party to assert their rights for them.

8           And the -- the big questions that the courts look

9   to there is whether the third party suffered -- the third

10  party that wants to -- to assert the rights of others

11  suffered an injury, in fact, and whether that third party can

12  be expected to properly frame the issues and present them

13  with the necessary adversarial zeal.

14          And we -- we cited the cases, the *Enterline* case

15  and the *McVickers* case and the *Indiana Newspapers* case, in

16  which courts have applied the Third Party Standing Doctrine

17  in situations actually quite similar to this, in which

18  litigants have tried to seek the identities of online

19  posters.

20          And in those cases, there were newspapers that had

21  websites, and the posters had -- had written comments on the

22  newspapers' site, and the newspapers went ahead and asserted

23  the rights of their posters.  And the courts allowed that,

24  citing the Third Party Standing Doctrine.

25          So I think this is definitely a case where we have

1   individuals who are facing practical obstacles preventing

2   them from asserting their own rights.

3          As an -- as an initial matter, and -- and I think

4   this is hugely important, we don't know that all of these

5   individuals received notice of these subpoenas.

6          To their credit, Google and Yahoo! sent emails

7   informing them, but we don't know whether they read those

8   emails, whether they were filtered into their spam folders,

9   whether they could even read them because some of them are --

10  are not people who are U.S. citizens.

11         You know, we -- we don't know that they actually

12  ever received notice of this.  I mean, sending an email to

13  somebody is not legal process, right.  So I -- I -- I think

14  that that is certainly a practical obstacle.

15         And not all those people are necessarily in a

16  position to easily appear in this court and contest the

17  subpoenas either.

18         Third party injury.  In fact, all of the people,

19  all of the Non-Party Movants who are bringing this motion are

20  -- are -- they're similarly situated.  They all have these

21  associational interests that are all kind of tied up in each

22  other, and they have these -- these anonymity arguments as

23  well, and so each Movant is in a position to assert the

24  rights of the others.  And so it's -- it's not as though

25  there's -- there -- there's any Movant who's in a -- in a

1   substantially different legal position.

2          And then, finally, we can frame the issues fairly

3   and present the -- the arguments with the necessary

4   adversarial zeal because here we are in court.  They're --

5   they've all joined together.  They've secured counsel, and --

6   and we're -- we're here framing the issues that's common to

7   all of them and presenting them, and so I think third party

8   standing is absolutely appropriate here.

9          And turning to the *Taylor* case for a moment -- we

10  were just handed this right before the hearing, so I haven't

11  had time to go through in tremendous detail, but it is not a

12  First Amendment case and it's not a third party standing case

13  either.

14          It's a FOIA case, Freedom of Information Act case,

15  that involves preclusion, the Preclusion Doctrine.  And you

16  know, the question in that case seems to be if somebody

17  brings a FOIA lawsuit and loses it, can a second person bring

18  a FOIA lawsuit, or is that person precluded from doing so?

19  And that's just not what we're dealing with here.  It's just

20  irrelevant to this case.

21          If you find this compelling precedent, and you'd

22  like to hear more about how it may or may not apply, I would

23  appreciate a chance to brief that though because, as I said,

24  I just got a chance to look at this right before the hearing.

25          **THE COURT:**  All right.  I'll take that request

1   under consideration.

2         **MS. HOFFMAN:**  Have I answered your questions about

3   third party standing?

4         **THE COURT:**  Yes.

5         **MS. HOFFMAN:**  Okay.  So I can get --

6         **THE COURT:**  Well --

7         **MS. HOFFMAN:**  -- into rebuttal now?

8         **THE COURT:**  You may.  Well, one question I have is

9   the -- -- Chevron makes the point that well, they're not

10  seeking anything more than just the IP information, the --

11  not looking for the substance of the emails.  What's such a

12  big deal?  It's not a privacy concern because they're not

13  actually looking for substance.

14        What do you think about that?

15        **MS. HOFFMAN:**  So here's what they're seeking, as

16  far as I understand it.  They're seeking identity

17  information, and they're seeking IP logs that would reflect

18  when people have logged into their -- into their accounts.

19        And in the aggregate, over a long period of time,

20  what information shows is people's movements and when they're

21  in the same place at the same time.

22        As Mr. Boutrous mentioned, they were curious

23  whether people were in New York at the certain time or in

24  Ecuador at a certain time, and it -- you know, this is

25  information that might reflect when they are at work, when

1  they are at home, when they are at a certain office, when

2  they share an IP address and so they're likely to be in the

3  same physical location at the same time.

4       And considering that these are people who are all

5  engaged in -- in political activism -- I know Mr. Boutrous

6  calls it a pressure campaign, but I would say it's public

7  criticism against Chevron -- and this is information that

8  they're asking the Court to -- to -- to force Google and

9  Yahoo! to release to people who obviously don't like what

10  they're doing.  I think that raises some very profound

11  associational concerns.

12       And I -- I know that Mr. Boutrous says that the

13  *Perry* case is extremely narrow and somehow it only applies to

14  situations where the -- where somebody is trying to compel

15  the disclosure of internal communications, but the Supreme

16  Court has precedent that is very different than that.

17       *NAACP versus Alabama* said that the disclosure of

18  rank and file members of an organization raises concerns --

19  associational concerns, AND -- and found that that would

20  violate First Amendment right of association.

21       And also, his suggestion that litigation is somehow

22  not protected by First Amendment right to association is --

23  is wrong as well.

24       *NAACP versus Button*, another Supreme Court case,

25  says litigation is -- is -- is -- is protected associational

1    -- is a protected associational interest.

2            And that aside, many of these people were not

3    lawyers.  They had nothing to do with the case.  They are

4    journalists and they're activists and -- and they serve other

5    roles in this whole situation.  And basically, their

6    involvement is just speaking out publicly and saying they

7    don't like what Chevron did.

8            And, you know, I think that to suggest that somehow

9    that's not political speech or it's not something that is,

10   you know, worthy of protecting is -- is, frankly, just

11   disingenuous.

12           And, you know, his suggestion that an organization

13   can't represent the interest of others, I think, also -- you

14   know, *NAACP versus Alabama*, that's exactly what happened.

15   The NAACP stood up for the interest of its members.  So I

16   think that, you know, there's plenty of support under the law

17   for that.

18           And also, I'd like to point out, just turning for a

19   moment to the associational -- or rather, the anonymity

20   argument.  We just heard they know who all these people are.

21   You know, I think you really can't have it both ways.  Either

22   you know who they are or you don't.  And if you know who they

23   are, then this is completely duplicative in terms of the

24   identity information.

25           **THE COURT:**  All right.  I think that I know enough

1   information.  I thank everyone for their presentations.  I am

2   going to take this all under submission.

3            I'm going to be monitoring what Judge Kaplan does,

4   and depending on the timing of that and what more I read

5   about it, I may wait for some interim amount of time.

6            If I determine that I'd like more briefing on the

7   *Taylor versus Sturgell* case, I'll do (inaudible).  I don't

8   think I need more about that.

9            Any other information I need for today?

10           **MR. BOUTROUS:**  Your Honor, just on -- can I -- the

11   third party standing issue, which I -- since counsel brought

12   it up.

13           Those cases involve a situation where the parties

14   subpoenaed had its own interests, so that -- that -- like a

15   newspaper and where an on -- you know, an online

16   commentator's was -- information about that person was being

17   requested.

18           Then the person who had standing themselves, so

19   they're the newspaper, was able to also argue that First

20   Amendment rights were at stake, but none of those cases

21   involved a situation where one person or one lawyer was

22   trying to represent someone they didn't know and -- and that

23   person hadn't been -- wasn't the subpoenaed person.

24           So I just wanted to -- make sure the Court knew

25   that because that was in their -- their reply brief too.

1   Thank you, Your Honor.

2          **THE COURT:**  All right.

3          **MR. BOUTROUS:**  Thank you for hearing us.

4          **THE COURT:**  Thank you all.

5          **MS. HOFFMAN:**  Thank you.

6               (Proceedings adjourned at 2:38 p.m.)

1

**CERTIFICATE OF TRANSCRIBER**

      I certify that the foregoing is a true and correct transcript, to the best of my ability, of the above pages of the official electronic sound recording provided to me by the U. S. District Court, Northern District of California, of the proceedings taken on the date and time previously stated in the above matter.

      I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this hearing was taken; and, further, that I am not financially nor otherwise interested in the outcome of the action.

_____   1/30/2013

Signature of Transcriber      Date